**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| **ANN LEDFORD, individually and as next** | ) | |
| **friend and mother of  Johnathan Binkley,** | ) | |
| **Deceased,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | : | **Case No. 3:20-CV-325** |
| | ) | |
| **KNOX COUNTY, TENNESSEE,** | ) | **JURY DEMANDED** |
| **JAMES BRADSHAW,** | ) | **CORKER / GUYTON** |
| **COREY CAMPBELL,** | ) | |
| **PAUL BURNETT,** | ) | |
| **CLAY HARRELL,** | ) | |
| **ZACH DOSS,** | ) | |
| **CHADWICK SHANE MAY,** | ) | |
| **GAVIN BALES,** | ) | |
| **CHRISTIAN GOMEZ,** | ) | |
| **NATHAN STACHEY,** | ) | |
| **DENNIS SOSVILLE,** | ) | |
| **DUSTIN FARMER,** | ) | |
| **DENIFE JONES,** | ) | |
| **BRADLEY FINLEY,** | ) | |
| **JOSHUA BOWERS,** | ) | |
| **DAVID AMBURN,** | ) | |
| **JOHN DOES I-X,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Ann Ledford, individually and as next friend and mother of Johnathan Binkley, deceased, through counsel, and for cause of action against these Defendants, respectfully states as follows.

## GENERAL NATURE OF THE CASE

1.     This is a civil rights, personal injury, and wrongful death action arising out of the numerous wrongful and unconstitutional acts and omissions of the Defendants during the arrest of Johnathan Binkley on July 27, 2019.

2.      The wrongful and unconstitutional acts and omissions to which Mr. Binkley was subjected include, but are not limited to the following, all of which occurred at times when Mr. Binkley was not resisting or threatening anyone:  being repeatedly struck in his face, head and torso; being subjected to knee strikes into his back and side while lying face down on the ground and handcuffed behind his back; being held down in the prone position while handcuffed behind his back with force and weight applied to his back in a manner which restricted his breathing; having his face forcibly pressed against a gravel roadway for an extended time while being held down and while handcuffed behind his back; being "hog-tied" for an extended period of time, where Mr. Binkley's (handcuffed) hands and feet were chained together while Mr. Binkley was lying on his stomach in the prone position, which also severely impaired his ability to breathe; being subjected to a knee strike into his left posterior rib cage while he was hog-tied, further impairing his ability to breathe; and having weight and force applied to his back while he was hog-tied, which also severely impaired his ability to breathe.

3.      The wrongful and unconstitutional conduct described herein was the proximate and legal cause of serious injuries to Mr. Binkley and was a proximate and legal cause of Mr. Binkley's death at the scene of his arrest.

4.      Plaintiff's claims under 42 U.S.C. § 1983 and state law arise, among other things, out of the use of excessive force against Mr. Binkley in the manner generally described herein, which deprived him of his clearly established rights guaranteed to him under the Constitution and the laws of the United States and the State of Tennessee.  Defendants violated the rights of Mr. Binkley under the Fourth and Fourteenth Amendments of the United States Constitution when, as detailed herein, they engaged in the wrongful conduct described herein knowingly and with

2

objective unreasonableness and deliberate indifference to his constitutional rights.

5.      In the manner generally described herein, Defendants also failed to provide proper monitoring and treatment of Mr. Binkley when he was suffering from obvious injuries and distress, including distress caused by the injuries inflicted upon Mr. Binkley as referenced herein, as well as the effects of potential drug abuse, potentially excited delirium, and other medical and/or physical conditions.

6.      The individual Defendants were, at all material times, acting under color of state law and proximately caused the deprivation of Mr. Binkley's federally protected and state law rights.

## PARTIES AND MATERIAL PERSONS INVOLVED IN THE SUBJECT EVENTS

7.      Plaintiff Ann Ledford is an adult citizen of the United States of America and a resident of the State of Tennessee and is the mother and next friend of Johnathan Binkley, deceased.   Plaintiff Ann Ledford sues the Defendants for all damages recoverable under state and federal law on behalf of herself and on behalf of her deceased son, Johnathan Binkley, arising from his personal injuries and wrongful death.

8.      Plaintiff Ann Ledford brings this action in accordance with Tenn. Code Ann. §§ 20-5-106, 20-5-107, 20-5-113, and other relevant and applicable statutes and common law, as next friend and mother of Johnathan Binkley, deceased.

9.      Defendant, Knox County, Tennessee, is a governmental entity created under the laws of the State of Tennessee.   Among its other functions, Defendant Knox County operates and maintains a law enforcement agency, Defendant Knox County Sheriff's Office ("KCSO"). Defendant Knox County is responsible for ensuring the establishment and enforcement of rules,

regulations, policies, procedures, and customs for the Knox County Sheriff's Office, including those pertaining to the training, supervision, and discipline of law enforcement deputies, which are lawful. Knox County does not have immunity for violating the civil rights of citizens or for violations pursuant to T.C.A. § 8-8-302. Knox County is liable for its own conduct and/or for the unconstitutional conduct attributable to Knox County as described herein in accordance with controlling law. Defendant Knox County was, at all relevant times, under a duty to run its policing activities in a lawful manner so as to preserve the peace of Knox County and to preserve for its citizens the rights and privileges guaranteed and secured to them by the Constitution and laws of the United States.

10. At material times, the final official policymaker for Knox County within the KCSO was the elected Sheriff of Knox County. On July 27, 2019, and at material times before then, the Knox County Sheriff was Tom Spangler. At relevant times, the Knox County Sheriff was acting under color of law.

11. At material times, the customs, practices and *de facto* policies for the Knox County Sheriff's Office and Knox County were established by the Knox County Sheriff, in part through those given the delegated authority and/or the responsibility by the Sheriff to train KCSO deputies through instruction and through on the job training; for on the job training provided to KCSO deputy trainees, these individuals included KCSO senior officers and deputy mentors assigned to the deputy trainees' shifts.

12. The Sheriff and said KCSO senior officers were, at all relevant times, under a constitutional duty to establish lawful customs, practices and *de facto* policies for the KCSO; to train KCSO deputies regarding lawful enforcement practices and requirements; and to preserve

4

the rights and privileges guaranteed citizens by the Constitutions and laws of the United States and the State of Tennessee.

13.     Defendants James Bradshaw, Corey Campbell, Paul Burnett, Clay Harrell, Zach Doss, Chadwick Shane May, Gavin Bales, Christian Gomez, Nathan Stachey, Dennis Sosville, Dustin Farmer, Denife Jones, Bradley Finley, Joshua Bowers, and Captain David Amburn (collectively "KCSO Individual Defendants") are members of the KCSO, and based on information and belief, adult resident citizens of Knox County, Tennessee.   At all relevant times, the KCSO Individual Defendants were acting by virtue of their positions as law enforcement officials of the KCSO and under the color of law.   These Defendants either directly used excessive force against Mr. Binkley and/or were present for and witnessed such uses of excessive force and wrongfully failed to intervene to prevent it at relevant times.   The KCSO Defendants are sued individually for the causes of action asserted herein.

14.     Defendants John Does I-X (collectively "John Doe Defendants") were at all relevant times agents, employees, deputies, contractors, and/or supervisors of Knox County and/or the KCSO who were acting in the course and scope of their agency or employment with Knox County and/or the KCSO, either in their official capacity, their individual capacity, or both, and under color of law.   At the present time, the names, identities and extent of involvement of these persons has not yet been made known in a manner sufficient to assert a cause of action against such individuals after reasonable inquiry and notice.   The Plaintiff's decedent, Mr. Binkley, suffered injuries that lead to his death and, therefore, he cannot assist the Plaintiff in identifying the names and identities of the persons who caused injuries to him.   Plaintiff, by and through counsel, is still in the process of identifying other relevant documents and information that may

5

disclose the involvement and/or identify the other individuals who contributed to Mr. Binkley's injuries and death. None of the material records concerning the subject incident and Mr. Binkley's death were available until after the Knox County Office of the District Attorney General closed its investigation in early July of 2020. Plaintiff has reviewed the records made available in the limited time since then, and to the extent these or any other records, reports or information concerning the subject incident are incomplete, inaccurate, and/or for any reason reflect a mistake concerning the identity of any proper party and/or to the extent other material information is discovered or made known to Plaintiff which would allow Plaintiff to add such individuals as party defendants in this case, Plaintiff reserves the right to do so to the extent permitted under applicable law, including but not limited to Fed. R. Civ. P. 15.

15. Plaintiff has been diligent in attempting to identify all responsible parties in this action and the bases for appropriate causes of action against said parties and that the failure to name other potentially responsible parties is through no fault of the Plaintiff; accordingly, she reserves the right to add other defendants at a later time.

## JURISDICTION AND VENUE

16. This cause of action arises out of events which occurred involving Johnathan Binkley and members of the KCSO on July 27, 2019, in Knoxville, Knox County, Tennessee.

17. Venue is proper with this Court pursuant to 28 U.S.C. § 1391, because all the acts or omissions that give rise to this cause of action occurred within this district, and based on information and belief, all the Defendants are residents of and/or conduct business in this district.

18. Jurisdiction is proper in this Court pursuant to federal question jurisdiction, 28 U.S.C. §§ 1331 and 1343, based on the claims brought under 42 U.S.C. § 1983, 42 U.S.C. § 1988,

6

and the Fourth and Fourteenth Amendments to the Constitution of the United States of America. Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. § 1367.

19.     Each and every act of the KCSO Individual Defendants was performed under the color of state law and by virtue of the constitutions, statutes, ordinances, regulations, customs and usages of the United States of America, the State of Tennessee, the County of Knox, and under the authority of their positions as law enforcement deputies for such state and county.

20.     All the wrongs complained of herein occurred within this jurisdiction and within the applicable statute of limitations governing this action.

## ADDITIONAL FACTUAL BACKGROUND

21.     In the later part of the evening of July 27, 2019, among those acting under color of state law for the KCSO were two shifts of KCSO officers and deputies scheduled to work from 9:00 p.m. until 6:30 a.m. the following morning ("Adam Shift" and "David Shift"), which included several deputies in training ("trainees"), several experienced deputies, and several KCSO officers. The highest ranking KCSO officer assigned to each shift was a KCSO Captain; the second highest ranking KCSO officer assigned to each shift was a KCSO Lieutenant.

22.     The deputy trainees were assigned to experienced deputies on the shift that evening who served as the trainees' mentors.  The mentors, along with other experienced deputies and officers of the KCSO, provided training and supervision to the trainees and served as role models for them.

23.     KCSO Adam Shift on the evening of July 27, 2019, included Deputy in training Zack Doss, whose mentor during the shift was Deputy Clay Harrell; and Deputy in training Paul

7

Burnett, whose mentor was Deputy Corey Campbell. Deputy Campbell was one of the most senior Deputies on the shift.

24. KCSO David Shift that evening included Deputy in training Dennis Sosville, whose mentor during the shift was Deputy Nathan Stachey; Deputy in training Gavin Bales, whose mentor was Deputy Shane May, one of the most senior Deputies on the shift; and Deputy in training Denife Jones, who was assigned another experienced deputy on the shift.

25. Captain David Amburn was the highest ranking KCSO senior officer on the scene at the time of the subject events on the evening of July 27, 2019. On information and belief, Captain Amburn has worked for KCSO for nearly 30 years and was, at relevant times, a high-ranking KCSO senior officer whose duties and responsibilities included overseeing the narcotics department and/or detectives of KCSO, as well as providing on the job training and supervision of less senior officers, deputies and deputies in training in the field. At material times and at the time of the subject events, Captain Amburn was acting under color of state law and in his role as a senior officer for KCSO and Knox County.

26. The highest ranking KCSO senior officer on the scene at the time of the subject events for the Adam Shift on July 27, 2019, was Lieutenant Jason Lubienski. On information and belief, Lieutenant Lubienski has worked for KCSO for approximately 20 years and was at all relevant times a KCSO senior officer, whose duties and responsibilities included providing on the job training and supervision of less senior officers, deputies and deputies in training in the field. At material times and at the time of the subject events, Lieutenant Lubienski was acting under color of state law and in his role as a senior officer for KCSO and Knox County.

8

27.     The trainees' mentors, along with other deputies and some senior officers of the KCSO, were training and mentoring the deputies in training referenced above, including during the interactions between the KCSO officers and Johnathan Binkley during said shifts the evening of July 27, 2019.

28.     Said training included, but is not limited to: the acts and omissions being modeled by the trainees' mentors, by numerous KCSO deputies, and the KCSO senior officers at the scene of the subject events involving Johnathan Binkley and his female companion, M. Jordan, near 5303 Brownlow Road in Knox County, as generally described herein; the direction and instruction being given to the trainees by the other KCSO officials at the scene during the events generally described herein; and the conduct being encouraged and condoned at the scene during the events generally described herein.

29.     The training being provided to the trainees as aforesaid, itself illustrates, in real time, the on-the-job training provided for deputies of the KCSO and Knox County as of July 27, 2019.

30.     The number of deputies at the scene, the training being performed, the presence of KCSO senior officers, the pattern of said individuals' conduct exhibited, the duration of said individuals' conduct, and related factors served to reinforce for the trainees—as well as for anyone subsequently and objectively observing the body cam video footage of the subject events—that the acts and omissions of the KCSO officials at the scene were, in fact, in accordance with (and reflective of) the customs, practices and *de facto* policies of the KCSO.

31.     At material times prior to and including July 27, 2019, Knox County, through the

9

person(s) at the KCSO responsible in their official capacities for training KCSO deputies (including but not limited to those responsible for training the deputies who are the KCSO Individual Defendants herein), was deliberately indifferent to providing material training to deputies regarding: (i) the risks and hazards of positional asphyxia; (ii) how to avoid positional asphyxia with respect to persons being arrested and taken into custody; (iii) the constitutional prohibition against putting pressure or weight on persons in custody who are restrained in the prone position, including such persons who are not resisting and/or who are injured and/or who are in need of medical attention; (iv) the constitutional prohibition against assaulting non-resisting persons who are being arrested and non-resisting persons who have been taken into custody; and (v) a deputy or officer's duty to intervene to protect any person who is being arrested or who has been taken into custody who is being assaulted and/or subjected to unlawful restraint, including when such assault(s) and/or unlawful restraint is being committed by another deputy or officer.

## THE INTERACTIONS BETWEEN KCSO AND JOHNATHAN BINKLEY ON JULY 27, 2019

32.     On July 27, 2019, Johnathan Binkley was a 35-year-old, single male.

33.     At approximately 9:40 p.m. the evening of July 27, 2019, Johnathan Binkley and a female companion, M. Jordan ("Ms. Jordan") were parked in a pickup truck in Sterchi Hills Park in Knox County, Tennessee.   They had been parked there for several hours and it had turned dark.

34.     Deputy James Bradshaw, a member of Adam Shift that evening, was on patrol in the area and noticed the couple parked there.   On account of a county ordinance that provides that county parks close at dark and that being in a county park after dark violates the ordinance, Deputy Bradshaw reportedly approached the pickup truck in which Mr. Binkley and Ms. Jordan were sitting and announced "Sheriff's Office."

10

35.     Mr. Binkley then drove himself and Ms. Jordan out of the park in the pickup truck.

36.     Deputy Bradshaw pursued Mr. Binkley's vehicle in his cruiser and activated his lights to pull Mr. Binkley over, but Mr. Binkley didn't stop.

37.     Soon thereafter, numerous other officers, deputies, and trainees of the KCSO joined the pursuit.

38.     Much of the time during the pursuit, Mr. Binkley was driving less than 40 mph, and it was observed by some of the deputies that the pickup truck appeared to be having engine trouble several times. And although Mr. Binkley briefly reached 80 mph on Maynardville Highway where there was "no visible traffic" ahead according to one of the pursuing deputies, the average speed during the entire pursuit was only "35 mph" as recorded on page one of the Knox County Sheriff's Office Post Pursuit Report Form. It was also noted on the report that traffic conditions were "light."

39.     The pursuit ended at approximately 10:05 p.m. near 5303 Brownlow Road, Knoxville, Tennessee 37938, in Knox County, Tennessee, when Mr. Binkley turned and drove down a dead-end road and into a vacant portion of a lot where his vehicle then stopped because some trees and a pile of brush ahead, as well as perhaps a shallow tree stump, prevented him from going further.

40.     Mr. Binkley maintained control of the pickup truck he was driving throughout the pursuit and through the time the truck stopped near 5303 Brownlow Road; he did not hit or injure anyone.

41.     Mr. Binkley was not injured either during the pursuit or when the pickup truck stopped near 5303 Brownlow Road just before numerous KCSO officers, deputies, and deputies

11

in training reached that same location.

42.     Ms. Jordan also was not injured either during the pursuit or when the pickup truck stopped near 5303 Brownlow Road. Indeed, Ms. Jordan was photographed not long after the pursuit ended and had no signs of any physical injury.   She had no bruises or cuts of any kind. No medical treatment was requested by her and no medical treatment was provided to her at the scene of the subject events.

43.     The pickup truck Mr. Binkley was driving did not sustain any material damage during the pursuit or when it stopped near 5303 Brownlow Road just before numerous KCSO officers, deputies, and deputies in training arrived.   The truck had no evidence of a frontal impact, an impact to either side, or a rear impact when it stopped.   The truck's airbags did not deploy. There was no damage of any kind to the truck's windshield.   And no damage of any kind was noted to the truck on the Vehicle Pull-In / Inventory Form filled out by one of the KCSO deputies – the truck was noted to be in "fair" condition as opposed to a "poor (damaged)" condition in terms of the pickup truck's glass, trunk, hood, front fender, and rear fender.

44.     The pickup truck Mr. Binkley was driving had a manual transmission.

45.     Once the pickup truck stopped near 5303 Brownlow Road, Mr. Binkley made no effort to move the pickup truck further.

46.     According to KCSO documentation, within approximately a minute from the time the pickup truck stopped near 5303 Brownlow Road, numerous KCSO officers, deputies, and deputies in training arrived at that same location, including Deputies James Bradshaw, Corey Campbell, Paul Burnett (trainee), Clay Harrell, Zach Doss (trainee), Nathan Stachey, Dennis Sosville (trainee), Christian Gomez, Chadwick Shane May, Gavin Bales (trainee), Dustin Famer,

12

Denife Jones (trainee), Joshua Bowers, Sergeant Roger Morgan, Russell Bruce, Bradley Finley, and Captain David Amburn. According to that same KCSO documentation, approximately twelve minutes later, Lieutenant Jason Lubienski and Sergeant Jason Overton arrived at the scene.

47.    After Mr. Binkley's vehicle stopped, multiple KCSO deputies, including Deputies Bradshaw, Campbell, and Harrell (and their officers in training), immediately began approaching the truck with their guns drawn.

48.    As they approached the truck, deputies Campbell, Burnett, and Doss ordered Mr. Binkley to show his hands.

### Constitutional Violations Committed Against Johnathan Binkley During His Initial Arrest

***After the Pickup Truck Came to a Stop and Deputies Approached It, Mr. Binkley Immediately Complied with the Deputies Orders to Put His Hands Out the Window***

49.    Although some deputies falsely claimed (and wrote in their post-pursuit reports) that Mr. Binkley refused to cooperate, was resisting the deputies' orders, and was purportedly "actively attempting to free the vehicle" (and allegedly putting the officers at risk), Mr. Binkley immediately complied with the deputies' orders and stretched his empty hands out of the driver's side window (as Deputy Bradshaw's bodycam video reflects), making no attempt to drive further.[1]

50.    As Deputy Bradshaw and others approached the driver's side of the pickup truck, they ordered Mr. Binkley to "[k]eep [his] hands out the window."

51.    Around this same time, other deputies were approaching the passenger side of the truck, including Deputy Harrell and Deputy Campbell. Deputy Harrell pulled Ms. Jordan out of the passenger side of the pickup truck, passed her off to another officer, and then entered the truck

---

[1] The bodycam videos similarly do not indicate that Mr. Binkley was revving the engine or doing anything to "actively attempt[] to free the vehicle."

13

through the passenger side door. While other deputies were still ordering Mr. Binkley to keep his hands out the truck's window, Deputies Harrell and Campbell were ordering Mr. Binkley to "[g]et the f*ck out of the car" and to "[t]urn the f*ing truck off."

52. Because the driver's side door of the truck was adjacent to a small tree, however, it was not possible for the driver's door to be opened for Mr. Binkley to get out. True copies of photographs taken at the scene, including ones showing the truck and the driver's door being blocked by a small tree, are attached as **Collective Exhibit A**, one of which is below:



53. Deputy Bradshaw continued to order Mr. Binkley to "keep [his] hands out the window" and Mr. Binkley, while attempting to comply with the deputies' orders, repeatedly said "I'm sorry."

54. When some of the deputies on the driver's side then noticed that the driver's side door wouldn't open, Deputy Bradshaw loudly called to Deputy Harrell, who was in the passenger's

14

side of the pickup truck, to alert Deputy Harrell that the driver's door wouldn't open: "[H]ey this door won't open. Clay, this door won't open."

### Deputy Harrell Repeatedly Struck Mr. Binkley While He was Attempting to Comply with the Deputies' Orders

55. Despite Deputy Bradshaw shouting that the door would not open, Deputy Harrell continued to shout at Mr. Binkley to "[t]urn the f*ing truck off," and although Mr. Binkley was attempting to comply with the deputies' commands, Deputy Harrell struck Mr. Binkley multiple times in the right side of his body and face and yelled for him to "turn the f*ing truck off" and to "get the f*ck out."

56. While Deputy Harrell was yelling at him and striking him, Mr. Binkley was not resisting any of the deputies, was not threatening any of the deputies, and was exclaiming to the deputies "I'm trying" and "I'm hurt."

57. In response, Deputy Harrell continued to yell at Mr. Binkley: "Get the f*ck out." Shortly after, while Mr. Binkley was not resisting, Defendant Harrell again repeatedly used a closed fist to strike Mr. Binkley in the face and body. Defendants Bradshaw, Campbell, and Burnett witnessed these uses of excessive force by Defendant Harrell.

58. Although Deputy Harrell's Use of Force report admits that he "delivered multiple strikes to the body and side of [Mr. Binkley's] face," it falsely states that this was in response to Mr. Binkley becoming "aggressive" and "refusing to get out of the vehicle." In fact, Mr. Binkley was attempting to comply with the deputies' instructions as evidenced by his statements that he was "trying" and that he was hurt and, as the deputies had recognized, the driver's door to the pickup truck would not open because of a small tree adjacent to the door. Mr. Binkley did not act

15

aggressively or use force against Deputy Harrell (or any of the other deputies) at any time.[2]

59.    Following the assaults by Deputy Harrell, multiple blood stains from Mr. Binkley could be seen within the truck, including on the steering wheel, seat, and part of the driver's side interior door frame.   This blood was the result of Deputy Harrell repeatedly striking Mr. Binkley and shoving Mr. Binkley while in the vehicle, causing Mr. Binkley's head to slam into the interior of the truck, including the steering wheel.

### KCSO Deputies Forced Mr. Binkley Through the Truck's Small and Partially Blocked Window

60.    While the KCSO deputies continued to order Mr. Binkley to get out of the vehicle and although Mr. Binkley was doing his best to comply – even after being hit several times and sustaining injuries from those strikes, the driver's door wouldn't open, as the deputies present had recognized.   Further, Deputy Harrell remained in the passenger's seat while striking Mr. Binkley numerous times, preventing Mr. Binkley from getting out of the vehicle on the passenger's side.

61.    Although by this time Ms. Jordan had been removed without incident from the passenger side of the pickup truck, although it was objectively clear that Mr. Binkley was making every effort to comply with the deputies commands, and while there were several deputies surrounding the cab of the pickup truck, some with their guns drawn and trained on Mr. Binkley (including by that time deputies on the driver's side of the pickup truck, the passenger side of the pickup truck, and in the bed of the pickup truck), the deputies chose to forcibly remove Mr. Binkley through the driver's side window (which itself, like the entire driver's door, was blocked with a small tree).

_____

[2] As noted in at least one of the reports from this incident (and the officers' conduct throughout the bodycam videos), none of the officers were injured by Mr. Binkley.

16

62.     Accordingly, as several of the KCSO deputies continued to yell at Mr. Binkley to get out of the vehicle, multiple KCSO deputies, including Defendants Bradshaw, Campbell, Harrell, and Burnett, began to force Mr. Binkley's body through the driver's side window, against and past the adjacent tree that was partially blocking the window. Because Mr. Binkley was a large individual, however, it was difficult for him to fit through the driver's side window.[3] While the deputies outside the driver's side door attempted to pull Mr. Binkley out of the driver's side window, wedging his body into the sides of the truck window and frame and between the frame and the tree, Deputy Harrell within the pickup truck began pushing and forcing Mr. Binkley out of the window, which resulted in injury to Mr. Binkley's back, including the skin on his back being visibly torn. Again, Mr. Binkley continued to say to the officers "I'm sorry" and groan in pain as he was wrenched through the window between the window frame and the tree.

63.     During this process of forcing Mr. Binkley out through the window as generally described above, Mr. Binkley's leg became lodged within the truck. At some point, one of the other deputies noticed that Mr. Binkley's leg was stuck and began instructing the other deputies to "[b]ack up on him" and "[g]et this leg out." Eventually Mr. Binkley's leg was dislodged, and the deputies allowed Mr. Binkley's body to drop out of the window and onto the ground below. Mr. Binkley can be heard on the body cam video footage to continue to groan in pain from the injuries he had sustained from the strikes to the head and torso by Deputy Harrell and from being forced through the small opening between the driver's side window frame and the tree.[4]

---

[3] Mr. Binkley was approximately 5 ft. 11 inches tall and weighed approximately 280 lbs.
[4] Mr. Binkley's Autopsy Report indicated that Mr. Binkley had numerous broken ribs; that his face, neck, and chest were "red-purple;" that he had multiple lacerations to his face; and that he had bruising on his face, head, torso, and other parts of his body.

17

***Though Not Resisting In Any Manner and Obviously Injured, Mr. Binkley Was
Again Struck in the Head and Deputies' Body Weight Was Applied to His Back While
He Was In The Prone Position On The Ground Just Outside the Pickup Truck***

64.     Immediately after being forced through and dropped out of the driver's side window, multiple deputies (including Bradshaw and Campbell) rolled Mr. Binkley onto his stomach and began to press their body weight down on Mr. Binkley, holding him down in the prone position with his t-shirt pulled over his head even though he was not resisting and posed no threat.   Deputies Burnett, Bales, Harrell, and Doss stood nearby as Mr. Binkley was pressed and held down in the prone position.

65.     Around this time, multiple deputies began to yell for Mr. Binkley to give them his hands, and although he was able to shift slightly and give the deputies one of his hands, he struggled to move his other hand from beneath him and up behind his back.   Mr. Binkley was not resisting or posing a threat to the deputies.   Nevertheless, Defendant Burnett (a deputy trainee) struck Mr. Binkley in the side of the head / face while at least one other deputy continued to press his body weight down onto Mr. Binkley.   Moments later, the deputies handcuffed Mr. Binkley.

66.     At this time, Mr. Binkley was physically handcuffed / restrained, barely moving, and neither actively resisting the officers nor posing a threat to them.

67.     Attached as **Exhibit B** are true copies of excerpts from the body camera videos of Deputies Bradshaw, Harrell, and Burnett taken at the scene during the events generally referenced above from the time when deputies first approached the pickup truck through the time Mr. Binkley was pulled by deputies through the driver's side window of the pickup truck.   Captions have been added to these excerpts that accurately reference the events shown, identify the deputy's body camera video from which each excerpt was taken, quote or summarize statements made during the events shown, and identify the person making each of the referenced statements.

18

## Additional Constitutional Violations Committed Against Johnathan Binkley After He Was Handcuffed Behind His Back and Obviously Injured While Beside the Pickup Truck

68.     While Mr. Binkley was on the ground and handcuffed behind his back in the prone position beside the pickup truck and while Mr. Binkley was not resisting and was obviously injured, one or more KCSO deputies continued to use their hands and knees to press their body weight down on Mr. Binkley's back.   Mr. Binkley's t-shirt had been pulled over his head and his shorts pulled down as he was wedged through and out of the driver's side window and his t-shirt was still covering his head.   Although Mr. Binkley was barely able to move, the deputies continued to press their weight into his back for an extended period of time.

69.     Also around this time, Captain Amburn and multiple other deputies (including Deputies Gomez, May, and Sosville) had come closer to where Mr. Binkley was and were watching the other deputies pressing their body weight down into Mr. Binkley's back although Mr. Binkley was handcuffed behind his back, lying in the prone position, barely moving, and not resisting.

70.     Within moments of Mr. Binkley's hands being handcuffed behind his back, Deputy Campbell radioed, "Adam 10, two in custody, start us a wagon."

71.     Not long after Mr. Binkley was removed from the truck, while supervising the events generally and, in particular, the deputies restraining Mr. Binkley (Campbell and Bradshaw), Captain Amburn directed that two other deputies (who were trainees) "replace" the more senior deputies and continue applying weight to Mr. Binkley's back while he was handcuffed behind his back and on the ground in the prone position.   Those deputies in training, Burnett and Bales, complied with Captain Amburn's instruction.

72.     After these two deputies took over, again pressing their body weight down into

19

Mr. Binkley's back while he was handcuffed behind his back and in the prone position, they began to shout "Stupid mother\*\*cker. You got any weapons on you?" and "Any knives? Anything, any weapons?"   Because it was plain that Mr. Binkley was obviously injured, was handcuffed behind his back in the prone position, and not threatening anyone, it was objectively unreasonable for weight to be applied to Mr. Binkley's back.   It was objectively clear that Mr. Binkley was not a threat to anyone, was not resisting, was injured, and was in need of medical attention.

73.     While the deputies questioned Mr. Binkley, Captain Amburn then began to shine his flashlight onto Mr. Binkley's face and body, making the extent of Mr. Binkley's injuries, including the severe laceration(s) on his head and face, even more evident.   Mr. Binkley appeared dazed, had a pool of blood forming on the ground immediately below his head, was barely moving, and was obviously incapacitated and in pain.

74.     When Mr. Binkley continued to not respond to the officers, Captain Amburn began to intervene stating "Hey, we're talking to you" and continued to have the trainees apply their body weight to Mr. Binkley's back while Mr. Binkley remained handcuffed in the prone position.

### A Senior Deputy Calls an Ambulance for Mr. Binkley's Uncontrolled Bleeding

75.     Not long after Mr. Binkley was removed from the truck, another deputy – Deputy May—who was the most senior deputy on David Shift, radioed to dispatch to "start a 47 for laceration" to get an ambulance to the scene to provide medical treatment for Mr. Binkley. Dispatch confirmed receipt and then asked whether the bleeding was controlled and one of the deputies responded "no." During this time period, the deputies in training continued to press their body weight on Mr. Binkley's back while he was handcuffed behind his back in the prone position while other deputies and senior officers were present.

20

76.     Subsequently, the deputies were instructed by a more senior member of the KCSO (Deputy Bowers) for Mr. Binkley to be taken a short distance to the nearby gravel roadway so that the ambulance and/or the medical personnel who had been called to the scene to treat Mr. Binkley would have somewhat easier access to him.

77.     While Mr. Binkley was handcuffed behind his back and lying face down on the ground, the KCSO deputies ordered Mr. Binkley to roll over to his right side and bring his knees to chest to get up, but Mr. Binkley was not able to do so and did not respond or move.

78.     Because of his injuries and because he was in physical distress and having difficulty breathing as the result of a significant amount of body weight from the deputies had been applied to his back for an extended period of time while Mr. Binkley was handcuffed behind his back in the prone position, Mr. Binkley was unable to stand on his own and was barely able to move.

79.     Around this time, another deputy, Deputy Gomez, came over and began to also hold Mr. Binkley down to the ground and then attempted to help the other deputies force Mr. Binkley up into a standing position.   Just moments later, evidently frustrated that Mr. Binkley was unable to support himself, the deputies dropped Mr. Binkley's body to the ground again claiming that he refused to walk and was resisting.

### Deputies Repeatedly Knee Mr. Binkley in His Back and Side

80.     Despite Mr. Binkley's injuries and objectively deteriorating condition and despite an ambulance already having been called so that medical personnel could treat him, the KCSO deputies then again tried to force Mr. Binkley to walk.   While one deputy yelled to Mr. Binkley: "you better use your f*ing legs, you lazy f*ck," another deputy pulled Mr. Binkley's shorts up from around his knees while Mr. Binkley continued to moan in obvious distress.

81.     Shortly after, the deputies ultimately dragged Mr. Binkley's limp body a few feet

21

before dropping him to the ground again. During this time, Mr. Binkley was only able to mumble and groan. Multiple KCSO deputies then pulled Mr. Binkley up to his knees and forcibly pulled his head back, which can be seen in the screenshot below from Deputy Burnett's body camera:



82.     Around this same time, Captain Amburn approached the passenger side of the truck and used a flashlight to inspect the interior, noting that there was evidence of drug paraphernalia. Not long after, he instructed the other officers on the scene that there had been signs of "drug stuff" inside the truck.

### *Deputies Drive Their Knees and Body Weight Into Mr. Binkley's Back*

83.     Moments later, while Mr. Binkley was still handcuffed behind his back, not resisting, and lying on the ground in the prone position with multiple officers holding him down, Deputy Gomez and other deputies (Bales and Burnett) again put their body weight on Mr. Binkley's back.

22

84.    Worse, these deputies (Gomez, Bales, and/or Burnett) then repeatedly drove their knees with their entire body weight into Mr. Binkley's back and torso with such force that Mr. Binkley's body could be seen recoiling from the ground repeatedly.

85.    These events occurred after an ambulance had been called for Mr. Binkley and well after it was objectively clear that Mr. Binkley was in obvious distress, was injured, was in custody, and was a threat to no one.

86.    The knee strikes being applied to Mr. Binkley's back by deputies, including by trainees Bales and Burnett, as well as the weight being applied to Mr. Binkley's back by these and other deputies while Mr. Binkley was handcuffed in the prone position, were encouraged and/or condoned by the more senior deputies and by the KCSO senior officers present, including but not limited to Captain David Amburn, Deputy May, Deputy Bowers and others.   None of the other individuals made any suggestion whatsoever that the trainees should do anything other than what they were doing and none intervened to stop any of the referenced conduct.

### *Mr. Binkley's Handcuffed Hands and Arms Are Wrenched Up and Away From His Back Towards His Head*

87.    Thereafter, while Mr. Binkley was lying on the ground in the prone position handcuffed behind his back, not resisting in any manner, injured and barely able to move, body cam footage shows one or more of the KCSO deputies, including Deputies Burnett and Bales, attempting to pull Mr. Binkley up by pulling his handcuffed hands and arms away from his back and up towards his head, wrenching his arms in an unnatural and painful position nearly perpendicular to his back.   Mr. Binkley can be heard to cry out in agony.

88.    Moments later, one or more of the deputies holding Mr. Binkley began to strike his back again with their knees.

23

89.     Instead of making any suggestion whatsoever that the trainees should do anything other than what they were doing and intervening to stop any of said conduct, Deputy May just reiterated his instructions for the deputies to carry Mr. Binkley to the road.  Around this same time, Captain Amburn instructed the deputies to use their sanitizer and to put gloves on before touching Mr. Binkley, ignoring completely the conduct that was compounding Mr. Binkley's injuries, distress, and difficulty breathing and his deteriorating condition.

90.     Further, none of those present at the scene, including Captain Amburn, made any adjustment, assessment or inquiry regarding Mr. Binkley's distressed condition on account of the drug paraphernalia discovered earlier by Captain Amburn, who was an experienced narcotics officer; such evidence objectively would have alerted any reasonable deputy or officer that Mr. Binkley had likely been using drugs and/or was a drug addict.

91.     To the contrary, despite numerous indicators of Mr. Binkley's objectively obvious distress, including but not limited to Mr. Binkley's condition resulting from the numerous strikes and blows inflicted by the deputies to Mr. Binkley's head, face, torso and back, both with their knees and with their fists, including the strikes / blows to Mr. Binkley after an ambulance had already been called for Mr. Binkley, some deputies mocked Mr. Binkley, including mimicking the sounds he was making; other deputies again pressed their body weight onto Mr. Binkley's back while he remained in the prone position; and another deputy asked "where the f*ing shackles at?"

92.     Around this same time, one of the more senior deputies (Deputy Bowers) instructed the younger deputies about how they could carry Mr. Binkley the short distance to the gravel roadway ladder style: "remember how to do it in SORTs where you make a chain underneath him and pick him up."

24

93.     Not long after, multiple deputies lifted and carried Mr. Binkley to the road while one deputy shouted, "don't you f*ng move you stupid f*er, we'll drop you on your face." Moments later, Deputy May reminded the officers to put Mr. Binkley down on the road "so the ambulance can get to him."   The deputies eventually put Mr. Binkley in the prone position, lying face down on his stomach, with his hands still cuffed behind his back.

94.     By this time, at a minimum, Captain Amburn and every deputy on the scene knew or should have known, objectively:   that Mr. Binkley was severely injured; that either the injuries inflicted on Mr. Binkley by the strikes and blows referenced above, including those fist and knee strikes to his back and torso, and/or deputies' body weight having been applied to his back while handcuffed in a prone position, had caused Mr. Binkley to be in significant distress, to be in a deteriorated condition, and to have a limited ability to breathe; that Mr. Binkley had likely used drugs; that medical personnel / an ambulance were on the way to provide medical treatment for Mr. Binkley; and that Mr. Binkley was not resisting or posing a threat to anyone.

95.     Attached as **Exhibit C** are true copies of excerpts from the body camera videos of Deputies Bradshaw, Burnett, Bales, May, Jones, Gomez, Farmer, and Sosville taken at the scene during the events referenced above from the time after Mr. Binkley was pulled through the driver's side window of the pickup truck until the time when deputies moved Mr. Binkley from the ground beside the pickup truck to a gravel road a short distance away.   Captions have been added to these excerpts that accurately reference the events shown, identify the deputy's body camera video from which each excerpt was taken, quote or summarize statements made during the events shown, and identify the person making each of the referenced statements.

## Additional Constitutional Violations Committed Against Johnathan Binkley After He Was Initially Moved to the Gravel Roadway, but Before He Was Hog-Tied.

### After Moving Mr. Binkley to the Road, Two Deputies Again Pressed Their Body Weight into Mr. Binkley's Back While Another Deputy Mashed Mr. Binkley's Face into the Dirt and Gravel For an Extended Time.

96.     Immediately thereafter, while Mr. Binkley was lying on his stomach with his hands cuffed behind his back, Mr. Binkley was held down by two other deputies in training (Defendants Jones and Sosville), who pressed their body weight down on Mr. Binkley's back while he was in the prone position, handcuffed and in great distress.   They did so with the encouragement and/or approval of the deputies and senior KCSO officers at the scene as part of their on-the-job training.

97.     Those deputies in training used their hands to press down on Mr. Binkley, and then, when Mr. Binkley attempted to raise his head to gasp for air, one of these deputies forced his knee into Mr. Binkley's back, continuing to hold him in the prone position and further inhibiting Mr. Binkley's ability to breathe.

98.     Nearby, Captain Amburn and Deputies Gomez, Bales, Burnett, Bradshaw, Doss, Farmer, Finley, Harrell, May, Bowers and others stood by with approval.   None of them intervened or instructed the deputies to stop engaging in this conduct.   To the contrary, it was evident to all at the scene that the trainees' actions were expected and condoned as part of their training that evening.

99.     Moreover, to emphasize for the trainees with greater clarity the type of conduct in which experienced deputies were expected to engage, moments later – when Mr. Binkley attempted once again to gasp for air and cried out in distress, Deputy Gomez put his hand on the back of Mr. Binkley's head, forced Mr. Binkley's head face-first into the ground, mashed his face into the gravel and dirt, and continued to mash Mr. Binkley's face into the dirt and gravel *for more*

26

*than a minute*.

100.     These actions, like all of the previous actions of the deputies and deputies in training that evening, were taken by Defendant Gomez not as an isolated incident of a rogue officer, but as a systematic pattern of actions and omissions at the scene for the purpose of training deputies – a training exercise in which more than sixteen deputies and senior KCSO officers were participating. Defendant Gomez's actions here, like the other conduct described herein, were in full view of the others at the scene and were permitted and condoned.

101.     This conduct, shown in the photographs below, was additional objectively unreasonable and unlawful conduct at the scene that made it even more difficult for Mr. Binkley to breathe and caused Mr. Binkley further injury and distress while the medical personnel were on their way:



27



102.     These events occurred approximately five minutes after the ambulance had been called for the uncontrolled bleeding and lacerations to Mr. Binkley's face and head on account of the injuries inflicted previously as generally described above.

103.     Captain Amburn and Deputies Burnett, Farmer, Finley, Harrell, May, Stachey, Bowers and the others at the scene stood nearby and were aware of the conduct referenced above by the referenced trainees and by Deputy Gomez.   They either encouraged the conduct, tacitly approved of the conduct, or did not intervene in any manner – either to prevent the trainees from applying weight and pressure on Mr. Binkley's back while Mr. Binkley was handcuffed in the prone position or to prevent Deputy Gomez from mashing and holding Mr. Binkley's face into the dirt and gravel for an extended period of time.

104.     Subsequently, after the trainees had applied pressure and weight to Mr. Binkley's back for approximately 2 minutes and after Mr. Binkley's face had been mashed into the gravel road as referenced above, one of the senior deputies instructed the trainees that they could "pop

28

up" and move away from Mr. Binkley.

105.    Desperate to breathe following the conduct referenced above, Mr. Binkley attempted to shift his body out of the prone position, moaned in agony, and tried to raise his face from the gravel road to be able to breathe.   Recognizing Mr. Binkley's obvious distress, but also wanting to provide cover for the deputies' conduct applying weight to Mr. Binkley's back and mashing his face in the gravel road as aforesaid, one of the deputies then falsely stated: "I know he is trying to slam his head into the ground"; "let him, cause it just makes it look like you're the one doing it and I know it's just him picking his head up and down"; and that "he probably ate a bunch of drugs."   In fact, the video footage objectively shows that Mr. Binkley, while continuing to be in obvious and worsening distress following the above-referenced conduct, is merely struggling to lift his head up to breathe while handcuffed behind his back in the prone position.

106.    Similarly, and also in an effort to provide cover for the conduct of the deputies and officers at the scene, at various times, including around this time, various deputies can be heard to say things like "stop fighting" and "stop resisting," when the video from the scene objectively shows that Mr. Binkley is not fighting or resisting – he's just struggling to breathe, he's seriously injured, and he's in significant distress.

107.    Indeed, the video footage around this time period clearly shows that Mr. Binkley is moaning, gasping for breath, and merely attempting to roll back and forth to try to get out of the prone position and into a position where he could breathe.   Once Mr. Binkley was able to get to his side, another deputy almost immediately pushes Mr. Binkley back into the prone position such that Mr. Binkley is on his stomach and his face is once again against the gravel road, except to the extent he is able to lift his head while struggling to breathe.

29

108.    And yet, while the ambulance remains on its way and medical attention for Mr. Binkley is just minutes away, the numerous deputies and KCSO senior officers at these scene from two different shifts (Adam Shift and David Shift), as well as Captain Amburn, continue to use the setting to train the deputies in training at the scene in accordance with Knox County's and the Knox County Sheriff's Office's customs, practices and *de facto* policies in effect at the time with regard to the treatment of arrestees.   They were conducting the training exercise at Mr. Binkley's expense, with deliberate indifference to Mr. Binkley's obvious distress and objectively worsening condition; with deliberate indifference to Mr. Binkley's obvious need for medical care; with deliberate indifference to the well-established constitutional prohibition in the Sixth Circuit against placing weight and pressure on the back of a person in custody in the prone position because of the risk of positional asphyxia; and with deliberate indifference to the well-established constitutional prohibition in the Sixth Circuit against assaulting a non-resisting citizen in custody.

109.    Attached as **Exhibit D** are true copies of excerpts from the body camera videos of Deputies Farmer, Gomez, and Jones taken at the scene during the events generally referenced above from the time when Mr. Binkley was placed by deputies on part of a gravel road at the scene through the time just before Mr. Binkley's hands and feet were bound together behind his back while he was lying on the gravel road.   Captions have been added to these excerpts that accurately reference the events shown, identify the deputy's body camera video from which each excerpt was taken, quote or summarize statements made during the events shown, and identify the person making each of the referenced statements.

<u>**Additional Constitutional Violations Committed Against**</u>
<u>**Johnathan Binkley at the Scene**</u>

110.    All of the deputies in training, deputies, and KCSO senior officers at the scene

30

could readily see that Mr. Binkley was overweight and all knew or should have known that Mr. Binkley had sustained multiple strikes and blows to the head, face, and torso with likely internal injuries (it was subsequently confirmed during the autopsy that Mr. Binkley had multiple broken ribs, both in his front and back rib cage), that Mr. Binkley was struggling to breathe, and that an ambulance was minutes away.

111.    Recognizing that Mr. Binkley was in distress and having difficulty breathing while in the prone position, one of the deputies then announced to the trainees and others:   "He's got a big belly; roll him on his side so he can breathe."

112.    Mr. Binkley was then rolled on his side and can be seen on the body cam footage struggling for breath.

113.    As before, during this time, Mr. Binkley had not been resisting in any manner and posed no threat to the officers.   His hands remained handcuffed behind his back.   Mr. Binkley was just trying to breathe.

### *Two Deputies Again Hold Mr. Binkley Down in the Prone Position, While Another Hog-ties Mr. Binkley*

114.    Only moments later, however, instead of leaving Mr. Binkley on his side so that he could continue to try to breathe, other deputies grabbed Mr. Binkley, held him down again (Defendants Gomez and trainees Jones, Doss, and Sosville), and screamed at him to "bend [his] legs," so that another Deputy (Defendant Farmer) could put leg shackles on Mr. Binkley.   This was less than 9 minutes after Deputy Campbell called for a "wagon" stating that both suspects were in custody and approximately 8 minutes after an ambulance had been called by a senior deputy at the scene on account of Mr. Binkley's injuries.

115.    Immediately after leg shackles were put on Mr. Binkley, Defendant Farmer then

31

connected and bound these leg shackles to the handcuffs behind Mr. Binkley's back in a "hog-tie" position. This forced Mr. Binkley again into a prone position, hog-tied, where he was lying on his stomach with his arms and legs tightly pulled and bound together behind him, making it all the more difficult for Mr. Binkley to breathe, as reflected in the screenshots below from contemporaneous bodycam videos:



Case 3:20-cv-00325-DCLC-HBG   Document 37   Filed 12/28/20   Page 32 of 117   PageID #: 351



116.     During this time, Captain Amburn stood nearby supervising the deputies and looked on with approval, as did Deputies Harrell, May, Stachey, Bowers, Finley, Burnett and others at the scene.   None of the trainees, deputies, or KCSO senior officers made any effort to intervene.

117.     Immediately after Mr. Binkley was hog-tied, Mr. Binkley started trying to roll back and forth from side to side to get out of the prone position, crying out for help, and struggling to breathe.

118.     However, instead of releasing the restraints, loosening the restraints, turning Mr. Binkley on his side, or assisting Mr. Binkley in any manner, deputy in training Defendant Jones, just a few seconds later, *actually tightened the restraints further*, causing Mr. Binkley's legs to bow out further, which in turn made it even more difficult for Mr. Binkley to be able to move out of the prone position on his stomach and making it all the more difficult for Mr. Binkley to breathe while waiting for the ambulance to arrive.

33

119.    Once again, Captain Amburn and the other deputies at the scene (including Gomez, Sosville, Burnett, Bradshaw, Harrell, May, Campbell, Bowers, Finley, Bales, Doss, Stachey) looked on with approval, generally in a circle around Mr. Binkley.

120.    None took any steps to intervene or to assist Mr. Binkley.

121.    Mr. Binkley was left in this position for an extended period of time.

122.    Many of the senior KCSO officers, deputies, and deputies in training continued standing in a circle around Mr. Binkley during this time period, watching Mr. Binkley struggling to breathe while hog-tied in this manner.

123.    During this same time period, Captain Amburn stood nearby, casually talking and joking with the deputies while Mr. Binkley struggled to breathe:



34



124.    Mr. Binkley was hog-tied in this agonizing position while injured and waiting for

medical treatment for approximately seven minutes.

125.    The presence of several KCSO deputies watching Mr. Binkley in this position is

reflected in the following screenshot from the video footage:



35

126. This conduct, as well as the conduct which preceded it, shocks the conscience – all the more so because the conduct was committed during a training exercise for multiple deputies in training when approximately sixteen deputies and officers from two different shifts were present and a Captain was present who was participating in supervising and directing the training along with other senior KCSO officers and deputies.

127. During this time period, as before, none of the deputies (Gomez, Sosville, Burnett, Bradshaw, Harrell, Jones, May, Campbell, Bowers, Finley, Bales, Doss, Stachey) and none of the officers at the scene, including Captain Amburn, appeared as though anything unusual was happening. To the contrary, the video footage of the scene, as well as the casual comments and jokes occurring at the scene during these events, confirm: that this type of treatment of a citizen in custody such as Johnathan Binkley is how deputies in training were actually trained and how they were intended to be trained as of July 27, 2019; that this type of treatment is consistent with the customs, practices in the field, and *de facto* policies of Knox County and the KCSO; and that, simply put, this type of treatment was business as usual at the Knox County Sheriff's Department in this type of setting.

***While Mr. Binkley was Hog-Tied, A Deputy Slammed his Knee into Mr. Binkley and then, Once Again, Applied Weight to Mr. Binkley's Back While Mr. Binkley Was Hog-Tied and in the Prone Position.***

128. The concerted pattern of unconstitutional conduct at the scene by the KCSO senior officers, deputies and trainees continued – and got even worse.

129. While Mr. Binkley continued to be restrained with his hands and feet bound together in a hog-tie behind his back, and after the restraints had been tightened further, such that Mr. Binkley's legs were splayed apart and he could not turn or roll out of the prone position, another mentor of one of the trainees at the scene – Defendant Campbell (Defendant Burnett's

36

mentor), struck Mr. Binkley forcibly with his knee into Mr. Binkley's left posterior rib cage (with the force of his body weight into the knee strike), exclaiming as he did so: "How about this?":



130.     Deputy Campbell is a larger person and it was foreseeable and is probable that said knee strike caused Mr. Binkley further internal injuries, exacerbating Mr. Binkley's distress and compounding the already enormous difficulty Mr. Binkley was having breathing.

131.     While Deputy Campbell did so, the others at the scene looked on with approval. None of them admonished Deputy Campbell in any manner and no one came to Mr. Binkley's aid.

132.     Thereafter, Deputy Campbell continued to force his body weight onto Mr. Binkley, staying generally on top of Mr. Binkley's back for an extended period of time, further restricting Mr. Binkley's ability to breathe.

133.     To provide a pretextual or perfunctory reason for engaging in this conduct, Deputy Campbell leaned forward and called out for Mr. Binkley to provide his name and date of birth.

134.     Defendant Campbell continued to hold his knee and press his weight on

37

Mr. Binkley's back for over a minute while he occasionally moaned and struggled to breathe.

135.    Then, Deputy Campbell also began pressing his fist into the center of Mr. Binkley's back and shoulder blades forcing Mr. Binkley's face and head even closer to the ground while Mr. Binkley was trapped in the prone position with Deputy Campbell's weight on his back:



136.    During this period, Captain Amburn and many of the other KCSO deputies (including Defendants Bales, Gomez, Doss, Farmer, Harrell, Jones, May, Sosville, and Stachey) continued to stand nearby with approval, watching Mr. Binkley struggle to breathe, without offering any assistance to Mr. Binkley whatsoever.

137.    By this time, Lieutenant Lubienski and Sergeant Overton had arrived on the scene.

138.    Both Lieutenant Lubienski and Sergeant Overton saw Mr. Binkley hog-tied, lying in a prone position with his breathing restricted and with Deputy Campbell's weight applied to Mr. Binkley's back.   At no point did either Lieutenant Lubienski or Sergeant Overton instruct that Mr. Binkley's hog-tie should be released or direct that Deputy Campbell cease pressing his weight onto Mr. Binkley.   Both of them knew that several deputies in training were present at the scene.

38

At no point did either make any comment that indicated that anything was going on that was inconsistent in any manner with KCSO's training, customs, practices in the field, or *de facto* policies. Instead, Lieutenant Lubienski and Sergeant Overton simply walked past Mr. Binkley and talked with the other deputies.

139. After Deputy Campbell got off of Mr. Binkley's back and while Mr. Binkley was still not resisting, was in great distress, and was incapacitated as described previously, another deputy asked again for Mr. Binkley's date of birth while Defendant Gomez pressed his knee down into Mr. Binkley's back while Mr. Binkley remained trapped in the prone position, hog-tied and struggling for breath. For approximately another 30 seconds, Mr. Binkley was forcibly held down in the prone position with another man's body weight on his back. Again, Captain Amburn and numerous other KCSO officers, including but not limited to Defendants Bales, Farmer, Jones, and May, continued to stand nearby Mr. Binkley, watching Mr. Binkley struggle to breathe but offering Mr. Binkley no assistance whatsoever.

140. Mr. Binkley tried, but was unable to completely state his date of birth to the deputy as he lost consciousness.

141. Especially given Mr. Binkley's multiple injuries, obvious distress, deteriorated condition, helplessness, and limited ability to breathe, hog-tied in the prone position with a deputy applying weight on his back, the fact that Mr. Binkley nevertheless made every effort to provide the deputy with his birthday, despite the deplorable circumstances, underscores how Mr. Binkley continued to make every effort to comply with the deputies' commands—pretextual or not—even to his last breath.

142. As a direct and proximate result of the concerted pattern of unconstitutional acts

39

and omissions referenced above, Mr. Binkley became completely motionless and was fatally injured. Although the deputies yelled at him and clapped in his face, Mr. Binkley was entirely unresponsive.

143. At some point, some of the KCSO deputies rolled Mr. Binkley onto his back, began to "sternum rub" him, and eventually, while Mr. Binkley was still unresponsive, decided to administer Narcan. As one deputy (Deputy Bradshaw) admitted just prior to deputies trying to administer the Narcan, Mr. Binkley "got a mouth full of damn dirt." Mr. Binkley was still hog-tied. Shortly thereafter, the KCSO deputies were unable to find a pulse.

144. When Mr. Binkley was turned over, the facial injuries which resulted in part from Defendant Gomez holding and forcing Mr. Binkley's face into the gravel road are evident on the body cam footage.

145. Around this time, one of the deputies noted that Mr. Binkley had turned purple / blue. While one deputy commented: "I can't tell if he's gray because of the lack of air or the dirt," another responded "Gravel, I think it's the gravel."

146. After a pulse was no longer detectable and after Mr. Binkley had been unconscious for at least three minutes, one of the KCSO deputies administered a dose of Narcan. It was not until after this that one of the deputies finally released the hog-tie and removed Mr. Binkley's leg shackles. Not long after, some of the deputies administered an additional dose of Narcan.

147. Later, after Mr. Binkley was unconscious and no longer had a pulse, the KCSO deputies began performing chest compressions and eventually, removed Mr. Binkley's handcuffs from behind his back and re-cuffed his hands in front of his chest.

148. It was not until after the deputies had repeatedly struck and kneed Mr. Binkley, held

40

him down in the prone position while pressing their body weight into his back, mashed his face into the ground while other officers held him down, hog-tied him, and pressed their body weight into Mr. Binkley's back and rib cage for an extended duration while he was hog-tied that Deputy May finally approached the female passenger (who had long been removed from the truck through a door, handcuffed, and sitting in a patrol car at the scene) to inquire whether Mr. Binkley had any medical conditions and what drugs he had taken.

149. Around this same time, while searching the truck further, another deputy discovered multiple inhalers and radioed to the other officers that Mr. Binkley may have asthma.

150. Sometime after Mr. Binkley no longer had a pulse and officers had begun chest compressions, one of the deputies asked for a CPR mask. After grabbing a red CPR mask of out his car, Deputy Harrell handed Deputy May the mask. In response, Deputy May (one of the deputies responsible for training rookie officers) refused the mask, saying "no, I ain't doin it; I'm not breathing in him." Deputy Harrell then put the mask back on the trunk of a patrol car.

151. It was not until at least 7 minutes after Mr. Binkley had stopped responding that another one of the deputies finally agreed to attempt to perform mouth-to-mouth resuscitation on Mr. Binkley.

152. The ambulance arrived not long thereafter. For approximately 30 minutes, paramedics attempted to resuscitate Mr. Binkley to no avail.

153. Sometime around 11:05 p.m., Mr. Binkley was determined to have died at the scene. The photograph below was taken at the scene not long after Mr. Binkley was declared deceased:



154.     Each of the unconstitutional acts and/or omissions attributable to the Defendants as described herein was a cause in fact and legal cause of the serious and painful personal injuries Mr. Binkley sustained.

155.     Each of the unconstitutional acts and/or omissions attributable to the Defendants as described herein was a cause in fact and legal cause of the physical agony and horror of compression asphyxia over an extended period of time that Mr. Binkley suffered.

156.     Each of the unconstitutional acts and/or omissions attributable to the Defendants as described herein was a cause in fact and legal cause of Mr. Binkley's wrongful death.   He was officially pronounced dead at the scene later that evening, July 27, 2019.

157.     While Mr. Binkley evidently had ingested some amount of drugs earlier in the evening, Mr. Binkley had long been suffering from a drug addiction and had an unusually high

42

tolerance for drugs in his system. This is reflected in the fact that he was able to drive the pickup truck for an extended period of time without wrecking or causing damage to the pickup truck he was operating or to any other vehicle. This is also reflected in the fact that he was readily able to comply with the officers' commands to show them his hands and was able to communicate with them when they first approached his pickup truck (before he was repeatedly struck in the head, face and torso while in the pickup truck, before he was forcibly wrenched through the driver's side window frame which was blocked by an adjacent tree, before he was subjected to further strikes to the head and torso, before substantial weight was applied to his back while he was handcuffed behind his back while on the ground in the prone position, and before the series of additional unconstitutional acts and omissions thereafter as previously described).

158. Attached as **Exhibit E** are true copies of excerpts from the body camera videos of Deputies Gomez, Doss, Bales, and Farmer taken at the scene during the events generally referenced above from the time when Mr. Binkley's hands and feet were bound together behind his back while he was lying on the gravel road through the time when Mr. Binkley appeared to lose consciousness. Captions have been added to these excerpts that accurately reference the events shown, identify the deputy's body camera video from which each excerpt was taken, quote or summarize statements made during the events shown, and identify the person making each of the referenced statements.

### Additional Facts Regarding KCSO's Unconstitutional Training, Customs, Practices, and *De Facto* Policies Relevant to Knox County

159. There were at least 18 KCSO deputies and officers present at the scene at the time of the subject events. These individuals witnessed many, if not all, of the unconstitutional acts and omissions described herein.

43

160.    The KCSO deputies and officers on the scene together constituted a significant number of the deputies and officers working in the field on Adam Shift and David Shift that evening.   Additionally, a senior officer of the KCSO, Captain Amburn, was one of the first on the scene and was present throughout the subject events.

161.    Further, at the time of these events, five KCSO deputies in training and their KCSO mentors were present.   The deputies in training and their mentors participated in the wrongful conduct described herein during the course of and as part of the trainees' *actual training* for their work as KCSO deputies.   Further, while the deputies in training and their mentors engaged in such unconstitutional conduct, they did so while their training was being observed and supervised by other, more senior KCSO officers at the scene, including KCSO officers assigned to Adam Shift and David Shift and including KCSO senior officer Captain Amburn.

162.    At least a significant amount of the unconstitutional acts and omissions was preserved on video captured from several KCSO deputies' body cams.

163.    The video footage from the body cams confirms that there was a series of instances at the scene on July 27, 2019, in which Mr. Binkley was struck while he was not resisting or threatening anyone in any manner.   Each such instance objectively and clearly violated Mr. Binkley's Fourth Amendment rights.   These instances were committed by different deputies and deputies in training at different times during the course of the subject events while they were in the presence of a large number of other KCSO deputies and officers and themselves illustrate and constitute a pattern of that type of unconstitutional conduct.

164.    The body cam footage also confirms that there was a series of instances in which weight or force was applied to Mr. Binkley's back while he was handcuffed behind his back, lying

44

in the prone position, and not resisting or threatening anyone and while Mr. Binkley was in distress and in need of medical attention. Each such instance objectively and clearly violated Mr. Binkley's Fourth Amendment rights. These instances were also committed by different deputies and deputies in training at different times during the course of the subject events while they were in the presence of a large number of other KCSO deputies and officers and also illustrate and constitute a pattern of that type of unconstitutional conduct.

165. Additionally, the body cam footage confirms that there was a series of instances when unconstitutional and excessive force was used on Mr. Binkley while other law enforcement officials observed it and had a clear and established duty to intervene and come to Mr. Binkley's aid, but failed to do so. Each such instance objectively and clearly violated Mr. Binkley's Fourth Amendment rights. These instances were also committed by numerous and different KCSO officers, deputies and deputies in training at different times during the course of the subject events while they were in the presence of a large number of other KCSO deputies and officers and also illustrate and constitute a pattern of that type of unconstitutional conduct.

166. Further, the fact that the unconstitutional conduct referenced above occurred during the course of training multiple KCSO deputy trainees in the field by their mentors, as well as by senior officers of the KCSO, itself illustrates that the training *actually being provided to KCSO deputies* during the relevant time period was deliberately indifferent to the established constitutional rights of citizens such as Mr. Binkley: (i) to be free from being struck or assaulted while being arrested and/or while in custody when not resisting or threatening anyone; (ii) to be free from compression asphyxia from having weight or force applied to the citizen's back while the citizen is handcuffed in the prone position and not resisting or threatening anyone (particularly

45

where the citizen is already in distress and in need of medical attention); and (iii) to have a law enforcement official intervene and come to the citizen's aid when unconstitutional force is being used by another law enforcement officer in the official's presence.

167. Further, the referenced unconstitutional conduct by multiple different individuals in the presence of a larger group of KCSO deputies and officers over the course of the subject events itself illustrates that on July 27, 2019, the KCSO had a custom, practice and/or *de facto* policy: (i) of condoning and encouraging its deputies to strike a citizen such as Mr. Binkley who is being arrested and/or who are in custody, even though the citizen is not resisting or threatening anyone; (ii) of condoning and encouraging its deputies to apply weight or force to a citizen's back while the citizen is handcuffed in the prone position and not resisting or threatening anyone (even where the citizen is already in distress and in need of medical attention); and (iii) of condoning and encouraging law enforcement officials not to intervene and come to a citizen's aid when unconstitutional force is being used by another law enforcement officer in the official's presence.

168. Additionally, the prior incidents of similar conduct referenced at ¶281, *infra*, also show that at relevant times prior to July 27, 2019, the KCSO had been deliberately indifferent to providing material training to deputies regarding the clearly established constitutional prohibitions and rights referenced above; and that the KCSO had the unlawful and unconstitutional customs, practices and/or *de facto* policies referenced above.

169. Significantly, the body cam footage also confirms that none of the numerous KCSO senior officers, deputies, and deputies in training reacted to any of the unconstitutional conduct as though it was anything other than routine. None admonished any of the other KCSO officers or deputies present; none was upset or showed the least bit of concern about any of the conduct; and

46

none objected to the conduct in any manner.

170. To the contrary, except when specifically interacting with Mr. Binkley, the KCSO officers and deputies were milling around at the scene near Mr. Binkley and casually chatting about the pursuit, telling jokes, and otherwise plainly demonstrating that none of the conduct was out of the ordinary, that none of the conduct was inconsistent with the KCSO customs, practices and/or *de facto* policies, and that none of the conduct was inconsistent with the KCSO's training.

171. Of no less significance, the reports and statements filled out by some of the KCSO deputies following the subject events omit material parts of the unconstitutional conduct described herein, reflecting that the deputies either fail to appreciate that the conduct is, in fact, unconstitutional or that the deputies have been taught not to record all of the conduct and to assert that the conduct that is documented is described as though it was required because the arrestee was resisting the deputy's commands (even in a circumstance such as this where numerous other deputies and KCSO senior officers present at the scene had actual knowledge otherwise).

172. The KCSO post-pursuit report and use of force reports included multiple facially incorrect statements that Mr. Binkley was resisting each time force was used (when the contemporaneous body camera videos clearly demonstrates otherwise). The reports also omit numerous material events, including the unconstitutional conduct described herein. Instead, regarding force used, the reports predominately describe that Mr. Binkley was struck multiple times by Defendant Harrell while Mr. Binkley was still in the pickup truck.

173. Following the death of Mr. Binkley, Knox County and the supervising officers of KCSO generally, including Sheriff Spangler, failed to conduct any material investigation of these events.

47

174.     KPD performed a cursory investigation into the incident as part of an investigation about whether any of the KCSO personnel had acted criminally during the subject events.   As part of KPD's investigation, it interviewed some of the deputies, reviewed the deputies' reports, examined Mr. Binkley's body (and noted that Mr. Binkley had a "cut above his left eye" and a few abrasions), and did at most a cursory review of the body camera videos.

175.     When some of the deputies at the scene were interviewed by KPD following Mr. Binkley's death, the deputies consistently omitted many of the facts noted above about the force they used at various times throughout Mr. Binkley's arrest and detention.

176.     A senior officer of the KCSO participated in the KPD investigation and observed the KPD interviews of KCSO personnel.

177.     At material times, the Knox County Sheriff was made aware of the events described herein.   Nevertheless, the Sheriff did not cause an internal affairs investigation to be undertaken by the KCSO and did not discipline any of the deputies in training, deputies or KCSO officers involved in the subject events.   Even though the Sheriff's actual or constructive knowledge of the subject events (and the video evidence of the constitutional violations described herein) was subsequent to the events themselves, the Sheriff's response (or lack of response) to the unconstitutional conduct reflects that the Sheriff considers said conduct to be consistent with the customs, practices and *de facto* policies of the KCSO and to be consistent with the training being provided to KCSO deputy trainees, deputies and officers at relevant times.

178.     No internal affairs investigation has been performed by the KCSO regarding the conduct described herein.

179.     None of the deputy trainees, deputies, or officers of the KCSO who engaged in any

48

of the unconstitutional violations referenced herein have been disciplined in any manner.

180.    Knox County, Tennessee had non-delegable constitutional duties to ensure: that Mr. Binkley was seized using, at most, only reasonable force under the circumstances; that Mr. Binkley was properly monitored, evaluated, and treated; that the Knox County Sheriff's Office had constitutional customs, practices and policies (including *de facto* policies); and that the KCSO provided training to its deputies and officers that was not deliberately indifferent to the constitutional rights of persons such as Mr. Binkley.

181.    However, Knox County had *de facto* policies, practices, and customs in place which failed to ensure that citizens' constitutional rights were protected during arrests and regarding the use of force.  Further, Knox County provided training at material times to KCSO deputies and officers which was deliberately indifferent to the constitutional rights of persons such as Mr. Binkley.    Therefore, Knox County is liable under these facts and circumstances for the unconstitutional conduct generally described herein.

182.    Despite the obvious and glaring constitutional violations by the individual KCSO Defendants, Knox County, the KCSO and the Knox County Sheriff found that all of the individual KCSO Defendants' actions complied with Knox County's and the KCSO's policies, practices, customs and training.

183.    Plaintiffs do not seek to hold Knox County liable under a *respondeat superior* theory; rather, based upon the subject events, Knox County's liability is illustrated and established in part by the conduct of KCSO senior officers, senior deputies, and other experienced officers at the scene who were training deputy trainees and supervising other KCSO deputies.  The conduct of those KCSO senior officers, senior deputies, and other experienced officers, including but not

49

limited to Captain Amburn, illustrates and establishes Knox County's (i) failure to train its officers on, among other things, the use of excessive force against non-resisting citizens, the risks of positional asphyxia, and the duty to intervene; and (ii) *de facto* custom, policy, or practice in allowing officers to use excessive force against non-resisting citizens, to use methods of restraint likely to cause positional asphyxia, and to not require officers to intervene or report when excessive force has been used. If Knox County did not have such policies, practices, or customs and instead had adequate training on, among other things, the use of excessive force, the duty to intervene, and the risks of positional asphyxia then these senior officers and experienced officers, including but not limited to Defendant Amburn, would have instructed against such use of force and methods of restraint and/or intervened to stop it.

184.    As a direct and proximate result of the unconstitutional acts and omissions referenced herein, Mr. Binkley's civil rights were violated and those violations were the legal cause and cause in fact of the severe physical and emotional injuries inflicted upon Mr. Binkley; were the legal cause and cause in fact of harms, losses and damages to Mr. Binkley prior to his death; and were a legal cause and cause in fact of Mr. Binkley's wrongful death, rendering the Defendants liable to the Plaintiff accordingly.

185.    True copies of the bodycam footage from deputies Bradshaw, Harrell, Burnett, May, and Bales are attached as **Collective Exhibit F**.

186.    A true copy of the bodycam footage of Deputy Gomez is attached as **Exhibit G**.

187.    True copies of the scene photographs previously referenced, as well as true copies of photographs/screenshots obtained from relevant portions of video footage from several of the deputies' body-cameras, are attached as Exhibit A.

50

188.    **A**ttached as **Exhibit H** is a compilation of excerpts from the body camera videos of several of the deputies' body camera videos during the events generally referenced above from the time when deputies first arrived on the scene through the time when Mr. Binkley appeared to lose consciousness.  Captions have been added to these excerpts that accurately reference the events shown, identify the deputy's body camera video from which each excerpt was taken, quote or summarize statements made during the events shown, and identify the person making each of the referenced statements.

### Additional Facts Regarding Ms. Ledford's Reasonable Diligence in Identifying the Parties Involved (Equitable Tolling)

189.    Within a few days of being notified by an investigator from the Knoxville Police Department ("KPD") of her son Johnathan Binkley's death on July 27, 2019, while in the custody of the KCSO, Plaintiff Ann Ledford asked one or more law enforcement investigators and/or officials to provide her with reports and information about those events.

190.    In response to each of Ms. Ledford's inquiries, however, Ms. Ledford was informed by the investigators and/or law enforcement officials that no information could be provided to her because those matters were under investigation.

191.    During the relevant time period, it was common for KPD to investigate deaths of individuals which occurred while the individuals were in the custody of the KCSO and then to provide the results of KPD's investigation to the Knox County District Attorney's office.   The District Attorney, then, would review the results of the KPD investigation and determine whether any of the KCSO personnel involved had engaged in criminal conduct and should be prosecuted in state criminal court.

51

192.    From late July 2019, through late June / early July 2020, Ms. Ledford continued to make periodic requests to KPD and to the Knox County District Attorney's office for reports and information about the events which occurred during Mr. Binkley's arrest on July 27, 2019.    Each time Ms. Ledford made such a request, the request was denied and she was told that she would have to wait until the investigation had concluded.

193.    On or about July 2, 2020, Ms. Ledford was advised by the Knox County District Attorney's Office that its review of the KPD's investigation was complete and that the DA's office had determined that no state criminal charges would be prosecuted against any of the KCSO deputies identified by the KPD investigation as having been involved in the arrest of Mr. Binkley.

194.    Ms. Ledford was provided with a copy of the District Attorney's closing letter to KPD Investigator Robert Cook, dated July 2, 2020, confirming that determination and referencing thirteen KCSO Deputies whose interactions with Mr. Binkley on July 27, 2019, had been reviewed. The July 2, 2020, closing letter made reference to "all the relevant reports, transcripts, statements, photographs, videos and evidence collected by the investigating agencies" with regard to thirteen KCSO deputies:    Bradshaw, Campbell, Burnett, Harrell, Doss, May, Bales, Gomez, Stachey, Sosville, Farmer, Jones and Finley.    A true copy of the July 2, 2020, closing letter is attached as **Exhibit I**.

195.    Ms. Ledford was informed at that time (on or about July 2, 2020) by the DA's office that because its investigation was closed, she would have access to the KPD investigative file within a few days, once the file materials had been returned to KPD and could be copied.

196.    Shortly thereafter, on July 8, 2020, Ms. Ledford, through counsel, sent a letter by email and hand delivery to the Knoxville City Law Director, Charles Swanson, Knoxville Police

52

Department Chief Eve Thomas, and KPD Investigator Robert Cook requesting copies of the evidence, videos, reports and other information pertaining to Mr. Binkley's arrest and/or death on July 27, 2019, pursuant to the Tennessee Public Records Act, T.C.A. §§ 10-7-501, *et seq.* (within seven (7) days), and also requested that all such information be preserved. A true copy of that letter is hereto attached as **Exhibit J**.

197. Similarly, on July 15, 2020, Ms. Ledford, through counsel, also sent a letter by hand delivery to the Knox County Law Director, the Knox County Sheriff, and each of the thirteen deputies referenced in the DA's closing letter requesting copies of the evidence, videos, reports and other information pertaining to Mr. Binkley's arrest and/or death on July 27, 2019, pursuant to the Tennessee Public Records Act, T.C.A. §§ 10-7-501, *et seq.* (within seven (7) days), and also requested that all such information be preserved. A true copy of that letter is hereto attached as **Exhibit K**.

198. On July 16, 2020, Ms. Ledford, through counsel, received a copy of the KPD investigative report for the subject events, which generally described some of the events involving the interactions between certain KCSO deputies and Mr. Binkley on July 27, 2019. The only KCSO deputies or employees mentioned in the KPD report as having been involved with the arrest of Mr. Binkley were the thirteen deputies referenced in the DA's closing letter: Deputies Bradshaw, Campbell, Burnett, Harrell, Doss, May, Bales, Gomez, Stachey, Sosville, Farmer, Jones and Finley. A true copy of the KPD report is attached as **Exhibit L**.

199. The KPD report referenced above is objectively inconsistent with the conduct of the KCSO deputies and senior officers evident on the body cam video footage from the subject events on July 27, 2019.

53

200. Further, the KPD report referenced above omits references to the unconstitutional conduct described herein.

201. Additionally, the KPD report referenced above makes no mention whatsoever of the fact that there were KCSO senior officers present who participated in directing and/or supervising the deputies' conduct at material times during the subject events on July 27, 2019, including but not limited to KCSO Captain Dave Amburn.

202. On July 17, 2020, Ms. Ledford, through counsel, received from KPD copies of several of the body cam videos from the KCSO deputies at the scene of Mr. Binkley's arrest and death on July 27, 2019, although because two of them were not duplicated successfully, additional copies had to be reimaged in the days that followed.

203. Also included as part of the KPD's production on July 17, 2020, were copies of certain KCSO reports and records concerning the subject events which were evidently collected by KPD as part of its investigation; true copies of those reports are attached as collective **Exhibit M.** Around the same time, Ms. Ledford also obtained a copy of the medical examiner's report, a true copy of this report is attached as **Exhibit N.**

204. The KCSO reports and records referenced above are also objectively inconsistent with the conduct of the KCSO deputies and senior officers evident on the body cam video footage from the subject events on July 27, 2019.

205. Further, the KCSO reports referenced above omit references to the unconstitutional conduct described herein.

206. The earliest date when Ms. Ledford had access to any information regarding the fact that civil rights violations had occurred causing injuries and the wrongful death of Mr. Binkley

54

was on July 17, 2020, when Ms. Ledford was first able to request and obtain copies of the body cam videos from the subject events following the DA's office closing of its file on July 2, 2020.

207.    It was not until Ms. Ledford had access to the body cam videos that Ms. Ledford and her counsel had the first opportunity to discover the unconstitutional conduct that is the subject of this case and to begin investigating the identity of the individuals involved in that conduct.

208.    Although Ms. Ledford's counsel was able to prepare and file an initial Complaint seven (7) days later, on July 24, 2020, based on the body cam videos and the individuals identified in the KPD report, it was not possible in one week to identify all of the individuals involved in the subject events, in part because the investigative reports were objectively deficient and in part because the identities of all of the participants in the wrongful conduct at issue could not be verified based on a review of the body cam videos alone.

209.    For example, it was not until weeks later, in October of 2020, when the KCSO subsequently produced the personnel files of several individuals pursuant to Ms. Ledford's public records request that Ms. Ledford was able to learn that a KCSO Captain – David Amburn – was involved in the supervision of the subject events on July 27, 2019, even though he was not one of the officers scheduled to work on either Adam shift or David shift that evening.

210.    Evidently Captain Amburn joined the chase and drove to the scene during the course of the subject events, arriving near the same time as the first deputies to arrive (including Deputies Bradshaw, Campbell and Harrell).   Captain Amburn then participated in supervising and/or directing the conduct of others at the scene at relevant times thereafter.

211.    Ms. Ledford has exercised reasonable diligence at all material times to discover the facts of the subject events on July 27, 2019.   In fairness, Ms. Ledford should be permitted to have

Case 3:20-cv-00325-DCLC-HBG   Document 37   Filed 12/28/20   Page 55 of 117   PageID #: 374

one year from the date when she was first able to discover the existence of the constitutional violations and injuries at issue to investigate and bring causes of action against those responsible for those violations and injuries.

212.     Because Johnathan Binkley died at the scene on July 27, 2019; because the essential facts concerning his injuries and wrongful death were not made available as public records until after July 2, 2020; because the law enforcement reports concerning the subject events (which were not available until after July 2, 2020) themselves did not contain fair or accurate information about the subject conduct in any event; and because the unconstitutional conduct could not have been discovered until the deputies' body cam videos were first made public and could be reviewed on or about July 17, 2020, the commencement of the one-year statute of limitations should be equitably tolled until at least July 2, 2020, if not July 17, 2020.

## <u>DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY</u>

213.     Qualified immunity is not available when an official violated a statutory or constitutional right and that right was clearly established at the time of the conduct.   *Hopper v. Plummer*, 887 F.3d 744, 751 (6th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735(2011)).

214.     Under the Fourth and Fourteenth Amendments of the United States Constitution, individuals have a right to be free from a governmental official's unreasonable seizure and use of excessive force.

215.     Under the Fourteenth Amendment of the United States Constitution, individuals have a right to receive medical attention.

216.     The risks of restraining individuals in the prone position and the risks of positional asphyxia are also obvious, widely known, and well-established, particularly in cases (a) where

56

mentally incapacitated individuals are restrained in the prone position and/or (b) when individuals who are restrained in the prone position then have additional weight put on top of them (such as another individual placing his body weight on top of the restrained individual). Since at least 1999, it has been recognized that putting substantial or significant pressure on a restrained individual's back while he is restrained in the prone position and subdued is dangerous. *See Johnson v. City of Cincinnati*, 39 F. Supp. 2d 1013, 1018-19 (S.D. Ohio Jan. 8, 1999).

217.     In 2004, the Sixth Circuit prohibited as unconstitutional the use of substantial or significant pressure that creates asphyxiating conditions to restrain a subject who does not pose a material danger to the officers or others. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903-04 (6th Cir. 2004); *Weigel v. Broad*, 544 F.3d 1143, 1154-55 (10th Cir. 2008). This prohibition, which encompasses placing weight on a subject's body after he has been handcuffed, was "clearly established in the Sixth Circuit" by no later than "August 2007." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013). Accordingly, courts have repeatedly refused to grant officers qualified immunity in situations where non-resisting citizens were restrained in the prone position with significant pressure put on their backs. *See Martin v. City of Broadview Heights*, No. 1:08 CV 2165, 2011 U.S. Dist. LEXIS 92466, at *21-22 (N.D. Ohio Aug. 18, 2011) (citing *Johnson*, 39 F. Supp. 2d at 1018-19); *see also Hopper*, 887 F.3d at 754-55; *Champion*, 380 F.3d at 903-04; *Weigel v. Broad*, 544 F.3d 1143, 1154-55 (10th Cir. 2008).

218.     The dangers of positional asphyxia have also been recognized in police policies requiring monitoring of restrained individuals and limiting when they can be restrained in the prone position, *see* **Collective Exhibit O**, composed of excerpts of various police / sheriff department policies (emphasis added), *see* **Collective Exhibit P** composed of examples of police

57

training articles / bulletins, and in research articles. *See also* **Collective Exhibit Q** composed of research journals.

219.     It has also been well-established in the Sixth Circuit since at least 1991 that using force after a suspect has been incapacitated or neutralized is excessive as a matter of law. *See Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.") (citing *Phelps v. McCoy*, 286 F.3d 295, 301 (6th Cir. 2002)); *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) ("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest.") (citing *Phelps*); *Phelps*, 286 F.3d at 301 ("[T]here was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was.") (citing *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) to show that the "unconstitutionality of use of gratuitous force against helpless and incapacitated suspect during arrest [were] well established in 1991").

220.     Similarly, it is well-established in the Sixth Circuit that police officers have a duty to intervene when excessive force is being used and that such failure to intervene is a basis for liability under Section 1983. *Sargent v. City of Toledo Police Dep't*, 150 F. App'x 470, 474 (6th Cir. 2005) ("[S]upervisory officers who order a subordinate officer to violate a person's constitutional rights and non-supervisory officers present during a violation of person's civil rights who fail to stop the violation can be liable under § 1983"); *Durham v. Nu'Man*, 97 F.3d 862, 867-68 (6th Cir. 1996); *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982) ("[I]t is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively

58

participated in [using force against] a plaintiff").

221.    The use of the "hog-tie" is well-known as a dangerous technique due to its causing positional asphyxia and subsequent death, particularly in individuals who are overweight, placed on their stomach (including in the prone position), and/or under the influence. *See* Collective Exhibit P composed of examples of police training articles / bulletins. Accordingly, the practice has been banned from use across the country by police / sheriff departments. *See* **Collective Exhibit R** composed of an F.B.I. bulletin and excerpts of various police / sheriff department policies banning the use of a hog-tie (emphasis added). When a non-resisting individual poses no immediate threat and is under the influence of drugs, it is excessive force to hog-tie him and have one or more individuals put substantial weight on the restrained citizen's back. *See Cruz v. City of Laramie*, 239 F.3d 1183, 1188 (10th Cir. 2001) (holding that "officers may not apply [the hog-tie] technique when an individual's diminished capacity is apparent" such as when he is under "the influence of controlled substances" or has "any other condition, apparent to the officers at the time, which would make the application of a hog-tie restraint likely to result in any significant risk to the individual's health or well-being" and that in such situations "an individual's condition mandates the use of less restrictive means for physical restraint").

222.    Finally, it is well-established that failure to provide adequate medical treatment can be a violation of well-established constitutional rights. *Esch v. Cty. of Kent*, 699 F. App'x 509, 515 (6th Cir. 2017) (citing *Ortiz v. City of Chicago*, 656 F.3d 523, 530-31 (7th Cir. 2011) and *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010)).

223.    Considering the circumstances discussed above, the deputies noted herein, among other things, striking / punching Johnathan Binkley while he was attempting to cooperate,

59

including but not limited to the time period when Mr. Binkley was asked to exit the pickup truck, and the referenced deputies shoving their knees into Mr. Binkley and/or striking Mr. Binkley with their knees and body weight, and mashing Mr. Binkley's face into the gravel and dirt -- all while Mr. Binkley was restrained and not resisting – was unjustified, unreasonable, excessive, and grossly disproportionate to Mr. Binkley's actions, and constituted the use of excessive and unreasonable force in violation of clearly established rights secured to Mr. Binkley by the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

224.    Further, when the deputies, as generally described herein, held Mr. Binkley's body to the ground in the prone position and put substantial weight on to his back while he was restrained and not resisting, their conduct was unjustified, unreasonable, excessive, and grossly disproportionate to Mr. Binkley's actions, and constituted the use of excessive and unreasonable force in violation of clearly established rights secured to Mr. Binkley by the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

225.    Additionally, hog-tying Johnathan Binkley and pressing their body weight down on him while he was in the prone position was unjustified, unreasonable, excessive, and grossly disproportionate to Mr. Binkley's actions, the circumstances then and there existing, and posed a serious and obvious risk of serious bodily injury and/or death to Mr. Binkley, particularly when the officers' then put their body weight on him after he was already subdued and not resisting, and constituted the use of excessive and unreasonable force in violation of clearly established rights secured to Mr. Binkley by the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

226.    Given the circumstances described above, the failure to provide medical attention

60

to Johnathan Binkley after he was repeatedly struck and injured in the manner generally referenced herein, when it was evident that he had sustained serious and obvious injuries and that he was in distress, was objectively unreasonable and arbitrary governmental activity that was shocking, reckless, and deliberately indifferent to the serious medical needs of Mr. Binkley and constituted a violation of his right to medical treatment in violation of clearly established rights secured to Mr. Binkley by the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

## CAUSES OF ACTION

### Federal Claims Asserted Under 42. U.S.C. §§ 1983 and 1988

### Count I: Federal Constitutional Violations for Repeatedly Striking Mr. Binkley in the Truck and Forcing Him out the Truck's Small Window (Against Defendants Harrell, Bradshaw, Campbell, and Burnett)

227.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

228.    Plaintiff avers that objectively unreasonable and excessive force was used against Mr. Binkley when, among other things: (i) Defendant Harrell entered the truck and gratuitously struck Mr. Binkley in the face and body with a closed fist when Mr. Binkley was attempting to comply with the deputies' orders and was not resisting; (ii) Defendants Harrell, Bradshaw, Campbell, and Burnett injured Mr. Binkley, who was unable to exit the truck from the blocked driver's side door, and forcibly pushed him out of the truck (from the passenger's side of the truck) and forcibly pulled him (from the driver's side of the truck) out of the small and partially blocked driver's side window; and (iii) Defendant Burnett struck Mr. Binkley shortly after Mr. Binkley was dropped out of the truck's window, was neutralized / not resisting, and posed no threat.

229.    Plaintiff avers that Defendants Harrell, Bradshaw, Campbell and Burnett acted in

61

concert by using and/or permitting objectively unreasonable and excessive force to be used under these circumstances against Mr. Binkley in the manner generally referenced in this count, including but not limited to striking Mr. Binkley when Mr. Binkley was not resisting and was attempting to comply with the deputies' orders and forcing Mr. Binkley through the small and partially blocked window and wrenching his body against the adjacent small tree instead of allowing Mr. Binkley to exit the truck through the open passenger side door (as Ms. Jordan had a short time beforehand).

230.    Further, by being present at the scene, by watching Mr. Binkley's constitutional rights be violated by the other deputies, and by having the ability to intervene to stop such violations but failing to intervene, each of these deputies is also liable for violating Mr. Binkley's constitutional rights by failing to take reasonable measures to protect Mr. Binkley from the other deputies' uses of unconstitutional excessive force as aforesaid.

231.    Each of the instances of the excessive use of force against Mr. Binkley and each of the instances of the failure to intervene to protect Mr. Binkley referenced in this count was clearly objectively unreasonable under the circumstances presented at the time, especially given the fact that Mr. Binkley was cooperating with the officers.

232.    Each of the defendants referenced in this count committed the actions and/or omissions referenced in this count under the color of state law and by virtue of their authority as Sheriff's Deputies of the Knox County Sheriff's Office and substantially deprived Mr. Binkley of his rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived Mr. Binkley of the rights guaranteed to him by the Fourth and Fourteenth Amendment to the United States Constitution including, but not limited to:

62

a. The right to freedom from unreasonable seizure of his person;

b. The right to freedom from the use of unreasonable, unjustified, and excessive force; and

c. The duty of a law enforcement officer to intervene and protect a citizen when the officer observed or had reason to know that excessive force was being used and the officer had both the opportunity and means to prevent the harm from occurring.

233. Each of the unconstitutional acts and/or omissions generally described above was a cause in fact and legal cause of personal injuries, harms, losses, and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

**Count II: Federal Constitutional Violations for Repeatedly Assaulting Mr. Binkley After He was Removed From the Truck and Restrained (Against Defendants Bradshaw, Campbell, Gomez, Burnett, Bales, Harrell, May, Bowers, Doss, Sosville, and Amburn)**

234. Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

235. Plaintiff avers that objectively unreasonable and excessive force was used against Mr. Binkley when after he was forced out of the truck window and his hands were cuffed behind his back, Defendants Bradshaw, Harrell, Gomez, Burnett, and Bales, among other things: held Mr. Binkley to the ground in the prone position by sitting, kneeling, and/or using their body-weight to hold Mr. Binkley down (Defendants Bradshaw, Campbell, Gomez, Burnett, and Bales); wrenching Mr. Binkley's handcuffed arms up above his head because he was unable to walk or stand on his own, causing him to screech out in pain (Defendants Burnett and Bales); and repeatedly drove theirs knees with their entire body into Mr. Binkley's back and torso with such force that Mr. Binkley's body could be seen to have recoiled repeatedly from the multiple forceful impacts (Defendants Gomez, Burnett, and/or Bales) while he was otherwise restrained and lying on the ground in the prone position, not resisting and posing no threat.

63

236. Plaintiff avers that Defendants Amburn, Campbell, Bradshaw, Burnett, Bales, Gomez, Harrell, May, Bowers, Doss, and Sosville acted in concert by using and/or encouraging the use of objectively unreasonable and excessive force to be used against Mr. Binkley under the circumstances generally described in this count, including but not limited to the referenced deputies driving their knees into Mr. Binkley's body, wrenching Mr. Binkley's arms up behind his body while Mr. Binkley was handcuffed, and pressing their body weight on Mr. Binkley while he was handcuffed behind his back, was in the prone position, was injured and in need of medical attention, was dazed, was struggling to breathe, was not resisting in any manner, and did not pose a threat.

237. Additionally, during the events referenced in this count when excessive force was used against Mr. Binkley, none of the above-referenced defendants on the scene, including but not limited to Captain Amburn and the deputies referenced in this count, intervened to protect Mr. Binkley from such unconstitutional conduct, to provide adequate medical treatment or monitoring given Mr. Binkley's need for medical attention and evident distress, or to enable Mr. Binkley to be in a position (and to be free from the referenced acts of excessive force) so that his ability to breath was not improperly and/or wrongfully impeded or impaired.

238. Further, although Defendant Amburn and other senior officers and/or deputies present, including but not limited to the deputies assigned as mentors of the trainees on the scene, had an established legal duty to intervene and witnessed the unconstitutional conduct referenced in this count, Defendant Amburn and the other senior officers and/or deputies present repeatedly failed to intervene to prevent the use of such force and in fact, directed and/or encouraged the use of such excessive force, including but not limited to when the trainees were directed to "replace"

64

more senior deputies and to continue to apply their body weight to Mr. Binkley while Mr. Binkley was in the prone position, handcuffed behind his back, was in distress as aforesaid, and was not resisting or posing a threat to anyone.

239.    By being present at the scene, watching Mr. Binkley's constitutional rights be violated, having the ability to intervene to stop such violations, failing to intervene, and failing to take reasonable measures to protect Mr. Binkley from the other deputies' use of unconstitutional excessive force, the other deputies at the scene (Defendants Harrell, May, Bowers, Doss, and Sosville) and Defendant Amburn are also liable for violating Mr. Binkley's constitutional rights.

240.    Each of the defendants referenced in this count committed the above described actions and/or omissions under the color of state law and by virtue of their authority as officers of the Knox County Sheriff's Office and substantially deprived Johnathan Binkley of his rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived Mr. Binkley of the rights guaranteed to him by the Fourth and Fourteenth Amendment to the United States Constitution including, but not limited to:

a.    The right to freedom from unreasonable seizure of his person;

b.    The right to freedom from the use of unreasonable, unjustified, and excessive force;

c.    The duty of a law enforcement officer to intervene and protect a citizen when the officer observed or had reason to know that excessive force was being used and the officer had both the opportunity and means to prevent the harm from occurring; and

d.    The right to be free from conduct that was deliberately indifferent to Mr. Binkley's serious medical needs under the Fourteenth Amendment as well as conduct that was objectively unreasonable under the Fourth Amendment given his clearly serious medical needs and his status as an arrestee.

241.    Each of the unconstitutional acts and/or omissions generally described above was

65

a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

**Count III: Federal Constitutional Violations for Restraining Mr. Binkley in the Prone Position, Pressing Substantial Weight on His Back, and Inhibiting His Ability to Breathe (Against Defendants Gomez, Jones, Sosville, Harrell, Stachey, May, Farmer, Finley, Bowers, Bradshaw, Burnett, and Amburn)**

242.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

243.    Plaintiff avers that objectively unreasonable and excessive force was used against Mr. Binkley when, after calling for an ambulance for Mr. Binkley because of his medical distress and after Mr. Binkley was carried to the nearby gravel road by several officers, Defendants Gomez, Jones, and Sosville, among other things, forcibly applied their body weight to Mr. Binkley's back while Mr. Binkley in the prone position and handcuffed behind his back, further impairing and limiting Mr. Binkley's ability to breathe.

244.    Additionally, during this same general time period, Plaintiff avers that objectively unreasonable and excessive force was also used against Mr. Binkley when Defendants Jones and Sosville held Mr. Binkley down in the prone position using their body weight while Defendant Gomez mashed Mr. Binkley's face (which already had a severe and uncontrolled laceration) into the dirt and gravel ground below, making it even more difficult for Mr. Binkley to breathe and exacerbating his existing injuries and condition.

245.    Plaintiff avers that Defendants Gomez, Jones, Sosville, Harrell, Stachey, May, Farmer, Finley, Bradshaw, Bowers, Burnett, and Amburn acted in concert by using, encouraging and/or condoning the use of objectively unreasonable and excessive force as is generally described in this count, including but not limited to the forcible application of body weight to Mr. Binkley's

66

back and Mr. Binkley's face being mashed into the gravel road for an extended period of time while Mr. Binkley was handcuffed behind his back in the prone position, was in obvious need of medical attention, was not resisting, and did not pose a threat.

246.    Prior to and while the referenced defendants were committing the acts described in this count, it was objectively evident that Mr. Binkley was already seriously injured, was already having difficulty breathing, had likely taken drugs and/or was likely suffering from excited delirium, was not resisting, and posed no threat.

247.    Further, although Defendant Amburn and the other referenced senior officers, deputies and trainees referenced in this count had an established legal duty to intervene and observed or had reason to know of the unconstitutional conduct referenced in this count, each of said individual defendants improperly and unlawfully failed to intervene to prevent the use of such force and/or to protect Mr. Binkley from such unlawful conduct.

248.    Similarly, each of said defendants improperly and unlawfully failed to provide adequate medical treatment and/or attention to Mr. Binkley, failed to monitor Mr. Binkley's rapidly declining condition, and/or failed to ensure that Mr. Binkley was allowed to wait for the ambulance which had been called for his care in a position which did not impair or impede Mr. Binkley's ability to breathe.

249.    Each of the defendants referenced in this count committed the above described actions and/or omissions under the color of state law and by virtue of their authority as officers of the Knox County Sheriff's Office and substantially deprived Johnathan Binkley of his rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived Mr. Binkley of the rights guaranteed to him by the Fourth

67

and Fourteenth Amendment to the United States Constitution including, but not limited to:

   a.   The right to freedom from unreasonable seizure of his person;

   b.   The right to freedom from the use of unreasonable, unjustified, and excessive force;

   c.   The duty of a law enforcement officer to intervene and protect a citizen when the officer observed or had reason to know that excessive force was being used and the officer had both the opportunity and means to prevent the harm from occurring; and

   d.   The right to be free from conduct that was deliberately indifferent to Mr. Binkley's serious medical needs under the Fourteenth Amendment as well as conduct that was objectively unreasonable under the Fourth Amendment given his clearly serious medical needs and his status as an arrestee.

250.   Each of the unconstitutional acts and/or omissions generally described above was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

**Count IV: Federal Constitutional Violations for Hog-Tying Mr. Binkley in the Prone Position, Putting Substantial Pressure and Weight on Mr. Binkley's While He Was Hog-Tied, and Subjecting Mr. Binkley to a Knee Strike, Further Injuring Mr. Binkley and Further Impairing Mr. Binkley's Ability to Breathe (Against KCSO Individual Defendants and John Doe Defendants)**

251.   Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

252.   After Mr. Binkley had been carried to the road, after the events described above, and while Mr. Binkley continued to be handcuffed behind his back in the prone position in the distressed condition previously described, one of the deputies called out to others to roll Mr. Binkley to his side (from the prone position) so that Mr. Binkley could breathe.

253.   Just moments later, additional acts of objectively unreasonable and excessive force were committed against Mr. Binkley by KCSO Individual Defendants Farmer, Gomez, Doss,

68

Jones, Sosville, and Campbell who, while acting in concert, committed acts which included: (i) putting Mr. Binkley in the prone position while handcuffed behind his back, using additional restraints to bind Mr. Binkley's legs and feet together, and then connecting and wrenching the handcuffs and leg restraints together behind Mr. Binkley's back, binding them together (in a "hog-tie" with Mr. Binkley still in the prone position); (ii) further tightening the hog-tie restraint soon thereafter while Mr. Binkley was objectively struggling to roll from side to side in an effort to get out of the prone position while hog-tied in an effort to breathe; (iii) subjecting Mr. Binkley to a knee strike while hog-tied in the prone position; and (iv) imposing substantial pressure and weight on Mr. Binkley's back and posterior rib cage for an extended period while it was obvious that Mr. Binkley was in distress and struggling to breathe, was not resisting, and posed no threat. These acts were committed well after an ambulance had been called on account of Mr. Binkley's injuries.

254.    While Mr. Binkley was handcuffed behind his back in prone position on the gravel roadway, multiple deputies (Defendants Gomez, Jones, and Sosville) held Mr. Binkley while Defendant Farmer put leg shackles on Mr. Binkley and then connected the leg shackles to the handcuffs behind Mr. Binkley's back, Mr. Binkley into a hog-tie position. Shortly thereafter, while Mr. Binkley was trying to roll out of the prone position to his side while struggling to breathe, Defendant Jones tightened the hog-tie even more, further bowing Mr. Binkley's position and making it all the more difficult for Mr. Binkley to breathe.

255.    Then, with Mr. Binkley hog-tied in this position, Deputy Campbell proceeded to drive his knee into Mr. Binkley's back and posterior rib cage, causing further injury to Mr. Binkley, and then kept his knee and body weight on Mr. Binkley for an extended period of time. Additionally, while Defendant Campbell had his knee and weight pressed into Mr. Binkley's back,

69

Defendant Campbell began to press his closed fist into Mr. Binkley's upper back near his shoulder blades, thereby asserting even more pressure on to Mr. Binkley's back while he was restrained in the prone position and while Mr. Binkley was struggling to breathe.

256.    Further, after Defendant Campbell got off of Mr. Binkley, Defendant Gomez quickly replaced him and began pressing his body weight on to Mr. Binkley's back while Mr. Binkley remained hog-tied in the prone position.

257.    Captain Amburn and other deputies and trainees on the scene (Gomez, Sosville, Burnett, Bradshaw, Harrell, Jones, May, Campbell, Bowers, Finley, Bales, Doss, Farmer, and Stachey) acted in concert by using, encouraging and/or condoning the unlawful and unconstitutional conduct generally described in this count.

258.    By being present at the scene, by watching and/or by having reason to know that Mr. Binkley's constitutional rights were being violated, by having the opportunity and means to prevent and/or stop violations, and by failing to intervene and do so, Captain Amburn and the other deputies (Defendants Gomez, Sosville, Burnett, Bradshaw, Harrell, Jones, May, Campbell, Bowers, Finley, Bales, Doss, Farmer, and Stachey) at the scene are liable for violating Mr. Binkley's constitutional rights on that basis as well.

259.    Similarly, each of said defendants improperly and unlawfully failed to provide adequate medical treatment and/or attention to Mr. Binkley, failed to monitor Mr. Binkley's rapidly declining condition, and/or failed to ensure that Mr. Binkley was allowed to wait for the ambulance which had been called for his care without further injury and in a position which did further not impair or impede Mr. Binkley's ability to breathe.

260.    Each of the defendants referenced in this count committed the above described

70

actions and/or omissions under the color of state law and by virtue of their authority as officers of the Knox County Sheriff's Office and substantially deprived Johnathan Binkley of his rights, privileges and immunities guaranteed to him as a citizen of the United States in violation of 42 U.S.C. §§ 1983 and 1988, and deprived Mr. Binkley of the rights guaranteed to him by the Fourth and Fourteenth Amendment to the United States Constitution including, but not limited to:

a.  The right to freedom from unreasonable seizure of his person;

b.  The right to freedom from the use of unreasonable, unjustified, and excessive force;

c.  The duty of a law enforcement officer to intervene and protect a citizen when the officer observed or had reason to know that excessive force was being used and the officer had both the opportunity and means to prevent the harm from occurring; and

d.  The right to be free from conduct that was deliberately indifferent to Mr. Binkley's serious medical needs under the Fourteenth Amendment as well as conduct that was objectively unreasonable under the Fourth Amendment given his clearly serious medical needs and his status as an arrestee.

261.    Each of the unconstitutional acts and/or omissions generally described above was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

## Count V: Federal Constitutional Violations – *Monell* Failure to Train or Supervise for Assaulting Non-Resisting Citizens (Against Defendant Knox County, Tennessee)

262.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

263.    A plaintiff may "establish 'a single violation of federal rights, accompanied by a showing that [Defendant] has failed to train its employees to handle recurring situations presenting an obvious potential' for a constitutional violation."  *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 739

71

(6th Cir. 2015) (reversing grant of summary judgment in favor of healthcare company that stood in the County's shoes for liability under § 1983); *see e.g. Jackson v. City of Cleveland*, 925 F.3d 793, 836-37 (6th Cir. 2019) (reversing grant of summary judgment in favor of County on *Monell* failure to train). Accordingly, Knox County is liable for the violations of Mr. Binkley's constitutional rights described herein because it was deliberately indifferent and failed to adequately train and supervise KCSO officers to address the foreseeable and obvious risk that KCSO officers would regularly encounter situations in which they would have the opportunity and means to assault non-resisting citizens and, in so doing, would violate citizens' rights.

264.    Knox County failed to train and educate its deputies with respect to such use of force applications which it knew or had reason to know its deputies were utilizing in the field, would repeatedly encounter in the field, and which posed a serious risk of personal injury or death to citizens they would encounter in deliberate indifference to and reckless disregard of the welfare of the public at large, including Mr. Binkley.

265.    Knox County's failure to adequately train and/or supervise its officers is evidenced by at least four circumstances present here, which individually and collectively establish Knox County's deliberate indifference and failure to adequately train and supervise KCSO officers: (i) lack of adequate written policies and training materials concerning the use of excessive force; (ii) the number of officers, and the seniority or rank of those officers at the scene from two separate shifts who either directly engaged in the subject assaults or who encouraged and/or condoned the subject assaults and the number of different acts of assault which occurred during the series of discrete time periods at the scene; (iii) the arrest and detention of Mr. Binkley was utilized as a training exercise in which numerous KCSO deputy trainees were being supervised, directed and

72

encouraged by multiple officers responsible for their training and supervision; and (iv) the series of prior incidents and claims that excessive force was being used by KCSO officers, which put Knox County on notice that the KCSO officers were not being adequately training and/or supervised previously.

*KCSO's Lack of Adequate Written Policies and Training Materials*

266.    Knox County failed to have in place proper protocols and training for sheriff's deputies concerning, among other things, the appropriate use of force, the use of deadly force, proper methods of extracting a non-resisting citizen, the prohibition of assaulting a non-resisting citizen, the prohibition of pressing substantial body weight on a non-resisting citizen restrained in the prone position, and the prohibition of using the hog-tie restraints on a citizen who is not resisting, especially when the citizen is injured, is in medical distress, is incapacitated by the consumption of drugs, and/or is at risk or is evidencing signs of excited delirium.   As a result, excessive force and restraint was repeatedly and gratuitously used against Mr. Binkley which proximately caused personal injuries and his wrongful death.

267.    KCSO's General Orders and written policies do not appropriately and/or sufficiently address and train KCSO officers regarding the established law that it is unconstitutional to assault a citizen and/or to engaged in the conduct referenced above when the citizen is not resisting arrest and/or when the citizen is posing no threat to anyone.

268.    Additionally, Knox County failed to adequately monitor and evaluate the performance of its deputies and their use of force applications including the uses of force and deadly force described herein.

269.    Knox County lacks appropriate and/or sufficient written policies and training:

73

prohibiting deputies from placing substantial weight on a non-resisting citizen restrained in the prone position; prohibiting the use of a hog-tie; requiring officers to use safe and reasonable methods to extract non-resisting individuals from areas (such as vehicles), such as here where one means of exit is substantially blocked; requiring officers to cease using force when a citizen is restrained, not resisting, and/or compliant; prohibiting officers from assaulting citizens who are not-resisting and/or pose no immediate threat; and prohibiting the use of deadly force against an individual who is already restrained and/or poses no immediate threat.

270. The Use of Force PowerPoint apparently used by KCSO for use of force training is woefully deficient for, among other reasons, failing to mention the dangers and risks of placing substantial weight on a non-resisting citizen restrained in the prone position, the dangers of the hog-tie, and/or the risks of the types of assaults utilized under the circumstances referenced herein.

***The Number of KCSO Officers at the Scene, Including Supervisors, and the Pattern of Assaults by Different Deputies During Different Time Periods at the Scene***

271. The officers' lack of adequate training and supervision is further evidenced by the sheer number of KCSO officers present on the scene who either assaulted Mr. Binkley or witnessed the assaults on him after he was already incapacitated, restrained, and not resisting.

272. At material times, at least 16 KCSO officers at the scene participated in the subject unconstitutional conduct or witnessed and condoned this conduct and failed to intervene. These 16 officers included 4 rookie officers who were being trained and several supervising officers and experienced deputies who were responsible for supervising them. The various KCSO personnel present included officers, experienced deputies, and trainees from two separate shifts.

273. Accordingly, far from the subject events being the actions of one or two rouge officers, the subject events involved and objectively constituted a systematic pattern of numerous

74

acts of assault committed and/or supervised, encouraged or condoned by numerous officers and deputies of every experience level over the course of an extended time period at the scene.

274.    Accordingly, this series of events at the scene by this many KCSO personnel with different levels of training and experience illustrates that *none* of them – from the least to the most experienced officer – had been adequately or sufficiently trained by Knox County.  The entire group of officers present at the scene participated in some manner and/or encouraged and condoned a pattern of gratuitous, unnecessary, and repeated assaults on Mr. Binkley while he was already restrained and not resisting by: forcing Mr. Binkley out of a partially closed truck window against an adjacent tree instead of allowing him to exit through the open passenger door; repeatedly striking, kneeing, and kicking Mr. Binkley while he was handcuffed behind his back, was not resisting, and was barely able to move; restraining Mr. Binkley in the prone position and then sitting, kneeling, and/or placing substantial weight down on Mr. Binkley's back; mashing Mr. Binkley's face into the dirt and gravel for an extended period of time while he was being held down in the prone position by two deputies and was already struggling to breathe; hog-tying Mr. Binkley in the prone position; tightening the hog-tie when it was already clear that Mr. Binkley could not breathe; and pressing body weight down on Mr. Binkley while he was hog-tied in the prone position, further injuring and ultimately preventing altogether Mr. Binkley from breathing.

***The Subject Events Were Utilized as a KCSO Training Exercise***

275.    Knox County's deliberate indifference to training and supervising KCSO deputies in the manner described in this count is all the more clearly evidenced by the fact that the pattern of unconstitutional assaults referenced herein occurred during a KCSO training exercise in which multiple KCSO deputies in training were being trained by their deputy mentors and supervised by

75

a number of experienced deputies and senior officers.

276.    The KCSO senior officers supervising the conduct included, at material times, Captain Amburn, Lieutenant Lubienski, and Sergeant Overton, as well as the deputies previously identified.

277.    Accordingly, the subject events at the scene not only establish that Knox County's training of the officers and deputies involved was deliberately indifferent with regard to assaulting non-resisting citizens that so many officers and deputies with so many levels of experience from different shifts could engage in a pattern of this many assaults against Jonathan Binkley, but Knox County's training was so woefully inadequate and constitutionally deficient that the KCSO deputy trainees on the scene that evening were being trained by numerous senior officers and experienced deputies *to engage in this type of gratuitous, unlawful and unconstitutional conduct*.

**Prior Instances of Excessive Force Reflecting KCSO's Inadequate Training**

278.    Plaintiff specifically asserts that based on applicable precedent, the systemic pattern of numerous unconstitutional acts by numerous officers and deputies of different experience levels from different shifts itself is sufficient, if proven, to establish Knox County's liability based on this count.

279.    Further, Knox County's deliberate indifference and failure to adequately train and supervise KCSO officers is additionally evidenced by the fact that there were repeated prior complaints (and lawsuits) against KCSO officers asserting that KCSO officers used excessive force, which put Knox County, KCSO, and Sheriff Spangler on notice that their training was deficient and was likely to cause injury.   These complaints and lawsuits included at least three of the KCSO Individual Defendants who used excessive force against Mr. Binkley on July 27, 2019.

76

280. Despite claims and lawsuits for use of excessive force having been brought recently against three of the KCSO Individual Defendants involved here, each of these defendants was permitted to work on patrol in the field. One of them (Defendant Harrell) was also permitted to work as a mentor / training officer responsible for training rookie officers (including on the evening of July 27, 2019).

281. Prior to the subject incident with Mr. Binkley, there were multiple complaints and lawsuits asserting that KCSO officers used excessive force and injured civilians:

a. At least two lawsuits have been brought against Defendant Gomez claiming that he used excessive force against individuals who were not resisting, including repeatedly using a taser (stun gun) on an unarmed man who was neither resisting nor attempting to harm deputies (Aug. 2017), and grabbing a sleeping elderly man and dragging him out of a hospital/nursing home when he had no weapons, was visibly bleeding, and repeatedly stated that he was injured (Feb. 2019), *see* **Collective Exhibit S**, composed of complaints and news article concerning the lawsuits filed against Defendant Gomez;[5]

b. At least one lawsuit has been brought against Defendant Harrell for using a wristlock technique and hurling a citizen against a car and then to the ground, pinning her arms behind her back, and placing his full body weight on her back and refusing to provide her any medical assistance despite her cries for help (June 2019), *see* **Exhibit T**, complaint previously filed against Defendant Harrell;[6]

c. At least two complaints were made against Defendant Sosville claiming that he

_____

[5] Deputy Gomez was not disciplined or reprimanded for either of these incidents.
[6] It does not appear that Deputy Harrell was disciplined or reprimanded for this incident.

77

used excessive force against inmates, including punching / striking one inmate in the groin (Feb. 2011) and slamming another inmate's head into a wall and then pushing him to the floor and driving a knee into the inmate's back (Oct. 2016);[7]

d.      At least 13 other lawsuits or claims have been made against KCSO and various KCSO officers for using excessive force against individuals, including: a lawsuit in which KCSO jailers tased, hog-tied, and pressed their body weight down on an inmate (2019); a lawsuit in which KCSO jailers tried to remove an inmate from his cell during a psychotic episode by hog-tying the inmate and placing him in the prone position and kicking him in the head (2015); a lawsuit in which KCSO officers shackled a mentally incapacitated inmate's hands and legs to a restraint chair in the jail for 48-hours (2015); a lawsuit in which an officer grabbed a student's neck and began to choke him while the student had his hands behind his back and was being handcuffed by two other officers (2015); a lawsuit in which a KCSO officer shoved an inmate into a concrete wall after he was attempting to comply with the officers' directions (2014); a lawsuit in which KCSO officers wrestled a man to the ground, tased him, and handcuffed him, and then another officer repeatedly kneed and struck the man in the head (2014); and a wrongful death lawsuit in which officers kneed and kicked a man's head and slammed it into a concrete floor at a detention center causing his death (1999), *see generally* **Collective Exhibit U**, composed of various pleadings and news articles concerning these prior cases.

282.    Considering the lawsuits noted above and others that have been brought against

---

[7] Although Deputy Sosville was reprimanded in some way for these incidents, he was later promoted and permitted to begin working as a patrol deputy.

KCSO officers claiming that they assaulted non-resisting citizens and/or used excessive force, there is a clear pattern of KCSO officers and deputies assaulting non-resisting citizens, using excessive force and violating the constitutional rights of citizens, such that Knox County, KCSO, and Sheriff Spangler knew or should have known that the training and supervision of KCSO officers and deputies concerning, among other things, the use of force, the prohibition on placing substantial weight on an individual's back while he was restrained in the prone position, and the failure to intervene when excessive force is used, was inadequate, dangerous, and likely to lead to constitutional violations, such as those suffered by Mr. Binkley.

283. Despite this pattern of lawsuits and complaints against KCSO officers and deputies for using excessive force, KCSO, Knox County, and Sheriff Spangler failed to implement adequate training and/or supervision of KCSO officers to avoid future constitutional violations, particularly those caused by officers assaulting non-resisting citizens, using excessive force against non-resisting citizens, and failing to intervene and report when another officer uses excessive force.

*Causation*

284. It is foreseeable that KCSO officers in the field will routinely and repeatedly encounter citizens who need to be removed from areas (including vehicles) that are partially blocked / restricted; will use force to restrain and arrest citizens; and will restrain individuals who may be or end up in the prone position. The failure of Knox County to have adequate policies and training on the issues noted above, including but not limited to the appropriate use of force, the appropriate and safe ways to restrain mentally and/or physically incapacitated individuals, the risks of serious injury or death from putting body weight or substantial weight on an individual restrained in the prone position, and the risk of serious injury or death from using a hog-tie, reflects

79

that Knox County, itself and through its final policy maker for the KCSO, Sheriff Spangler, failed to adequately train KCSO officers and deputies for the tasks they would be performing and acted with deliberate indifference to the risks that citizens' constitutional rights would be violated.

285.    As a direct result of Knox County's failure to have any adequate written policies and training and/or Knox County's deliberately indifferent training and supervision regarding the foreseeable situations previously described, Mr. Binkley's constitutional rights were violated, including by but not limited to Mr. Binkley being struck, assaulted, restrained in the prone position and hog-tied with weight applied to his back, causing Mr. Binkley to suffer serious personal injuries and a wrongful death.

286.    Each of Knox County's unconstitutional acts and/or omissions generally described in this count was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

### Count VI: Federal Constitutional Violations – *Monell* Policy, Practice, or Custom of Permitting and Condoning the Assault of Non-Resisting Citizens (Against Defendant Knox County, Tennessee)

287.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

288.    Knox County is liable for the violations of Mr. Binkley's constitutional rights referenced above because Knox County had a custom, practice and/or *de facto* policy of permitting and condoning KCSO officers and deputies violating the constitutional rights of the public at large, including Mr. Binkley, by assaulting non-resisting citizens.

289.    Knox County's custom, practice and/or *de facto* policy of allowing officers to assault non-resisting citizens is evidenced by at least five circumstances present here, which

80

individually and collectively establish that Knox County had such a custom, practice and/or *de facto* policy: (i) senior officers and experienced officers of different levels and from different shifts participated in and/or encouraged and condoned the assaults and the use of excessive force against Mr. Binkley during the subject events; (ii) the unconstitutional conduct consisted of a pattern of numerous assaults by several different individuals over an extended time period; (iii) the numerous assaults and acts of excessive force against Mr. Binkley by numerous KCSO deputies and officials occurred during a training exercise in which numerous KCSO deputy trainees were being supervised, directed and encouraged by multiple officers responsible for their training and supervision; (iv) Sheriff Spangler gave tacit approval of the KCSO officers' conduct; and (v) there was a series of prior incidents and claims concerning the use of excessive force by KCSO officers.

### *The Presence of a Number of Senior Officers and Experienced Deputies and the Series and Pattern of Unconstitutional Assaults and Uses of Excessive Force*

290.    The facts establishing the first two bases for Knox County's custom, practice and/or *de facto* policy of permitting deputies to assault a non-resisting citizen – that senior officers and experienced officers of different levels and from different shifts participated in and/or encouraged and condoned the subject assaults and that the unconstitutional conduct consisted of a pattern of numerous assaults by several different individuals over an extended time period – have previously been addressed in detail above.

### *The Custom, Practice and De Facto Policy is Evident from the Unconstitutional Conduct Having Occurred During a Training Exercise*

291.    The facts establishing the third basis – that the subject events were being utilized as a training exercise – also has been generally described above.   Plaintiff specifically avers that the events and video evidence cited above themselves establish that Knox County in fact had a

81

custom, practice and *de facto* policy of permitting deputies to assault non-resisting citizens who have been arrested at the time of the subject events on July 27, 2019.

292.    Far from being training by one or two rouge deputies in the field, the training provided to the numerous trainees on the scene of the events involving Johnathan Binkley on July 27, 2019, involved numerous senior officers, deputy mentors, and experienced deputies during a series of distinct events over an extended time period.

293.    The officers present at the scene, including Captain Amburn, Lieutenant Lubienski, Sergeant Overton, and senior deputies, all witnessed instances of Mr. Binkley being assaulted, including conduct that they knew or should have known posed a substantial risk of serious bodily injury and/or death to Mr. Binkley.   Despite this, none of these officers intervened or acted in a manner suggesting that such assaults or such uses of excessive force were prohibited or out of the ordinary; rather, these officers and others at times casually walked around the scene and joked around in close proximity to the unconstitutional conduct.

294.    Moreover, during the subject events, senior officers and deputies repeatedly allowed, encouraged, acquiesced, and/or permitted less-experienced deputies to assault Mr. Binkley and use excessive force against him when he was already restrained and such conduct was gratuitous and unnecessary, such as, by way of example only: (i) Defendant Burnett striking Mr. Binkley while Mr. Binkley was restrained on the ground without Deputy Burnett being corrected or reprimanded in any manner; (ii) Defendants Sosville and Burnett being encouraged to use their weight to hold Mr. Binkley down in the prone position while Mr. Binkley was already restrained and not resisting; (iii) Captain Amburn instructing two rookie deputies to "replace" the senior deputies and to continue holding Mr. Binkley down in the prone position and putting

82

substantial weight on Mr. Binkley's back when it was already objectively clear that he was injured, was not resisting, and posed no threat; and (iv) less-experienced deputies being close at hand while a more experienced deputy forced Mr. Binkley's face into the gravel road and held it there for an extended period of time (by Defendant Gomez) and Mr. Binkley being hog-tied with body weight applied to his back (by Defendant Farmer and others as described in detail previously).

295.    In this manner, the rookie deputies were systematically provided on-the-job training during the subject events which taught each of them that these kinds of assaults and uses of force were acceptable and encouraged, even when it was objectively clear that Mr. Binkley was not resisting, was in medical and physical distress, was restrained, and posed no threat.

296.    Further, the fact that there were so many officers at the scene – from different shifts and with varying experience levels from senior officers to trainees – who participated in, encouraged and condoned the assaults and the use of excessive force against Mr. Binkley during the trainees' on-the-job training itself illustrates that the subject events were typical and customary for Knox County and the KCSO as of the evening of July 27, 2019.

297.    Indeed, at all times during the subject events, all of the KCSO deputies and officers present encouraged, participated in, and/or condoned the training which included the unconstitutional assaults of Johnathan Binkley described herein.

298.    None of the KCSO deputies and officers present acted as though anything out of the ordinary was occurring at any time.   To the contrary, the KCSO deputies and officers present acted at all material times in a manner which confirmed that the conduct (including the unconstitutional assaults) was routine and customary.

299.    None of the KCSO deputies and officers present voiced any objection to the

83

conduct or took any steps to stop the unconstitutional conduct at any time.

300.    Knox County's custom, practice and/or *de facto* policy of permitting deputies to assault non-resisting citizens and to use excessive force is further evidenced specifically by the fact that a Captain on the scene with supervisory authority, Captain Amburn, as well as other senior and experience deputies present, witnessed the above-referenced excessive force, approved of it, and failed to instruct any of the deputies to use less force.   To the contrary, they each indicated their approval of the unconstitutional conduct by casually walking around the scene, talking with each other and joking with each other (including while Mr. Binkley was restrained in the prone position, hog-tied, and struggling for his last breaths within a few feet of them).   This reflects both that this kind of conduct is routine for KCSO and Knox County and that KCSO and Knox County tacitly approve of deputies assaulting a non-resisting individual – even when it is objectively clear that an individual is injured to the point of having an ambulance called, is in significant distress, is having a difficult time breathing, is not resisting, and is not a threat to anyone.

301.    Further, Knox County's custom, practice and/or *de facto* policy of permitting deputies to assault a non-resisting citizen and to use excessive force is also evidenced by several officers, including senior deputies, repeatedly shouting out pretextual statements (such as "stop resisting") during the course of the referenced on-the-job training of the deputy trainees when it is objectively clear from the video evidence (and was objectively clear to those present at the scene) that such statements were perfunctory.   The fact that such statements were made in such a routine manner during a series and pattern of assaults and uses of excessive force involving so many KCSO senior officers, experienced deputies, deputy mentors, and trainees underscores how common and systemic the underlying unconstitutional conduct was by the time these events occurred on July

84

27, 2019.

***Sheriff Spangler Approved of the Excessive Force Used Against Mr. Binkley***

302.    The facts establishing the fourth basis of Knox County's unconstitutional custom, practice and/or *de facto* policy of permitting assaults and uses of excessive force on non-resisting citizens – Sheriff Spangler gave tacit approval of the KCSO officers' conduct – is evidenced by the fact that Sheriff Spangler failed to investigate the events described herein for the purpose of determining whether any unconstitutional or wrongful conduct had occurred.

303.    Further, on information and belief, following the subject events with Mr. Binkley, Sheriff Spangler also failed to institute any additional or appropriate policies or training concerning the use of such excessive force.   If the KCSO Individual Defendants' use of excessive force was not in accordance with Knox County's *de facto* customs, policies, and practices, then there would have been some reprimand, training, and/or new policies instituted following the subject events.

304.    On information and belief, although the Knoxville Police Department investigated the subject incidents to make a determination of whether the KCSO deputy's conduct had violated any state criminal law for the purpose of reporting the results of its investigation to the Knox County District Attorney's office, KPD was not investigating whether a civil rights violation had been committed or whether any Knox County or KCSO policy had been violated.

305.    Following the repeated assaults on Mr. Binkley and his subsequent death in the custody of KCSO, none of the KCSO Individual officers were disciplined for their conduct thereby their conduct was found to be in compliance with the policies, practices, and customs of Knox County in all respects.  *See e.g. Marchese v. Lucas*, 758 F.2d 181, 184, 188-89 (6th Cir. 1985) (affirming trial court judgment of liability against Sheriff and County based on "[t]he Sheriff's subsequent failure to order and direct any investigation which disclosed exactly who were the

85

perpetrators of these brutal violations . . . and to administer censure and punishment," which "served to confirm the existence of an unstated 'policy' or toleration of illegal brutality"); *Grandstaff v. Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that the "disposition of the policymaker may be inferred from his conduct after the events" and inferring a "preexisting disposition and policy" of permitting excessive and deadly force when after all six officers on the night shift participated in a pursuit and shot and killed an innocent man, "there were no reprimands, no discharges, no admissions of error" reflecting that if a "prior policy had been violated" then "changes would have been made"); *see also Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir. 1989), *cert. denied*, 110 S. Ct. 75 (1989) (upholding admission of post-event conduct concerning lack of proper internal investigation and failure to discipline officers involved as evidence of the customs that were in effect prior to the subject incident) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right.").

### *Prior Instances of Excessive Force Reflecting Knox County's Custom, Practice and/or De Facto Policy of Permitting the Assault of Non-Resisting Citizens*

306.    The facts establishing the fifth basis of Knox County's unconstitutional custom, practice and/or *de facto* policy of permitting assaults and uses of excessive force on non-resisting citizens – the prior instances and complaints of assaults and uses of excessive force by deputies – has been cited in detail previously and is incorporated herein.

307.    Each of said prior instances and complaints is evidence that the pattern of systemic unconstitutional conduct during the course of the subject events on July 27, 2019, is consistent with the customs, practices and *de facto* policies of the KCSO previously.

308.    Plaintiff avers that in the manner generally described herein, Knox County has

86

allowed its officers and deputies to engage in conduct at material times that violates the constitutional rights of citizens such as Mr. Binkley and repeatedly and knowingly has failed to discipline its deputies with respect to, among other things, violations of the laws of the State of Tennessee and the Constitution of the United States, thus creating a pattern, *de facto* policy, practice, custom or atmosphere where such illegal and unconstitutional behavior is tolerated, condoned, and accepted by the KCSO in deliberate indifference to and reckless disregard of the public at large, including Mr. Binkley.

309.    The grossly excessive and unnecessary series of assaults on July 27, 2019, by the KCSO officers against Mr. Binkley, who was injured, incapacitated, restrained, and not resisting, clearly evidences a *de facto* policy, practice, or custom of allowing officers to assault non-resisting citizens.  *See e.g. Marchese*, 758 F.2d at 184, 188-89 (finding that a policy or custom of permitting excessive force was established based on the conduct of multiple officers on a single day committing two attacks on a man being held in the jail); *Kibbe v. Springfield*, 777 F.2d 801 (1st Cir. 1985) (explaining that when there were "at least ten officers and three separate shooting incidents, in which three different officers fired their weapons" this "widespread activity" was "more likely to reflect the operating procedures of the policy department"); *Grandstaff*, 767 F.2d at 171 (explaining that there was evidence of a policy or custom when "the entire six officers of the night shift . . . participated in this wild barrage," including "repeated acts of abuse on this night by several officers in several episodes, tending to prove a disposition to disregard human life and safety so prevalent as to be police policy or custom"); *see also Bordanaro*, 871 F.2d at 1155-64 (affirming jury's imposition of liability against the City for maintaining an unconstitutional police custom of breaking down doors without a warrant and for deliberate indifference in the

87

recruitment, training, supervision, and discipline of the city's police officers leading to the plaintiff being severely beaten). If KCSO did not have a custom, policy, or practice of allowing officers' to assault non-resisting citizens, this incident would not have involved the sheer number of officers it did, including multiple supervisory officers; there would not have been a series of separate assaults committed by multiple officers on the scene; the senior Captain on the scene would not have approved of such force and assisted in directing the use of force; this incident would not have been used as a training exercise for rookie deputies; there would have been a serious investigation by KCSO into Mr. Binkley's death and the force used by the deputies; and the KCSO Individual Defendants would have been disciplined.

*Causation*

310.    It is foreseeable that KCSO officers in the field will routinely and repeatedly encounter citizens who need to be removed from areas (including vehicles) that are partially blocked / restricted; will use force to restrain and arrest citizens; and will restrain individuals who may be or end up in the prone position.

311.    Knox County's unlawful customs, practices, and *de facto* policies of permitting deputies to assault non-resisting citizens and to use excessive force against them was the moving force behind and proximately caused the deprivation of Mr. Binkley's constitutional rights under the Fourth and Fourteenth Amendments as described herein.

312.    Consistent with and as a direct and proximate result of Knox County's unconstitutional customs, practices and *de facto* policies described above, Mr. Binkley's constitutional rights were violated, including by but not limited to Mr. Binkley being struck, assaulted, restrained in the prone position and hog-tied with weight applied to his back, causing

Mr. Binkley to suffer serious personal injuries and a wrongful death.

313.     Each of Knox County's unconstitutional acts and/or omissions generally described in this count was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

**Count VII: Federal Constitutional Violations – *Monell* Failure to Train Concerning Uses of Force Likely to Cause Positional Asphyxia**
**(Against Defendant Knox County, Tennessee)**

314.     Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

315.     Knox County is liable for the violations of Mr. Binkley's constitutional rights described herein because it was deliberately indifferent and failed to adequately train and supervise KCSO officers to address the foreseeable and obvious risks that KCSO officers would regularly encounter situations involving: methods of restraint that are likely to cause positional asphyxia[8]; individuals who are at a higher risk of suffering from positional asphyxia (such as those who are overweight, incapacitated, and/or suffering from drug abuse); individuals who are in the prone position; individuals who are suffering from positional asphyxia; and/or individuals who have been restrained in the prone position; the risks of such asphyxia, generally and as a result, would violate citizens' rights.

316.     Knox County failed to train and educate its deputies with respect to situations involving positional asphyxia or methods of restraint that are likely to cause positional asphyxia which it knew or had reason to know its deputies were utilizing in the field, would repeatedly

---

[8] "Positional asphyxia" has been defined as "difficulty breathing due to one's posture or position." *Jones v. City of Cincinnati*, 521 F.3d 555, 558 (6th Cir. 2008).

encounter in the field, and which posed a serious risk of personal injury or death to citizens they would encounter in deliberate indifference to and reckless disregard of the welfare of the public at large, including Mr. Binkley.

317. Knox County's failure to adequately train and/or supervise its officers is evidenced by at least three circumstances present here, which individually and collectively establish Knox County's deliberate indifference and failure to adequately train and supervise its KCSO officers: (i) KCSO's lack of adequate written policies and training materials concerning the risks of positional asphyxia and/or restraining individuals in the prone position; (ii) the failure of the KCSO officers to timely identify when Mr. Binkley was suffering from positional asphyxia and assist him even though it was obvious he was at a higher risk of suffering from it; and (iii) the range of officers who restrained Mr. Binkley in the prone position and/or placed substantial weight on his back and the failure of more experienced officers to instruct the other officers against such methods of restraint, which increased Mr. Binkley's risk of suffering from positional asphyxia.

*KCSO's Lack of Adequate Written Policies and Training Materials*

318. Knox County failed to have in place proper protocols, training, and supervision for sheriff's deputies regarding, among other things, the risks of positional asphyxiation generally, identifying and reducing the risk of positional asphyxia; identifying categories of individuals who are at a higher risk of suffering from positional asphyxia (such as those who are mentally incapacitated and/or suffering from drug abuse and/or excited delirium); the risks of restraining someone face down in the prone position, the risks of placing body weight on a person in the prone position (particularly an overweight individual); describing what treatment and/or corrective measures should be used when an individual is suffering from positional asphyxia; prohibiting or

90

limiting officers from holding restrained individuals in the prone position; prohibiting or limiting officers from placing substantial weight (including their body weight) on individuals restrained and/or subdued in the prone position; the hog-tie; the importance of monitoring restrained individual's condition; and the unreasonable and unjustified risk of asphyxia and death to persons restrained with body weight in the prone position and/or who are hog-tied.

319.    KCSO's General Orders and written policies, among other things, do not appropriately and/or sufficiently address and train KCSO officers regarding the well-established: risks of positional asphyxia, risks of restraining individuals in the prone position, and/or methods of restraint that increase the risk of positional asphyxia.   In fact, the General Orders do not even mention those risks.

320.    Similarly, KCSO's General Orders and written policies do not appropriately and/or sufficiently address and train KCSO officers concerning the appropriate methods to identify, treat, and/or restrain individuals who may be suffering from positional asphyxia or teach them how to identify persons who are at a higher risk of suffering from positional asphyxia, including those who have consumed drugs, have certain medical conditions, and/or are overweight. In fact, the General Orders do not even mention those risks.

321.    Knox County lacks appropriate and/or sufficient written policies and training: prohibiting deputies from placing substantial weight on a non-resisting citizen restrained in the prone position; prohibiting restraining individuals who are at a higher risk of suffering from positional asphyxia in the prone position; prohibiting the use of a hog-tie; and requiring officers to monitor the medical condition of restrained individuals.

91

*KCSO Officers' Failure to Timely Identify When Mr. Binkley was Suffering from Positional Asphyxia*

322.    The failure of the KCSO officers to recognize that Mr. Binkley was unable to breathe and suffering from positional asphyxiation further evidences a lack of training and supervision on the risks of positional asphyxiation, the importance of monitoring restrained individuals (particularly those in the prone position), the signs that someone is suffering from asphyxiation, and the appropriate methods to respond and obtain immediate treatment for such individuals.   This is particularly evident by the fact that after Mr. Binkley ceased breathing (while a deputy was pressing his body weight down into Mr. Binkley's back while he was hog-tied), the deputies did not remove the hog-tie for approximately three minutes.

323.    Under the circumstances, it was obvious to anyone with adequate training concerning the risks of positional asphyxia that Mr. Binkley was at an objectively higher risk than the average person—he was overweight, mentally incapacitated, and/or suffering from drug abuse or excited delirium.   Despite it being objectively clear that Mr. Binkley was at an increased risk of suffering from positional asphyxia, the deputies failed to recognize this, which clearly illustrates their lack of training on identifying the categories of individuals who are at a higher risk of suffering from positional asphyxia, including mentally incapacitated individuals and those suffering from drug abuse, and the appropriate restraint methods to use for such individuals to reduce the risk of positional asphyxia.

324.    The failure of the KCSO officers to recognize that Mr. Binkley was unable to breathe and suffering from positional asphyxiation was further illustrated by the fact that after it was obvious Mr. Binkley was unable to breathe, several deputies administered Narcan. It was not until after the Narcan was unsuccessful that the officers attempted chest compressions or another

92

form of resuscitation that was more likely to reduce the effects of the positional asphyxia from which Mr. Binkley was suffering.

*A Range of Officers Restrained Mr. Binkley in a Manner Likely to Cause Positional Asphyxia, and KCSO Supervisors Failed to Instruct Otherwise*

325. The fact that multiple senior and supervisory officers and deputies at the scene, including Captain Amburn, Lieutenant Lubienski, and Sergeant Overton, directly witnessed Mr. Binkley being held down in the prone position (and hog-tied) with one or more deputies putting substantial weight on his back evidences Knox County's lack of training concerning positional asphyxia, because, if this was well-known and adequately taught as dangerous, one or more of these supervisors (along with the other deputies) would have, at a minimum, intervened and instructed the deputies to not restrain Mr. Binkley in the prone position and/or to not assert pressure on his back while he was restrained in the prone position.

326. Instead, shortly after Mr. Binkley was forced through the truck window and was not resisting, the most senior officer on the scene (who also oversees the narcotics division and should be well aware of the risks of positional asphyxia to those who have used drugs), Captain Amburn, instructed two rookie deputies to replace senior deputies who had been both holding Mr. Binkley down in the prone position and putting substantial weight on his back. Although the dangers of positional asphyxia and putting substantial pressure on an individual's back while he is in the prone position are well-established, Knox County's training was so woefully inadequate and constitutionally deficient that the KCSO deputy trainees on the scene that evening were being trained by numerous senior officers and experienced deputies to restrain an individual in the prone position and to place pressure on that individual's back to hold him down regardless of the risks of positional asphyxia.

93

327.     In the period that Mr. Binkley was in KCSO custody at the scene, at least eight KCSO officers restrained Mr. Binkley in the prone position and/or asserted substantial weight on his back while he was restrained in this position (including when he was hog-tied).   If the officers had been trained by Knox County that such methods of restraint were prohibited, on the risks of positional asphyxia, and to identify individuals at a greater risk of positional asphyxia, then this number of officers would not have used this method of restraint on Mr. Binkley, particularly when it was obvious that he was restrained, injured, and not resisting.

328.     Further, numerous other KCSO officers witnessed other deputies force Mr. Binkley down in the prone position while he was already restrained and assert substantial weight on Mr. Binkley's back.   Yet, none of these officers intervened to prevent these things from occurring. When one officer briefly said to roll Mr. Binkley on his side, the group then immediately put leg shackles on Mr. Binkley, put him back in the prone position, and again had a deputy pressing substantial weight into Mr. Binkley's back.   The officers' failure to react to Mr. Binkley repeatedly struggling to breathe after being restrained in the manner described above and then subsequent immediate reaction to hog-tie Mr. Binkley illustrates that the officers generally (including both the more experienced officers and rookies) had not been adequately trained on, among other things, the risks of positional asphyxia.

329.     This series of events at the scene by this many KCSO personnel with different levels of training and experience illustrates that *none* of them – from the least to the most experienced officer – had been adequately or sufficiently trained by Knox County.   The entire group of officers present at the scene participated in some manner and/or encouraged and condoned, among other things, a pattern of using methods of restraint likely to cause positional

94

asphyxia and failing to monitor restrained individuals, including Mr. Binkley who was already restrained, not resisting, and clearly struggling to breathe.

*Causation*

330.    It is foreseeable that KCSO officers in the field will routinely and repeatedly encounter citizens who may be or end up in the prone position; will need to restrain individuals; and will need to identify and provide assistance to individuals suffering from positional asphyxia. Knox County's failure to have adequate policies and training on the issues noted above, reflects that Knox County, itself and through its final policy maker for the KCSO, Sheriff Spangler, failed to adequately train KCSO officers and deputies for the tasks they would be performing and acted with deliberate indifference to the obvious risks that citizens' constitutional rights would be violated.

331.    As a direct result of Knox County's failure to have any adequate written policies and training and/or Knox County's deliberately indifferent training and supervision regarding the foreseeable situations previously described, Mr. Binkley's constitutional rights were violated, including by but not limited to Mr. Binkley being restrained in the prone position and hog-tied with weight applied to his back, causing Mr. Binkley to suffer serious personal injuries and a wrongful death.

332.    Each of Knox County's unconstitutional acts and/or omissions generally described in this count was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

95

**Count VIII: Federal Constitutional Violations – *Monell* Policy, Practice, or Custom of Allowing Officers to Use Force Likely to Cause Positional Asphyxia (Against Defendant Knox County, Tennessee)**

333.     Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.   Plaintiff hereby incorporates, in their entirety, each and every paragraph of this Complaint and by reference make said Paragraphs a part hereof as if fully set forth herein.

334.     Knox County is liable for the violations of Mr. Binkley's constitutional rights because it permitted, encouraged, and tolerated a pattern, practice, or custom of KCSO officers violating the constitutional rights of the public at large, including Mr. Binkley, by using restraints and methods of force likely to cause positional asphyxia and not requiring any monitoring of the restrained citizen's condition.

335.     Knox County's *de facto* custom, policy, and practice of allowing among other things, deputies to use restraint methods that are likely to cause positional asphyxia and not requiring deputies to monitor the medical condition of restrained individuals is evidenced by at least three circumstances present here, which individually and collectively establish Knox County's deliberate indifference and such policies, practices, and customs: (i) the officers continued use of methods of restraint likely to cause positional asphyxia even though it was objectively clear that Mr. Binkley was at an increased risk of suffering from positional asphyxia; (ii) numerous officers of all ranks participated in, approved of, and/or failed to intervene concerning the use of restraint methods likely to cause positional asphyxia against Mr. Binkley; and (iii) Sheriff Spangler's approval and failure to reprimand the officers involved for using such restraints or institute any policies or training preventing the use of such methods of restraint.

96

***KCSO Officers Used Restraint Methods Likely to Cause Positional Asphyxia Despite
Mr. Binkley's Obvious Heightened Risk***

336.     Knox County's custom, policy, or practice of, among other things, deputies using restraint methods that were likely to cause positional asphyxia is evidenced by the fact that Mr. Binkley was, for multiple reasons, objectively at a higher risk of suffering from positional asphyxia.  *See* Collective Exhibit P.   First, Mr. Binkley was overweight.   Second, he clearly had sustained injuries to his head, back, and torso, caused in substantial part by Defendant Harrell repeatedly striking Mr. Binkley in the face and torso while in the truck and then forcing Mr. Binkley out of the truck window and dropping him on to the ground and then having multiple deputies drive their knees into his back.   Third, Mr. Binkley was incapacitated.   Finally, the officers knew and/or should have known early on that there was evidence of drug paraphernalia in the truck and suspected that Mr. Binkley was suffering from drug abuse and/or excited delirium.

337.     Knox County's *de facto* custom, policy, or practice of, among other things, the use of restraints likely to cause positional asphyxia and failure to monitor restrained citizen's conditions is further evidenced by the deputies using such restraints and failing to adequately monitor Mr. Binkley's condition even after: (i) a deputy called for an ambulance (acknowledging that Mr. Binkley was injured and had uncontrolled bleeding); and (ii) it was objectively clear that Mr. Binkley was struggling to breathe while he was restrained on the ground, which could be seen by him repeatedly trying to shift his body so that he could breathe freely and gasping for breath.

338.     Despite Mr. Binkley clearly being at a heightened risk of suffering from positional asphyxia and despite the events noted above, After both of these occurrences, several officers consistently used methods of restraint that increased the risks of positional asphyxia, including

97

hog-tying Mr. Binkley, forcing him into the prone position, and pressing their body weight or other substantial weight on his back, failed to use methods of restraint less likely to cause positional asphyxia, and failed to monitor his condition until after he had already lost consciousness and barely had a pulse. Accordingly, as noted above, although it generally is unreasonable and excessive to restrain a non-resisting individual in the prone position while placing substantial weight on his back because of the risks of positional asphyxia, it was particularly dangerous and likely to cause Mr. Binkley to suffer from positional asphyxia considering his weight, drug use, injuries, and incapacitation.

***Numerous Officers of All Ranks Participated in Restraining Mr. Binkley in a Manner that Increased His Risk of Positional Asphyxia***

339. As noted above, a series of multiple officers using grossly excessive and unreasonable conduct on a single night can evidence a county's or police department's policy, practice, or custom. *See e.g. Marchese*, 758 F.2d at 184, 188-89; *Kibbe*, 777 F.2d at 805-06; *Grandstaff*, 767 F.2d at 171. The sheer number of instances on July 27, 2019, where different KCSO deputies used restraint methods against Mr. Binkley that were likely to cause positional asphyxia, particularly by holding him down in the prone position, pressing their body weight down on his back, and hog-tying him in the prone position, clearly evidences Knox County's *de facto* policy, practice, or custom of allowing deputies to use restraints likely to cause positional asphyxia and failing to require deputies to monitor the condition of a restrained citizen.

340. The facts establishing the second basis for Knox County's custom, practice and/or *de facto* policy of permitting deputies to use methods of restraint likely to cause asphyxiation and not requiring them to monitor a citizen's medical condition – that more than eight deputies on at least five separate occasions, including senior officers such as Defendants Campbell and Harrell

98

and Captain Amburn, participated in, directed, and/or encouraged and condoned the use of restraints likely to cause positional asphyxia on Mr. Binkley and that the unconstitutional conduct consisted of a pattern of numerous instances by several different individuals over an extended time period and in front of deputies in training – have previously been addressed in detail above.

***Sheriff Spangler's Failure to Investigate, Reprimand, or Establish New Policies and Training***

341.    The facts establishing the third basis of Knox County's unconstitutional custom, practice and/or *de facto* policy of permitting officers to use methods of restraint likely to cause positional asphyxia without monitoring the restrained citizen's condition – Sheriff Spangler gave tacit approval of the KCSO officers' conduct – is evidenced by the fact that Sheriff Spangler failed to investigate the events described herein for the purpose of determining whether any unconstitutional or wrongful conduct had occurred.  If the officers were prohibited from using restraints that were likely to cause positional asphyxia, then there would have been some type of investigation and/or reprimand of the officers involved.  Through his failure to adequately investigate or reprimand the KCSO Individual Defendants for their use of restraint methods likely to cause positional asphyxia against Mr. Binkley, however, Sheriff Spangler has tacitly approved of the use of such methods.

342.    Further, on information and belief, following the subject events with Mr. Binkley, Sheriff Spangler also failed to institute any additional or appropriate policies or training limiting or preventing the use of such restraint methods likely to cause positional asphyxia. If the KCSO Individual Defendants' use of excessive force was not in accordance with Knox County's *de facto* customs, policies, and practices, then there would have been some reprimand, training, and/or new policies instituted following the subject events.

343.    Following the repeated use of restraints likely to cause positional asphyxia on

99

Mr. Binkley and his subsequent death in the custody of KCSO, none of the KCSO Individual officers were disciplined for their conduct thereby their conduct was found to be in compliance with the policies, practices, and customs of Knox County in all respects.

344.    Worse yet, Knox County's *de facto* policy, practice, or custom of allowing deputies to use restraint methods that are likely to cause positional asphyxia is evidenced by the deputies' consistent failure to include in the post-incident reports and to provide information to the medical examiner that Mr. Binkley had been restrained in the prone position, particularly with substantial weight on his back for extended periods of time.   These failures reflect KCSO's tacitly approving and/or affirming that using such methods of restraint was consistent with its policies, customs, or practices, and suggests that this information was not worthy of being mentioned in such reports.

*Causation*

345.    It is foreseeable that KCSO officers in the field will routinely and repeatedly encounter citizens who are in the prone position, who are suffering from positional asphyxia, who will require monitoring of their medical condition, including their ability to breathe, and/or will need to restrain individuals who may be or end up in the prone position.

346.    Knox County's unlawful customs, practices, and *de facto* policies of permitting deputies to use methods of restraint likely to cause positional asphyxia and not requiring officers to monitor the condition of the restrained citizen were the moving force behind and proximately caused the deprivation of Mr. Binkley's constitutional rights under the Fourth and Fourteenth Amendments as described herein.

347.    Consistent with and as a direct and proximate result of Knox County's unconstitutional customs, practices and *de facto* policies described above, Mr. Binkley's

100

constitutional rights were violated, including by but not limited to Mr. Binkley being restrained in the prone position and hog-tied with weight applied to his back on several occasions and for prolonged periods, causing Mr. Binkley to suffer serious personal injuries and a wrongful death.

348.     Each of Knox County's unconstitutional acts and/or omissions generally described in this count was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

### Count IX: Federal Constitutional Violations – *Monell* Failure to Train Concerning the Duty to Intervene (Against Defendant Knox County, Tennessee)

349.     Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

350.     Knox County is liable for the violations of Mr. Binkley's constitutional rights because it was deliberately indifferent and failed to adequately train and supervise KCSO officers to address the foreseeable and obvious risk that KCSO officers would regularly encounter situations in which they would need to intervene and come to a citizen's aid when unconstitutional force is being used by another law enforcement officer in the official's presence and, as a result, would violate citizens' rights.

351.     Knox County failed to train and educate its deputies with respect to, among other things, the duty to intervene and the duty to report when another officer has used excessive force, which it knew or had reason to know its deputies were utilizing in the field, would repeatedly encounter in the field, and which posed a serious risk of personal injury or death to citizens they would encounter in deliberate indifference to and reckless disregard of the welfare of the public at

101

large, including Mr. Binkley.

352.    Knox County's failure to adequately train and/or supervise its officers is evidenced by at least three circumstances present here, which individually and collectively establish Knox County's deliberate indifference and failure to adequately train and supervise KCSO officers: (i) the County's lack of adequate written policies and training materials concerning the duty to intervene to prevent the use of excessive force and/or the duty to report when another officer has used excessive force; (ii) the number of officers, and seniority of those officers at the scene, who failed to intervene despite the recurring use of excessive force; and (iii) the arrest and detention of Mr. Binkley was part of in-the-field training for rookie officers.

*KCSO's Lack of Adequate Written Policies and Training Materials*

353.    Knox County failed to have in place proper protocols and training for sheriff's deputies concerning, among other things, an officer's duty to intervene and/or report when another officer has violated a citizen's constitutional rights, including by using excessive force.  As a result, even though there were at least sixteen KCSO officers on the scene, none of them intervened when excessive force and restraint was repeatedly and gratuitously used against Mr. Binkley, which proximately caused his wrongful death.

354.    KCSO's General Orders and written policies do not appropriately and/or sufficiently address and train KCSO officers regarding the established law that an officer is required to intervene when excessive force is being used by another officer on the scene or address an officer's duty to report another officer's use of excessive force.

355.    Additionally, Knox County failed to adequately monitor and evaluate the performance of its deputies and determine whether they were properly intervening and reporting

102

in the situations described herein.

356.     Knox County lacks appropriate and/or sufficient written policies and training requiring officers to intervene when they witness another officer violating a citizen's constitutional rights, including by using excessive force and requiring officers to report incidents of excessive force by another officer, particularly when the citizen is thereby injured and/or dies in custody.

**The Number of KCSO Officers at the Scene Who Failed to Intervene**

357.     The officers' lack of adequate training and supervision is similarly evidenced by the sheer number of KCSO officers present on the scene who failed to intervene and/or report the use of excessive force against Mr. Binkley after they witnessed the assaults on Mr. Binkley while he was already incapacitated, restrained, and not resisting.

358.     As described above, at material times while excessive force was being used against Mr. Binkley, including when he was hog-tied and restrained in the prone position with a deputy pressing substantial weight into his back, at least 16 KCSO officers at the scene witnessed this conduct, were able to intervene, and failed to intervene.   Instead, many of these officers casually stood nearby, joking around while such excessive force was used against Mr. Binkley while he was clearly incapacitated, restrained, and not resisting.   As noted above, these officers included Captain Amburn, Lieutenant Lubienski, Sergeant Overton. and senior deputies.

359.     Accordingly, far from the subject events being the actions of one or two rouge officers, the subject events involved and objectively constituted a systematic pattern of numerous officers witnessing the violations of Mr. Binkley's constitutional rights and failing to intervene. The series of events at the scene described herein involved many KCSO personnel with different levels of training and experience illustrating that *none* of them – from the least to the most

103

experienced officer – had been adequately or sufficiently trained by Knox County.   The entire group of officers present at the scene failed to intervene and thereby condoned a pattern of gratuitous, unnecessary, and repeated assaults on Mr. Binkley while he was already restrained and not resisting.

***Rookie Deputies Witnessed this Failure to Intervene During their In-the-Field Training***

360.    Knox County's deliberate indifference to training and supervising KCSO deputies in the manner described in this count is all the more clearly evidenced by the fact that the pattern of unconstitutional assaults referenced herein occurred during the in-the-field training for multiple KCSO deputies who were being trained by their deputy mentors and supervised by a number of experienced deputies and senior officers.

361.    As described above, during this training exercise in the field, there were multiple senior officers at the scene supervising, including Captain Amburn, Lieutenant Lubienski, and Sergeant Overton.   During this time, rookie deputies were actually learning how to conduct their duties from more senior deputies and other officers at the scene—yet these more experienced deputies and senior officers did not teach the rookie deputies that they have a duty to intervene either by instructing the deputies of this or by demonstrating this duty (such as by one of these senior officers intervening himself).   Instead, they taught the rookie deputies that it was acceptable in the field to not intervene or report when such excessive force has been used by another officer.

362.    Accordingly, the subject events at the scene not only establish that Knox County's training of the officers and deputies involved was deliberately indifferent with regard to an officer's duty to intervene that so many officers and deputies with so many levels of experience from different shifts could engage in a pattern of failure to intervene to prevent the violation of

104

Mr. Binkley's constitutional rights, but Knox County's training was so woefully inadequate and constitutionally deficient that the KCSO deputy trainees on the scene that evening were being trained by numerous senior officers and experienced deputies that it was acceptable to witness another officer use excessive force and do *nothing*; worse yet, they were being trained that it was acceptable to engage in conduct that violated a citizen's constitutional rights.

*Causation*

363.    It is foreseeable that KCSO officers in the field will routinely and repeatedly encounter situations in which they must intervene to prevent the use of excessive force and/or report when excessive force has been used.  Accordingly, the failure to have adequate policies and training on the issues noted above, reflects that Knox County, itself and through its final policy maker for the KCSO, Sheriff Spangler, failed to adequately train KCSO officers and deputies for the tasks they would be performing and acted with deliberate indifference to the obvious risks that citizens' constitutional rights would be violated.

364.    As a direct result of Knox County's failure to have any adequate written policies and training and/or Knox County's deliberately indifferent training and supervision regarding the foreseeable situations previously described, Mr. Binkley's constitutional rights were repeatedly and gratuitously violated and more than a dozen officers failed to intervene, causing Mr. Binkley to suffer serious personal injuries and a wrongful death.

365.    As a result of the failure of Knox County to establish and implement adequate training and supervision of KCSO officers and deputies, the KCSO Individual Defendants noted above failed to intervene and allowed the other deputies to repeatedly and gratuitously assault Mr. Binkley when he was already restrained and not resisting, such that they used excessive force

105

against Mr. Binkley, violated his constitutional rights, and caused his death on July 27, 2019.

366. Each of the unconstitutional acts and/or omissions generally described above was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

### Count X: Federal Constitutional Violations – *Monell* Policy, Practice, or Custom of Failing to Intervene (Against Defendant Knox County, Tennessee)

367. Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

368. Knox County is liable for the violations of Mr. Binkley's constitutional rights referenced above because Knox County had a custom, practice and/or *de facto* policy of permitting and condoning KCSO officers and deputies violating the constitutional rights of the public at large, including Mr. Binkley, by allowing them to fail to intervene when excessive force is being used against a citizen.

369. Knox County's *de facto* custom, policy, and practice of allowing, among other things, not requiring officers to intervene and report the use of excessive force is evidenced by at least three circumstances present here, which individually and collectively establish Knox County's deliberate indifference and such policies, practices, and customs: (i) the number of officers at the scene, who failed to intervene to prevent the use of excessive force against Mr. Binkley; (ii) the senior of the officers at the scene who failed to intervene; (iii) that the subject events involving Mr. Binkley were part of a training exercise; and (iv) Sheriff Spangler's failure to reprimand the officers involved for failing to intervene and report the use of such force.

106

***The Sheer Number of Officers, including Senior Officers, who Failed to Intervene or Report the Use of Excessive Force Against Mr. Binkley***

370.    The facts establishing the first two bases for Knox County's custom, practice and/or *de facto* policy of permitting deputies to not intervene when a citizen's constitutional rights are being violated – that numerous officers, including senior officers and experienced officers of different levels and from different shifts, failed to intervene when they witnessed the subject assaults and unconstitutional conduct against Mr. Binkley which ultimately consisted of a pattern of officers failing to intervene over an extended time period – have previously been addressed in detail above and are incorporated herein.

***The Arrest and Detention of Mr. Binkley was a Training Exercise***

371.    The facts establishing the third basis – that the subject events were being utilized as a training exercise – also has been generally described above.   Plaintiff specifically avers that the events and video evidence cited above establish that, at the time of the subject events on July 27, 2019, Knox County in fact had a custom, practice and *de facto* policy of permitting officers to not intervene or report when they witness another officer violating a citizen's constitutional rights.

372.    Worse yet, not only was Knox County's *de facto* policy, practice, or custom of not requiring officers to intervene illustrated by omission, the opposite was actually practiced.   The most senior officer on the scene, Captain Amburn, both failed to intervene and instead actively instructed two rookie deputies to use excessive force against Mr. Binkley by restraining him in the prone position.   By witnessing this use of excessive force and failing to intervene, and worse yet by the directing the use of excessive force, the senior officers on the scene, including Defendant Amburn, were affirming for these rookie deputies (and other deputies present) that Knox County's

107

*de facto* policies, customs, and practices do not require officers to intervene or report the use of excessive force against a citizen.

373. Further, the fact that there were so many officers at the scene – from different shifts and with varying experience levels from senior officers to trainees – who failed to intervene and instead encourage or condoned the assaults and the use of excessive force against Mr. Binkley during the trainees' on-the-job training itself illustrates that the subject events were typical and customary for Knox County and the KCSO as of the evening of July 27, 2019.

***Sheriff Spangler's Failure to Reprimand Following the Events Involving Mr. Binkley***

374. As noted above, following the subject events, Sheriff Spangler did not investigate or reprimand any of the KCSO Individual Defendants involved for their failure to intervene or report that other deputies used excessive force, including in post-incident reports. By failing to adequately investigate or reprimand the KCSO Individual Defendants for their failure to intervene when excessive force was being used against Mr. Binkley, Sheriff Spangler has tacitly affirmed Knox County's *de facto* policy, custom, or practice that does not require officers to intervene or report such conduct.

375. Further, on information and belief, following the subject events with Mr. Binkley, Sheriff Spangler also failed to institute any additional or appropriate policies or training concerning an officer's duty to intervene when he witnesses the use of excessive force. If the officers' failure to intervene when witnessing the repeated use of excessive force against Mr. Binkley was not in accordance with Knox County's *de facto* customs, policies, and practices, then there would have been some reprimand, training, and/or new policies instituted following the subject events.

376. Finally, on information and belief, it is routine for deputies to not include in post-incident reports and to otherwise not report the use of excessive force by another deputy. As

108

noted above, numerous uses of excessive force were not included in the KCSO reports concerning Mr. Binkley and the officers did not report the above-referenced uses of excessive force against Mr. Binkley following his death. In fact, numerous KCSO reports do not even mention that Mr. Binkley was hog-tied or that he was repeatedly restrained with one or more officers pressing weight on to his back while he was in the prone position. These failures reflect KCSO's tacitly approving and/or affirming that the defendants' failure to intervene and report the use of excessive force was consistent with Knox County's *de facto* policies, customs, or practices, and suggests that this information was not worthy of being mentioned in such reports.

*Causation*

377. It is foreseeable that KCSO officers in the field will routinely and repeatedly encounter situations in which they must intervene to prevent the violation of a citizen's rights, including the use of excessive force against that citizen, or where the officers must report when another officer has used excessive force.

378. Knox County's unlawful customs, practices, and *de facto* policies of permitting deputies to note intervene when they witness a citizen's constitutional rights being violated was the moving force behind and proximately caused the deprivation of Mr. Binkley's constitutional rights under the Fourth and Fourteenth Amendments as described herein.

379. Consistent with and as a direct and proximate result of Knox County's unconstitutional customs, practices and *de facto* policies described above, Mr. Binkley's constitutional rights were violated, including by but not limited to Mr. Binkley being struck, assaulted, restrained in the prone position and hog-tied with weight applied to his back, causing Mr. Binkley to suffer serious personal injuries and a wrongful death.

380.     Each of Knox County's unconstitutional acts and/or omissions generally described in this count was a cause in fact and legal cause of personal injuries, harms, losses and damages sustained by decedent Johnathan Binkley for which Plaintiff seeks recovery herein pursuant to applicable law.

## State Law Claims

## Count XI: Assault and Battery: Defendants Harrell, Bradshaw, Campbell, Burnett, Gomez, Bales, Jones, Sossville, Farmer and Doss)

381.     Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

382.     Based on their conduct described previously, including but not limited to their conduct referenced in the recitation of facts and in Counts I through IV above, Defendants Harrell, Bradshaw, Campbell, Burnett, Gomez, Bales, Jones, Sossville, Farmer and Doss each committed acts of assault and/or battery upon Johnathan Binkley in the manner referenced above.

383.     Each of the acts and omissions of each of said Defendants was committed while each such Defendant was acting under color of the office and in the course and scope of his employment with the Knox County and KCSO and in the performance of his official functions.

384.     Each of said Defendants, through the actions described above, did intentionally engage in each of said acts and each such act was the cause in fact and legal cause of harm, injuries, mental anguish, damages, and losses to Johnathan Binkley and was a cause in fact and legal cause of the wrongful death of Johnathan Binkley as generally described above, rendering each of them liable to Plaintiff Ann Ledford in accordance with Tennessee law.

110

## Count XII: Intentional Infliction of Emotional Distress
### (Against KCSO Individual Defendants)

385.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

386.    Based on their conduct described previously, including but not limited to their conduct referenced in the recitation of facts and in Counts I through IV above, each of the KCSO Individual Defendants, by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to Johnathan Binkley, which resulted in bodily harm and/or mental anguish and/or injury to Mr. Binkley.

387.    Each of the acts and/or omissions of each of said Defendants was so outrageous that it is not to be tolerated by civilized society.

388.    Each of the acts and omissions of each of said Defendants was committed while each such Defendant was acting under color of the office and in the course and scope of his employment with the Knox County and KCSO and in the performance of his official functions.

389.    Plaintiff specifically avers that each of said acts and/or omissions was intentional and/or reckless and, accordingly, was of such a nature none of said Defendants is entitled to immunity for any such conduct under applicable Tennessee law.

390.    Each of said Defendant's acts and/or omissions was the cause in fact and legal cause of harm, injuries, mental anguish, damages, and losses to Johnathan Binkley and was a cause in fact and legal cause of the wrongful death of Johnathan Binkley as generally described above, rendering each of them liable to Plaintiff Ann Ledford in accordance with Tennessee law.

## Count XIII: Assault and Battery and Related Wrongful Conduct
### (Against Knox County, Tennessee, Pursuant to T.C.A. § 8-8-301, *et seq.*)

391.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by

reference as if fully set forth in this count.

392.    Plaintiff asserts that Defendant Knox County is liable for each of the intentional and/or reckless acts and/or omissions of each of the individual defendants as described in Counts XI and XII above pursuant to Tennessee Code Annotated § 8-8-301, *et seq*., because said statutes render municipalities such as Knox County liable for the non-negligent conduct of its deputies.

393.    Each such act and/or omission was the cause in fact and legal cause of harm, injuries, mental anguish, damages, and losses to Johnathan Binkley and was a cause in fact and legal cause of the wrongful death of Johnathan Binkley as generally described above, rendering each of them liable to Plaintiff Ann Ledford in accordance with Tennessee law.

**Count XIV: GTLA Negligence Claims in the Alternative (Against Knox County, TN)[9]**

394.    Plaintiff hereby incorporates by reference each and every paragraph above as if fully set forth in this count.

395.    The KCSO Individual Defendants were, at all relevant times, employees of Defendant Knox County and/or KCSO.   None of the Defendants are healthcare facilities.

396.    Each of the acts and omissions of the KCSO Individual Defendants referenced herein occurred in the course and scope of their employment with Knox County and KCSO and in

---

[9] Plaintiff notes that there is a split of authority regarding the circumstances when a Plaintiff may plead in the alternative claims that sound in negligence against a municipality under the GTLA, T.C.A. 29-20-201 *et seq.*, in an action asserting primarily civil rights violations under 18 U.S.C. § 1983.   Plaintiff asserts negligence claims in the alternative in this count and in Count XV to preserve these claims in accordance with prior consistent authority while recognizing that there is also authority to the contrary, though in cases which Plaintiff contends are factually distinguishable.   The right to assert alternative negligence claims is particularly – and uniquely – important given the facts of this case where so many different officers and deputies of the Knox County Sheriff's Office -- with varying experience and authority levels – were, at various times, individually and jointly engaged in numerous separate wrongful acts and omissions which severely and ultimately fatally injured Mr. Binkley at the scene of his arrest on July 27, 2019.

112

the performance of their official functions.

397.    Each of the KCSO Individual Defendants had duties to the general public, including to protect and serve the general public in a lawful manner, and these duties extended to individuals such as Mr. Binkley.

398.    As Plaintiff has asserted in detail previously, Plaintiff principally contends that each of the acts of each of the KCSO Individual Defendants was intentional, reckless and/or unconstitutional (and not merely negligent).

399.    In the alternative, however, Plaintiff asserts that one or more of the acts and/or omissions of each of said individual defendants referenced in prior counts – where the individual act or omission itself consisted only of improperly supervising other deputies, improperly conducting on-the-job training of trainees, improperly failing to monitor Johnathan Binkley's condition, improperly failing to provide Johnathan Binkley with medical attention, improperly failing to recognize that Mr. Binkley was struggling to breathe and/or was suffering from positional or compression asphyxia, improperly failing to intervene to stop wrongful and illegal conduct, and/or improperly failing to intervene and protect Johnathan Binkley from wrongful or illegal conduct – was negligent.

400.    In any such event (as described in the preceding paragraph), Plaintiff asserts that any such negligent act or omission should be considered separately, distinctly, and apart from any other conduct committed otherwise which was in fact intentional, reckless, and/or unconstitutional and a violation of Mr. Binkley's civil rights (which unconstitutional conduct has been previously described in detail).

401.    Accordingly, and specifically with regard to any such negligent act or omission

113

only (and not any separate intentional, reckless, and/or unconstitutional conduct which violated Mr. Binkley's civil rights), Plaintiff asserts that each such negligent act and/or omission was a breach of the duties to Johnathan Binkley referenced above; was a cause in fact and legal cause of harm, injuries, mental anguish, damages, and losses to Johnathan Binkley; and was a cause in fact and legal cause of the wrongful death of Johnathan Binkley as generally described above, rendering Knox County liable to Plaintiff Ann Ledford in accordance with the Governmental Tort Liability Act, Tenn. Code Ann § 29-20-201, *et. seq*.

### Count XV: Individual Negligence Claims in the Alternative
### (Against KCSO Individual Defendants)

402.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

403.    Each of the KCSO Individual Defendants had duties to the general public, including to protect and serve the general public in a lawful manner, and these duties extended to individuals such as Mr. Binkley.

404.    As Plaintiff has asserted in detail previously, Plaintiff principally contends that each of the acts of each of the KCSO Individual Defendants was intentional, reckless and/or unconstitutional (and not merely negligent).

405.    In the alternative, however, Plaintiff asserts that one or more of the acts and/or omissions of each of said individual defendants referenced in prior counts – where the individual act or omission itself consisted only of improperly supervising other deputies, improperly conducting on-the-job training of trainees, improperly failing to monitor Johnathan Binkley's condition, improperly failing to recognize that Mr. Binkley was struggling to breathe and/or was suffering from positional or compression asphyxia, improperly failing to provide Johnathan

114

Binkley with medical attention, improperly failing to intervene to stop wrongful and illegal conduct, and/or improperly failing to intervene protect Johnathan Binkley from wrongful or illegal conduct – was negligent.

406.    In any such event (as described in the preceding paragraphs in this count), Plaintiff asserts that any such negligent act or omission should be considered separately, distinctly, and apart from any other conduct committed otherwise which was in fact intentional, reckless, and/or unconstitutional and a violation of Mr. Binkley's civil rights (which unconstitutional conduct has been previously described in detail).

407.    Further, in the event that it is determined, based on the application of the Governmental Tort Liability Act, Tenn. Code Ann § 29-20-201, *et. seq*., that immunity has not been removed for Knox County and, further, that none of the KCSO Individual Defendants are immune from any negligent conduct pursuant to said statutes, Plaintiff asserts that each such negligent act and/or omission was a breach of the duties to Johnathan Binkley referenced above; was cause in fact and legal cause of harm, injuries, mental anguish, damages, and losses to Johnathan Binkley; and was a cause in fact and legal cause of the wrongful death of Johnathan Binkley as generally described above, rendering the KCSO Individual Defendant responsible for each such negligent act or omission liable to Plaintiff Ann Ledford pursuant to applicable law.

### Count XVI: Punitive Damages (Against KCSO Individual Defendants)

408.    Plaintiff hereby incorporates, in their entirety, each and every paragraph above by reference as if fully set forth in this count.

409.    For each of the actions and omissions of the individual Defendants which was intentional, reckless, deliberately indifferent, and/or shocking to the conscience and/or unconstitutional, Plaintiff requests that she be awarded punitive damages in the amount the trier

115

of fact deems appropriate and just in accordance with applicable law.

## **DAMAGES AND PRAYER FOR RELIEF**

410.    As a direct and proximate result of the acts and omissions of Defendants, Mr. Binkley's constitutional rights were violated, and he sustained serious and grave personal injuries and a wrongful death.  Further, Plaintiff and any other such heirs of Mr. Binkley have suffered losses and damages as a result of his wrongful death.   The injuries and damages for which Plaintiff seeks compensation from Defendants, both jointly and severally, under both state and federal law include, but are not limited to, the following:

a.    The wrongful death of Johnathan Binkley;

b.    Mr. Binkley's physical pain and suffering prior to his death;

c.    Mr. Binkley's emotional pain and suffering prior to his death;

d.    Funeral expenses;

e.    Losses in the enjoyment of life;

f.    Losses of wages and earning capacity;

g.    Losses of familial consortium and services of Mr. Binkley;

h.    Losses of the right to familial association, society and companionship with Mr. Binkley;

i.    The full pecuniary value of the life of Mr. Binkley as defined by Tennessee law; and

j.    All other damages for personal injuries and wrongful death allowed under applicable law.

411.    Further, Plaintiff requests that this Honorable Court enter a judgment against Defendants, jointly and severally, granting or awarding the following relief:

a.    Compensatory damages for the injuries, damages, and wrongful death of Johnathan Binkley described herein in the amount the jury determines appropriate and just, not to exceed four million dollars;

116

b.  Punitive damages in an amount to be determined by the jury as fair and reasonable in accordance with applicable law to deter the individual Defendants and others from engaging in similar misconduct;

c.  Attorneys' fees, to the fullest extent allowable by the statutes generally referenced herein and/or the common law applicable to this case, including but not limited to the extent permitted under 42 U.S.C. § 1988 and any other applicable statute;

d.  Statutory and discretionary costs;

e.  Pre- and post- judgment interest; and

f.  All such further relief, both general and specific, to which she may be entitled.

412.  Plaintiff requests that a jury be impaneled to hear this cause.


Respectfully submitted this 28th day of December, 2020.


s/Wayne A. Ritchie II
Wayne A. Ritchie II, BPR No. 013936
James R. Stovall, BPR No. 32512
Samantha I. Ellis, BPR No. 036709
Ritchie, Dillard, Davies & Johnson, P.c.
606 W. Main Street, Suite 300
Knoxville, Tennessee 37902
Telephone: (865) 637-0661
Facsimile: (865) 524-4623
E-mail: war@rddjlaw.com
        jstovall@rddjlaw.com
        swarchol@rddjlaw.com
***Attorneys for Plaintiff***


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28th day of December, 2020, the foregoing was electronically filed with the Clerk of Court using the CM/EFC filing system, which will electronically serve same on all counsel of record.


s/Wayne A. Ritchie II
WAYNE A. RITCHIE II

117