# Austin Police Department
Policy Manual

## CHIEF'S MESSAGE

I am proud to present the newest edition of the Austin Police Department Policy Manual. The Policy Manual is designed to assist all employees in accomplishing the Department's mission in a professional and lawful manner. Adherence to these policies also helps safeguard employees and the Department against civil litigation and ensures that employees will be protected when their individual actions are scrutinized, especially after a critical incident.

All employees will abide by these policies and are responsible for keeping themselves current on the content of this manual.

Stay safe,

Brian

*Brian Manley*

Chief of Police

Copyright Lexipol, LLC 2017/07/21, All Rights Reserved.
Published with permission by Austin Police Department

# Chapter 2 - Response to Resistance and Pursuit Policies

Copyright Lexipol, LLC 2017/07/21, All Rights Reserved.
Published with permission by Austin Police Department

**Austin Police Department**

Policy Manual

# Leg Restraint Device

## 204.1  PURPOSE AND SCOPE

The proper use and application of a leg restraint devicecan reduce the potential of injury and damage to property when dealing with violent or potentially violent subjects. This policy provides guidelines for the proper use of these devices.

### 204.1.1  PHILOSOPHY

The Department recognizes and respects the value of all human life and dignity without prejudice to anyone. A leg restraint device should only be used when officers reasonably believe it is necessary to augment other restraints while performing their lawful duties; a leg restraint device is never to be used as punishment.

## 204.2  POLICY

When an officer encounters circumstances where it reasonably appears necessary to restrain the legs to prevent escape or restrain a violent or potentially violent subject during the course of a detention, arrest, and/or transportation, only Department approved RIPP Hobble or Ankle/Leg Iron restraint devices shall be used and only in the Department approved manner for temporary immobilization of the legs.

Patrol sergeants and corporals will be assigned leg irons as part of their issued equipment on their personal inventory list. When the sergeant or corporal is no longer assigned to a patrol shift they will return the leg iron to Police Equipment.

## 204.3  AUTHORIZED USE

(a)  Only those officers trained in the use of the leg restraint device are authorized to employ it on any subject.

(b)  The leg restraint device shall only be used after a subject has been handcuffed.

(c)  In determining whether to use a leg restraint device, officers should consider the following:

  1.  If the officer and/or others are subject to harm due to the assaultive behavior of a violent, resisting, and/or attacking subject.

  2.  If it is objectively reasonable to protect the subject from his own actions (e.g., hitting his head against the interior of the Patrol unit, running away from the arresting officer while handcuffed, kicking at objects or officers).

## 204.4  PROCEDURE

The leg restraint device is designed to reduce the likelihood of injury to the restrained subject or others, and to reduce the likelihood of property damage caused by the restrained subject by preventing him from using his legs in a manner likely to result in injury or damage. The following guidelines shall be used when applying a leg restraint device:

Copyright Lexipol, LLC 2017/07/21, All Rights Reserved.
Published with permission by Austin Police Department

## Leg Restraint Device

(a) If practicable, officers should notify a supervisor of the intent to apply the restraint. In all cases, a supervisor shall be notified as soon as practicable after the application of the restraint and the name of that supervisor shall be noted in a report or supplement.

(b) This device shall not be used to hog tie. Once the subject's legs have been bound, the safety clip of a restraint shall not be attached to the chain of the handcuffs.

(c) Absent a medical emergency, the subject being restrained shall remain restrained until the officer arrives at the jail or other facility or the subject no longer poses a threat.

(d) Once secured, the subject should be placed in a seated or upright position. Subjects shall not be placed on their stomach for an extended period as this may potentially reduce their ability to breathe.

    1. The restrained subject should be constantly watched by an officer while in the restraint. The officer is to ensure the subject does not roll onto and remain on his stomach.

    2. The officer should look for signs of labored breathing and, where practicable, take appropriate steps to relieve and minimize any obvious factors contributing to this condition.

    3. In the event that it appears reasonably necessary to restrain a subject in such a position that the subject's ability to sit upright is restricted, an officer should monitor the subject in an effort to minimize restricted breathing. The subject should be placed in an upright position as soon as it reasonably appears safe and practicable.

Copyright Lexipol, LLC 2017/07/21, All Rights Reserved.
Published with permission by Austin Police Department



# Policy 1115

*By Order of the Police Commissioner*

## POLICY

The purpose of this policy is to establish when a member may use force, and members' duties before, during, and after the Use of Force. The decision to use force requires careful attention and continual assessment of the situation, threats, options, and risks, with the goal of resolving the encounter peacefully.

**While members must at all times comply with the minimum legal requirements governing the Use of Force, they must also comply with even stricter standards set forth by Department policy.**

## CORE PRINCIPLES

1.  **Sanctity of Human Life.** Members shall make every effort to preserve human life in all situations.

2.  **Value and Worth of All Persons.** All human beings have equal value and worth and members shall respect and uphold the value and dignity of all persons at all times.

3.  **Peaceful Resolutions**. Members shall avoid the Use of Force unless it is not possible to do so.

4.  **De-Escalation.** Members shall use De-Escalation Techniques and tactics to reduce any threat or gain compliance to lawful commands without the Use of Force or with the lowest level of force possible (See Policy 1107, *De-Escalation*).

5.  **Avoiding Escalation.** Members shall not do or say anything that escalates an encounter unless necessary to achieve a lawful purpose.

6 . **Assessment.** Members shall continuously assess each situation and change the member's response as the circumstances change. Members may be justified in using force in one instance, but not justified in using force an instant later. This duty to assess includes the continuous assessment of circumstances before and after the member uses force.

7.  **Use of Force: Reasonable, Necessary, and Proportional.** Members shall use only the force Reasonable, Necessary, and Proportional to respond to the threat or resistance to effectively and safely resolve an incident, and will immediately reduce the level of force as the threat or resistance diminishes.

8.  **Reporting Use of Force**. Each member who uses force, or observes another member or members use force, shall immediately notify their supervisor, and will accurately and completely report the Use of Force by the end of their tour of duty (See Policy 725, *Use of Force Reporting, Review, and Assessment*).

9.	**Duty to Intervene.** Members shall intervene to prevent the abusive conduct or the use of excessive force by another member (See Policy 319, *Duty to Intervene*).

10.	**Duty to Provide Medical Assistance.** After any Use of Force incident, members shall immediately render aid to any injured person consistent with the member's training and request medical assistance. If restrained, persons are not to be positioned facedown as it may cause positional asphyxia, and placing restrained persons on their back may lead to radial nerve damage to the wrists and forearms. Restrained persons are to be placed in a seated position or on their sides.

11.	**Accountability.** Members shall be held accountable for uses of force that violate law or policy.

12.	**Retaliatory Force.** Members are prohibited from using force against persons engaged in First Amendment protected activities or to punish persons for fleeing, resisting arrest or assaulting a member, or for any other reason (See Policy 804, *First Amendment Protected Activity*).


## DEFINITIONS

**Active Aggression** — Active Aggression is when a person attacks or attempts to attack a member or another person. Strikes, kicks, or attempted strikes or kicks with hands, fists, the head, elbows, knees, or an instrument, constitute Active Aggression.

**Aggravated Aggression** — Aggravated Aggression is when a person presents an Imminent Threat of death or Serious Physical Injury to the member or another person based on the Totality of the Circumstances. Aggravated Aggression represents the least encountered but most serious threat to a member or other person. Even when confronted with Aggravated Aggression, the member is required to make every reasonable effort to de-escalate and to continuously assess the member's Use of Force.

**Chemical Agents** — Substances designed to irritate the eyes and mucous membranes (CS gas, PepperBall, Mk-9 Pepper Fogger, smoke, etc.).

**Chokehold/Neck Hold** — A Chokehold or Neck hold is any hold or contact with the neck that may inhibit breathing by compression of the airway in the neck, may inhibit blood flow by compression of the blood vessels in the neck, or that applies pressure to the front, side, or back of the neck. Chokeholds/Neck Holds are prohibited unless the use of Deadly Force/Lethal Force is justified.

**Conducted Electrical Weapon (CEW)** — A weapon designed to discharge electrical impulses in two modes:

> **Drive Stun** — Pulling the trigger on the CEW with the cartridge removed or discharged, and placing the electrodes upon the skin/clothing of the person. Drive Stunning does not cause neuro-muscular incapacitation but causes severe pain.

> **Probes Deployment** — Probes Deployment is the primary way that CEWs are used. With a cartridge attached, pulling the trigger fires two probes with barbs on the end that can penetrate the clothing or skin of a person. The two probes are connected to the CEW by wires and upon contact, if an electrical circuit is established, the CEW delivers pulsed electricity into the person, and overrides the person's voluntary motor function. Probes Deployment also causes significant pain.

**Deadly Force/Lethal Force** — Any force likely to cause death or Serious Physical Injury, whether the member intended to cause death or Serious Physical Injury or not. Deadly Force/Lethal Force includes, but is not limited to:

- The discharge of a firearm at a person;
- Strikes with any hard object such as a baton, flashlight, radio, weapon stock/handle, or Improvised Impact Weapon to the head, neck, sternum, spine, groin, or kidneys;
- Intentionally striking a person's head against a hard, fixed object such as a roadway, concrete floor, wall, or iron bars;
- Knee strikes or kicks to a person's head;
- Any strikes to a person's throat;
- "Knee drops" against a prone or supine person's head, neck, or torso;
- Chokeholds/Neck Holds;
- Shooting someone in the head, neck, chest, or back, with a Less-Lethal Launcher at close range.
- The use of any force on a person whose health, age, condition, or circumstances make it likely death or Serious Physical Injury will result.

**De-Escalation Techniques** — De-Escalation Techniques are actions taken by members that are designed to eliminate the need to use force in order to resolve any event or situation. De-Escalation Techniques include: talking to a person using a tone of voice and language that is not aggressive or confrontational; creating space or placing barriers between the member and the person; waiting the person out when circumstances permit; permitting a person to move about when safe; permitting a person the opportunity to make statements or ask questions; slowing down the pace of an incident; tactical re-positioning and requesting additional resources. The guiding principles for de-escalation are patience, flexibility, and the desire to resolve each situation peacefully (See Policy 1107, *De-Escalation*).

**Imminent Threat** — A person presents an Imminent Threat when the person has the means and ability to harm the member or another person, and the member reasonably believes the person intends to deliver that harm.

**Improvised Impact Weapon (IIW)** — An Improvised Impact Weapon (IIW) is a device or object that is not a department approved weapon, but is nonetheless used as an impact weapon (e.g., flashlight, radio, or stick). Such weapons may be unpredictable, ineffective, or exert unexpectedly high levels of damage (e.g., board with protruding nail). Consequently, members shall use Improvised Impact Weapons only in rare, emergency conditions where members lack an authorized Baton or other approved less-lethal alternatives, and use of an Improvised Impact Weapon is reasonable and necessary to defend against a person displaying Active or Aggravated Aggression.

**Less-Lethal Force** — Force that, when employed as designed, intended, and consistent with policy and training, is not likely to cause death or Serious Physical Injury. Devices of Less-Lethal Force may include, but not be limited to, a DS-3027 bean bag, FN-303, Pepper Ball rounds, batons/impact weapons, O.C. spray, and CEW. The way a Less-Lethal Force device is used and the circumstances in which it is used could constitute Deadly Force/Lethal Force.

**Less-Lethal Launchers/Munitions** — A delivery tool that, when used as designed and intended, is less likely to cause death or Serious Physical Injury than a conventional lethal weapon such as a firearm. Less-Lethal Launchers/Munitions are only approved for use by certified members.

**Physical Force** — A member uses Physical Force any time a member coercively touches, directly or indirectly, any person. Physical Force includes holds, grabs, blows, and strikes as well as the use of instruments, such as batons, devices, such as CEWs, tools such as O.C. spray, canines, or firearms, whether

lethal or less-lethal.

**Reasonable, Necessary, and Proportional** — The review of every Use of Force shall be to determine whether it was reasonable, necessary, and proportional in light of the Totality of the Circumstances that were known, or should have been known, to the member, and in light of the mandates of BPD Policies.

> **Reasonable** — A member uses Reasonable Force when the member uses no more force than required to perform a lawful purpose.

> **Necessary** — Force is necessary only when no reasonably effective alternative exists. When force is Necessary, members shall use force in a manner that avoids unnecessary injury or risk of injury to members and civilians.

> **Proportional** — Proportionality measures whether the force used by the member is rationally related to the level of resistance or aggression confronting the member.

NOTE: Members who use force that is not Reasonable, Necessary, and Proportional will be subject to corrective action, possible discipline, possible criminal prosecution, and/or civil liability.

**Resistance** — Members may face the following types of Resistance to lawful directives:

> **Active Resistance** — Active Resistance is when a person moves to avoid detention or arrest but does not attack or attempt to attack the member or another person. Attempts to leave the scene, fleeing, hiding from detection, physical resistance to being handcuffed, or pulling away from the member's grasp are all examples of Active Resistance. Verbal statements, bracing, or tensing alone do not constitute Active Resistance. A person's reaction to pain caused by a member or purely defensive reactions to force does not constitute Active Resistance.

> **Passive Resistance** — Passive Resistance is when a non-assaultive person fails to comply with the member's commands without attempting to flee. Passive Resistance may include, but not be limited to, going limp, standing stationary and not moving based upon lawful direction, and/or verbally signaling an intention to avoid or prevent being taken into custody.

**Serious Physical Injury** — Serious Physical Injury is when there is disfigurement or substantial disruption or harm to one or more body parts, organs, or systems. The term includes, for example, brain injury, with or without unconsciousness, gunshot wounds, cardiac arrhythmia, difficulty breathing, cardiac or respiratory arrest, broken bones, dislocations, torn ligaments or tendons, or significant bleeding. This list is not exhaustive and is intended only to provide representative examples for guidance.

**Temporary Pain —** Any pain or complaint of pain that is brief, does not result in injury, and is delivered as a means to gain compliance. Temporary Pain may result from the application of, but is not limited to, elbow grips, wrist grips, shoulder grips, pressure point techniques, and/or forcible takedowns.

**Totality of Circumstances** — The Totality of Circumstances consists of all facts and circumstances surrounding any event. The facts and circumstances may include but are not limited to:

- Whether an offense has occurred;
- The nature of the offense;
- The seriousness of the offense;
- The size and strength of the person;
- The number of persons;

- The availability of weapons;
- Whether the person is exhibiting signs of mental illness or is experiencing a behavioral health crisis;
- Whether a person suffers from a medical or behavioral health disability, physical or hearing impairment, is impaired by alcohol or drug use, or may be non-compliant due to a language barrier;
- Other force options;
- Availability of non-force options, including tactical repositioning, going to cover, or other De-Escalation Techniques;
- Environmental factors;
- Availability of back up and specialized units.

**Use of Force** — Any Use of Force or show of force that falls within Level 1, Level 2, or Level 3 force as defined in this policy. Use of Force Levels are:

**Level 1 Use of Force** — Includes:
- Using techniques that cause Temporary Pain or disorientation as a means of gaining compliance, hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip), and pressure point compliance techniques. Force under this category is not reasonably expected to cause injury,
- Pointing a firearm, Less-Lethal Launcher, or CEW at a person,
- "Displaying the arc" with a CEW as a form of warning, and
- Forcible takedowns that do not result in actual injury or complaint of injury.

NOTE: Escorting, touching, or handcuffing a person with minimal or no resistance does not constitute a Level 1 Use of Force.

EXCEPTION #1: SWAT team members and members assigned to work on a federal task force will not be required to report the pointing of a firearm at a person as a Use of Force during the execution of SWAT team or federal task force duties.

EXCEPTION #2: Pointing of a firearm at a person by any member, if done solely while entering and securing a building in connection with the execution of an arrest or search warrant, will not be a Use of Force. A permanent-rank supervisor must still complete a Form 93, Weapons-Pointing Report detailing the incident (See Policy 725, *Use of Force Reporting, Review, and Assessment).*

**Level 2 Use of Force** — Includes:
- Force that causes or could reasonably be expected to cause an injury greater than Temporary Pain or the use of weapons or techniques listed below — provided they do not otherwise rise to a Level 3 Use of Force:
- Discharge of a CEW in Drive-Stun or Probes Deployment, in the direction of a person, including where a CEW is fired at a person but misses,
- Use of OC spray or other Chemical Agents,
- Weaponless defense techniques including, but not limited to, elbow or closed fist strikes, open hand strikes, and kicks,
- Discharge of a Less-Lethal Launcher/Munitions in the direction of a person,
- Canine-inflicted injuries that do not rise to a Level 3 Use of Force,
- Non-weapon strikes to the head, neck, sternum, spine, groin, or kidney area, and
- Striking of a person or a vehicle with a vehicle that does not rise to Level 3 Use of Force.

**Level 3 Use of Force** — Includes:
- Strikes to the head, neck, sternum, spine, groin, or kidney area with an impact weapon,
- Firearm discharges by a BPD member,
- Applications of more than three (3) CEW cycles in a single encounter, regardless of the mode or duration of the application, and regardless of whether the applications are by the same or different members,
- CEW application for longer than 15 seconds whether the application is a single continuous application or from multiple applications,
- Uses of Force resulting in death, Serious Physical Injury, loss of consciousness, or requiring hospitalization, and
- Uses of Deadly Force/Lethal Force.

<u>NOTE</u>: Hospitalization refers to admission to the hospital, and does not include treatment and release in the emergency department, no matter how long the stay.


## <u>DIRECTIVES</u>

**Use of Force**

1. Sworn members have the authority to use Reasonable force when Necessary to accomplish lawful ends. This authority is limited by the laws of the State of Maryland, federal law, the United States Constitution, and the provisions of this policy. Members must conform their actions to the law, the Constitution, and BPD policies. When members use force, they shall exercise the utmost restraint. When practical, members should announce that force will be utilized prior to the application of such force.

2. Members shall prevent or stop the illegal, inappropriate, or excessive Use of Force by other members. Failure to intervene may subject a member to disciplinary action (See Policy 319, *Duty to Intervene*).

3. Members may only use weapons and/or force techniques that are allowed by policy and on which the member is trained, unless warranted by the Totality of Circumstances.

**De-Escalation**

Members shall, unless it is not possible to do so, avoid the Use of Force by using De-Escalation Techniques, including verbal persuasion and warnings, slowing down the pace of an incident, waiting out persons, using barriers, creating distance (and thus the reactionary gap) between the member and the threat, and requesting additional resources such as specialized units, CIT trained members, behavioral health care providers, or negotiators, before resorting to force, and to reduce the need for force. De-Escalation Techniques mitigate the threats and gives officers time to utilize extra resources, and increases time available to call more officers or specialty units (See Policy 1107, *De-Escalation*).

1. Members shall talk to the person; attempt to convince the person to comply; reduce any threat presented by withdrawing to a position that is tactically advantageous; or take actions that allow the member greater distance and time, in order to de-escalate a situation or deploy a lesser force option or no force at all.

2. Members shall perform their work in a manner that avoids unduly jeopardizing their own safety or the safety of others through poor tactical decisions including, but not limited to, immediately approaching a person without proper evaluation of the situation, failing to leave sufficient space between the member and the person, closing the reactionary gap, or escalating a situation.

3. Members <u>shall not use tactics</u> that unnecessarily escalate an encounter or create a need for force.

4. Members shall de-escalate force immediately as resistance decreases.

5. If the member has no alternative to using force, the member shall use only the amount of force that is Reasonable, Necessary and Proportional to respond to the threat or resistance and shall immediately reduce the level of force as the threat or resistance lessens or stops.

**Critical Thinking**

Prior to using force, members shall use a critical thinking and decision-making framework to analyze and respond to incidents. This framework will allow members to uphold the sanctity of life and protect themselves by decelerating and stabilizing a situation to minimize the likelihood of a Use of Force incident. Using this framework, members will:

1. Assess the situation, threats, and risks;

2. Gather relevant facts about the incident;

3. Consider police powers and BPD policy;

4. Identify options and determine the best course of action; and

5. Act, review, and re-assess the situation.

**Restrained Persons**

1. Members shall not use force against persons who are handcuffed or otherwise restrained, except in exceptional circumstances where the Totality of Circumstances makes it Reasonable and Necessary to prevent injury or escape. Members are cautioned that force that may be Proportional against an unrestrained person may not be Proportional when used on a restrained person. As with any Use of Force, members shall be required to use De-Escalation Techniques and critical thinking in order to avoid the Use of Force.

2. Members shall not use force against a handcuffed or restrained person if the person's actions only present a risk of property damage.

3. Members shall **not** position a restrained person face-down as it may cause positional asphyxia, placing persons on their back can cause radial nerve damage to the wrist and forearm area. Restrained persons are to be seated or placed on their side.

**Use of Deadly Force/Lethal Force**

1. The use of Deadly Force/Lethal Force shall always be the last resort.

2. Members shall not use Deadly Force/Lethal Force unless they have exhausted de-escalation

(See Policy 1107, *De-Escalation*) and Less-Lethal Force options have been tried and failed, or are not safe based on the Totality of Circumstances.

3.  A member may use Deadly Force/Lethal Force when they reasonably believe such action is immediately necessary to protect a member or another person from an Imminent Threat of death or Serious Physical Injury.

4.  Prior to the decision to employ Deadly Force/Lethal Force members shall consider environmental considerations such as field of fire, backdrop, bystanders, potential for ricochet, possibility of over-penetration, and other risks to life.

5.  Where safety permits, a member should identify himself/herself as a law enforcement officer and state his/her intention to use Deadly Force/Lethal Force before using a firearm or employing Deadly Force/Lethal Force.

6.  A member may use Deadly Force/Lethal Force to prevent the escape of a fleeing person if force is authorized and no Reasonable force alternative exists that is within BPD policy, the member has given a verbal warning to the person (if time, safety, and circumstances permit), and there is probable cause to believe that:

    6.1.  The person has committed or is in the process of committing a felony involving the infliction or threatened infliction of Serious Physical Injury or death, <u>and</u>

    6.2.  The escape of the person would pose an Imminent Threat of death or Serious Physical Injury to the member or another unless the person is apprehended without delay, <u>and</u>

    6.3.  Members have identified themselves as law enforcement officers, have stated their intention to use Deadly Force/Lethal Force, and have given the person a reasonable opportunity to comply voluntarily, if time, safety, and the circumstances permit.

**Restrictions on the Use of Deadly Force/Lethal Force**

1.  Deadly Force/Lethal Force shall not be used to subdue persons whose conduct is a threat only to property.

2.  Deadly Force/Lethal Force shall not be used against persons whose conduct is a threat only to themselves.

3.  **<u>The following are prohibited</u>** unless the use of Deadly Force/Lethal Force is authorized and no reasonable alternatives exist:

    3.1.  Discharge of a firearm at a person.

    3.2.  Strikes with any hard object, such as a baton, flashlight, radio, weapon stock/handle, or IIW to the person's head, neck, sternum, spine, groin, or kidneys.

    3.3.  Intentional strikes of a person's head against a hard, fixed object including, but not limited to, a roadway, concrete floor, wall, or iron bars.

    3.4.  Kneeing or kicking a person's head, neck, back, or torso, including "knee drops" onto a prone or supine person.

3.5. Intentionally deploying a CEW to the neck, chest, groin or face of a person.

3.6. Application of Chokeholds/Neck Holds.

3.7. Discharge of a Less-Lethal Launcher to the chest, neck, or head at close range.

3.8. The use of any force on a person whose health, age, condition, or circumstances make it likely that death or Serious Physical Injury will result.

4. Firing warning shots is prohibited.

5. Firing into crowds is prohibited.

6. Members shall not fire any weapon from or at a moving vehicle, except:

6.1. To counter an immediate threat of death or Serious Physical Injury to the member or another person, by a person in the vehicle using means other than the vehicle.

6.2. To counter a situation where the member or another person is unavoidably in the path of the vehicle and cannot move to safety. Members shall not position themselves in the path of a moving vehicle where they have no option but to use Deadly Force/Lethal Force.

NOTE: Refer to Policy 409, *Firearms Regulations*, for instructions on the use of firearms.


## REQUIRED ACTION

### Duty to Intervene

Members shall intervene to stop any member from using excessive force. Intervention may be verbal and/or physical (see Policy 319, *Duty to Intervene*).

**NOTE: Failure to intervene may subject a member to disciplinary action. Members must immediately, or as soon as safety allows, notify a permanent-rank supervisor after such an intervention.**

### Duty to Provide Medical Assistance

1. When there is a visible injury, complaint of injury, signs of medical distress, or when medical attention is requested by any person, members shall immediately render aid consistent with their training and shall request that a medic respond to the scene, or transport the person directly to the nearest hospital emergency room. The member shall then notify their supervisor and the Communications Section.

2. If a person has been subjected to impact by any type of Less-Lethal Force including CEW, impact weapons or impact projectile, he/she will be provided with medical treatment. If the person refuses medical treatment or leaves the location (e.g., persons of an unlawful gathering dispersed by Less-Lethal Force that may voluntarily leave without aid), members must document the actions taken to identify and render aid to the person in the Use of Force Review.

## Children and Youth

1.     As with any encounter, members are expected to continually assess the situation, employ De-Escalation Techniques, and seek peaceful resolutions during incidents involving children and youth.

2.     Members will, when feasible, recognize and employ developmentally-appropriate and trauma-informed tactics including, but not limited to, using a calm and natural demeanor, and avoiding threatening language. Members will also account for any fear-based reactions children and youth may experience during an encounter.

3.     When force against a child or young person is necessary, take into account personalized factors of the child or young person including, apparent age, body size, and relative strength of the member relative to the child or young person; and risk posed by the child or young person; and,

4.     In the case of injury resulting from a Use of Force, in addition to the requirements to render aid, summon medical care and notify a supervisor, the member will notify the child or young person's parent, guardian, or other responsible adult.

## Reporting

1.     All members will adhere to the Use of Force guidelines found in Policy 725, *Use of Force Reporting, Review, and Assessment.*

2.     Members of the BPD must notify a permanent-rank supervisor immediately, or as soon as practicable, following a Use of Force. The supervisor will notify the Shift Commander by the end of the shift during which the force occurred. The notification will contain basic information concerning the incident. Any member with knowledge that another member used force must also immediately report that Use of Force to a permanent-rank supervisor. In all instances, the permanent-rank supervisor will conduct a thorough review of the Use of Force, and document this review by completing a BlueTeam entry before the conclusion of the supervisor's tour of duty.

3.     The failure of any commander, supervisor or member to fulfill any of the requirements of this policy will not prevent, inhibit or otherwise affect the ability of the Department to conduct an investigation of any misconduct arising from a Use of Force incident or to otherwise discipline a member for any violation of this policy.

## ASSOCIATED POLICIES

Policy 302,      *Rules and Regulations*
Policy 319,      *Duty to Intervene*
Policy 409,      *Firearms Regulations*
Policy 414,      *Less-Lethal Munitions and Chemical Agents*
Policy 710,      *Level 3 Use of Force Investigations / Special Investigation Response Team (SIRT)*
Policy 719,      *Conducted Electrical Weapon*
Policy 724,      *Performance Review Board*
Policy 725,      *Use of Force Reporting, Review, and Assessment*
Policy 824,      *Body-Worn Camera*
Policy 1107,     *De-Escalation*
Policy 1111,     *Batons / Impact Weapons*
Policy 1114,     *Persons in Police Custody*
Policy 1118,     *Oleoresin Capsicum Spray*
Policy 1602,     *Canine Procedure*

## RECISSION

Remove and destroy/recycle Policy 1115, *Use of Force*, dated 2 March 2018.

## COMMUNICATION OF POLICY

This policy is effective on the date listed herein. Each employee is responsible for complying with the contents of this policy.



# ~~~~~~~~~~~~~~~
# Greensboro Police Departmental Directives
# ~~~~~~~~~~~~~~~~





~~~~~~~~~~~~~~~~

# Chapter 11

~~~~~~~~~~~~~~~~



## 11.1.1 GENERAL POLICY

Personnel will take those measures which will reasonably ensure safety and security for arrestees, the transporting officers, and the general public. These measures will be followed by all officers who transport arrestees in Greensboro Police Department vehicles or who exercise control and custody over arrestees.

The primary duty of an officer when transporting an arrestee is the safe delivery of the arrestee in his care. An officer transporting an arrestee should not become involved in responding to the need for other law enforcement services. Only where the risk to third parties is both clear and grave and the risk to the arrestee is minimal should the officer stop to render assistance or become involved in a separate request for law enforcement service.

## 11.1.2 SEARCH PRIOR TO TRANSPORT

Each police vehicle used for transporting arrestees will be searched for contraband and weapons at the beginning and end of each duty day by the officer in charge of the vehicle. In the event contraband or weapons are found, the on-duty supervisor will be notified and the property will be turned in as found property, or confiscated property if it is an illegal substance, and any appropriate administrative investigation conducted.

Additionally, prior to placing an arrestee in a police vehicle for transporting, the transporting officer will ensure that no contraband or similar items or weapons are present in the area the arrestee is to occupy. After removing an arrestee from a vehicle in which he has been transported, the area occupied by the arrestee will be searched for contraband and weapons.

Any officer who transports an arrestee not having already been searched in that officer's presence shall personally search the arrestee prior to transportation.

When there is a need to search members of the opposite sex, officers shall, when feasible, arrange for the person to be searched by an officer of the same gender as the individual detained or in custody. When circumstances do not allow this, the officer will, when possible, secure the physical presence of another officer to witness the search process. In those instances when the officer must search a member of the opposite sex alone, reasonable procedures will be utilized which minimize embarrassment to the individual without diminishing the officer's personal safety. These procedures will conform to the current methods and techniques taught by the Training Division.

## 11.1.3 TRANSPORTATION

Transportation of arrestees will be accomplished according to procedures which address the safety of the officer as well as the security and welfare of the arrestee being transported. Since every eventuality cannot be predicted, unusual or special circumstances may require that an officer deviate to some extent from the following procedures, keeping officer safety and security of the arrestee in mind. The following general principles apply:

- No more than one arrestee will be transported in a vehicle having no shield and without a backup or guard officer.

- Officers will continually monitor any arrestee being transported.

- An arrestee being transported should not be allowed to communicate with anyone other than authorized personnel.

Arrestees transported in police vehicles equipped with shields will normally be placed in the rear seat area.

When a single officer is transporting an arrestee in a vehicle without a shield, the arrestee should be placed on the front passenger seat, with hands cuffed behind the back, and properly secured with a seatbelt.

When two officers transport an arrestee in a vehicle without a shield, the arrestee should be placed in the right rear passenger seat and seat belted in with hands cuffed behind the back. The passenger officer should sit in the left rear passenger seat behind the driver.

During the transport of an arrestee over a long distance or time period (out of town) and a meal is required; the selection of the place where the meal is to be taken should be done randomly. If the arrestee must use toilet facilities, he will be kept in sight by the transporting officers. Whenever officers are going to transport arrestees over a long distance or a long period of time, an all male officer team will not be used to transport a female arrestee, nor will an all female officer team be used to transport a male arrestee.

Each prisoner being transported from a detention facility must be positively identified as the person who is to be moved. The following procedures will be followed whenever removing a prisoner from a detention facility to be transported to another location:

- Booking records and numbers assigned to the prisoner in the detention facility must be verified with a picture of the prisoner made at the time of booking (if the prisoner was photographed at the time of booking). Any identification the prisoner may have had at the time of booking which will help to verify the prisoner's identity should be used.

- Proper documentation must accompany each prisoner transported from one detention facility to another. This documentation should include the following: medical records, if any; prisoner's personal property record and items of property; copies of warrants, etc.; and information relating to the prisoner's escape or suicide potential or other personal traits of a security nature (all of this information is for the officer's and prisoner's safety). This information, if applicable, must be passed on to the final receiving detention facility.

In the event an arrestee is injured or becomes ill during transport over a long distance, the transporting team will proceed to the nearest medical facility and notify the on-duty Watch Commander as soon as practical.

In the event an arrestee needs to be exchanged between an officer of the Greensboro Police Department and another law enforcement agency, the exchange will occur at a secure location where at least one of the agencies has jurisdiction.

## 11.1.4          RESTRAINT

The restraint of arrestees will be done with the safety of the officer and the security and welfare of the arrestee in mind.

<u>Handcuffs</u>:  Officers should handcuff the following persons:

- Any person under arrest who is violent, resisting arrest or threatening the safety of the officer or other persons present, or who the officer reasonably believes poses a threat of such violence.

- Any person legally under police control who is violent or threatening the safety of himself, the officer, or other persons present, or who the officer reasonably believes poses a threat of such violence.  An example would be a violent mental commitment.

The fact that the person in custody is a female or juvenile does not, in itself, preclude the use of handcuffs.  A reasonable belief that resistance, violence, or a threat to safety will result dictates whether handcuffs will be used, irrespective of gender or age.

An individual should be handcuffed behind the back, with the palms facing outward, to reduce the possibility of manipulating the handcuffs.  Unusual or special circumstances in a given situation may require an officer to deviate to some degree from this procedure.

The handcuffs should be tightened only enough to effectively secure the person's wrists.  The wrists should be checked for cutting and swelling, and the handcuffs loosened, as necessary.  Cuffs should be double-locked whenever possible.

A handcuffed person should be secured with a seat belt during transporting, if possible.

If a person has been handcuffed and the custody procedures will be completed in a reasonable period of time, the handcuffs should remain in place until the person is jailed, released from custody, or no longer poses a threat of violence.

Removal of the handcuffs to allow the person to sign custody or legal documents should not be done unless the officer is satisfied that removal may be done safely.  If not, the officer's name should be signed on the form with the notation "handcuffed".

When the custody procedures cause a delay and the human needs of the person must be attended to, the handcuffs may be removed, provided the officer believes the needs are valid and the person can be controlled, and there are sufficient officers present to control the person.

No person will be handcuffed to the interior of a vehicle or building, nor be placed in a vehicle with self-locking doors without an officer present during the time the person is in the vehicle.  The only routine exception to this policy is the handcuffing of an arrestee to the benches provided for such use in the jail booking room.  Unusual or special circumstances in a given situation may require an officer to deviate to some degree from this procedure.

<u>Flexicuffs</u>:  When the use of regular handcuffs is not appropriate, feasible, or sufficient, flexicuffs may be used.  Padding may be used to prevent injury to the wrists.  Flexicuffs may be used for leg restraint, as necessary.

Additional Restraint:  Sometimes it is necessary to use a higher level of restraint than handcuffing. In those cases, there are alternative restraint techniques which may be used.  In addition to the wrists, the feet or ankles of the arrestee may be secured to restrict the independent movement of the feet and legs.  For this purpose, training is provided in the use of the RIPP HOBBLE restraining device.  If further immobility is needed, the secured wrists and ankles of the arrestee may be linked together using flexicuffs or the hobble device.  At no time shall the wrists and ankles of an arrestee be linked together using the RIPP HOBBLE restraining device, unless the arrestee can be seated in an upright position, or on their side **If** this is done, the knees of the arrestee will not be bent more than 90 degrees (unless extenuating circumstances exist) to prevent stress being placed on the arrestee's chest muscles or diaphragm which might contribute to a positional asphyxia situation.  An arrestee restrained with both the wrists and ankles secured will be transported only on his side or in a sitting position.  It is the responsibility of the arresting officer to ensure the arrestee is under direct observation from the time he is restrained in this manner until the restraints are removed or the custody of the arrestee is turned over to another agency.  The arresting officer may utilize an assist officer for direct observation of the arrestee.  If an officer arrives at the jail with a combative arrestee, the officer may request assistance from the Sheriff's Department staff with utilization of the jail's restraint chair.

Gagging:  Placing any material in the mouth of an arrestee to further restrict an arrestee ("gagging") is prohibited.  Where there is a problem with the arrestee spitting bodily fluids at or on the officer or another person, a surgical mask may be placed on the arrestee.  The mask will be secured around the arrestee's face by tying one set of ties around his head.  The other set of ties will not be used, allowing the mask to drape in front of the arrestee's mouth and nose without interfering with the arrestee's ability to talk or breathe.

Sick or Injured Arrestees:  Restraining devices should be used on sick or injured arrestees if the officer reasonably believes that the arrestee is a threat to himself, the officer, or any other person. Each individual instance will be evaluated on its own, and the transporting officer will use discretion based upon the information known.

Physically and Mentally Handicapped Arrestees:  These individuals present conditions for their detention and transportation which dictate special care and attention.  It may be necessary to transport medicine or other special items for certain persons during transport.  The safety of the subject transported and the transporting officer requires due care when transporting handicapped persons.

Handicapped arrestees will be handled as follows:

- The arrestee should be handcuffed or restrained with other restraining devices if he is violent, resists arrest, or poses a danger to himself or others.

- If possible, the handicapped arrestee will be transported in a police vehicle with a security shield.  If the handicapped arrestee must be transported in a special vehicle, the officer will notify the Guilford County Department of Social Services and arrange for the use of a special vehicle used for the transportation of handicapped persons.  If this is not possible, the officer will contact the Sheriff's Department and ascertain if they can help in the transportation of the arrestee.  The Police Department's prisoner transport van may be used, if the arrestee is safely secured and prevented from moving around and possibly injuring himself.



# Department Manual

**Metropolitan Police Department**
*Nashville, Davidson County, TN*

*Published August 20, 2018*

www.police.nashville.org

# Title 11:  Use of Force

## 11.10  Use of Force

The Metropolitan Nashville Police Department recognizes and respects the value and special integrity of each human life.  When investing police employees with the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required.

**11.10.010** **It is the policy of the Metropolitan Nashville Police Department that authorized employees shall use only that force that is reasonably necessary to effect lawful objectives. Therefore, intentional misuse of the authority granted under this policy is grounds for disciplinary action up to and including those outlined in category A of established policy for Discipline and Corrective Action.**

This policy is for Metropolitan Nashville Police Department use only and does not apply in any criminal or civil legal proceedings.  This department policy should not be construed as the creation of a higher legal standard of care.  Violation of this directive will only form the basis for departmental administrative sanction.

**11.10.020** **Definitions Specific to Use of Force**

A. **Absolutely Necessary:** All other options have been exhausted, unavailable, or are not feasible.

B. **Active Aggression:** Where the employee's attempt to gain lawful compliance has culminated in the perception of an attack, or the potential for such an attack, on the employee or others.  The employee makes the reasonable assessment that such actions by the subject would not result in serious bodily injury or death to the employee or others.

C. **Active Resistance:** A subject whose non-compliance includes resistive movements or physical defiance.

D. **Aggravated Active Aggression:** Where the employee's attempt to gain lawful compliance has culminated in the perception of an attack or the potential for such an attack on the employee or others.  The employee makes the reasonable assessment that such actions by the subject could result in serious bodily injury or death to the employee or others.

E. **Authorized Weapons and Ammunition:** Weapons and ammunition approved by the Metropolitan Nashville Police Department Chief of Police and the Training Division for which authorized employees receive departmentally approved safety and proficiency training.

F. **Conducted Energy Device (CED):** A hand-held device that is designed to subdue persons and/or animals. The device uses a low dose electrical current to temporarily stun and immobilize. Currently, the departmentally approved CEDs are the Taser® Model M26, Taser® Model X26 or Taser® Model X26P.

G. **Deadly Force:** Any use of force reasonably calculated to produce death or serious bodily injury.

H. **Defensive Force:** Use of hands, feet, or any other defensive equipment to overcome violent resistance or to protect self or others from assault or injury.

I. **Excited Delirium:** A state of extreme mental and physiological excitement, characterized by extreme agitation (including shouting and disruptive behavior), hyperthermia, excessive watering of the eyes, hostility, paranoia or panic, inappropriate nudity, exceptional strength and endurance without fatigue.

J. **Force-Continuum:** Broad categories of force, in identifiable escalating/de-escalating stages of intensity, in response to a subject's action. They are commonly identified as official presence, verbal direction, soft empty-hand control, hand-held chemical spray/conducted energy device, hard empty-hand control, batons, and firearms. A subject's action may be defined in broad categories including full compliance to commands, verbal uncooperativeness, passive resistance, active resistance, active aggression, and aggravated active aggression (deadly force).

K. **Injury:** Includes any physical pain, illness, or any impairment of physical condition.

L. **Less Lethal Devices:** A device that is designed to reduce the potential of causing serious bodily injury or death.

M. **Lethal Weapon:** Any weapon reasonably calculated to produce death or serious bodily injury.

N. **Non-Deadly Force:** Any use of force other than that which is considered deadly force.

O. **Passive Resistance:** A non-compliant subject who offers no sign of physical defiance or resistive movement towards an employee's efforts.

P. **Physical Force:** The application of a technique, action, or device to compel a change in the actions of another person; usually compliance with a desired behavior, submission to authority, or to de-escalate a threatening behavior.

Q. **Positional Asphyxia:** Positional asphyxia is a position that can produce unconsciousness or death caused by a lack of oxygen or an increase of carbon dioxide in the blood.

R. **Reasonable Belief:** The facts or circumstances the employee knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

S. **Restraining Force:** Force which is limited to holding and restraining persons, which shall include arm-lock and takedown holds, but shall not include neck restraints.

T. **Serious Bodily Injury:** Bodily injury that creates a substantial risk of death, causes serious permanent disfigurement, or results in long-term loss or impairment of the functioning of any bodily member or organ.

U. **Verbal Uncooperativeness:** A compliant subject who offers no sign of physical defiance or resistive movement towards an employee's efforts, yet verbalizes resistance to instructions.

## 11.10.030 Parameters for Non-Deadly Force

A. When the use of force is needed, if feasible, authorized employees will identify themselves and determine which options in the force continuum will best de-escalate the situation in the most safe, reasonable, and prudent manner possible.

When communicating with any individual(s) wherein the use of force is likely, officers should be aware of any type of issue that may interfere with the subject's ability for communication and/or comprehension of the officer's instructions and/or commands.

Issues interfering with communication/understanding may include hearing impairment, but also cognitive deficits (e.g. dementia), or other apparent behavioral/mental impairment.

B. Authorized employees are permitted to use department authorized non-deadly force techniques and equipment for resolution of incidents to:

1. Protect themselves or another from bodily injury;
2. Restrain or subdue a resistant person for whom there is probable cause to arrest or reasonable suspicion to stop;
3. Prevent damage to property; and/or
4. Bring an unlawful situation in which there is lawful authority for the employee to intervene, safely and effectively under control.

C. Authorized employees may use department issued or approved hobble restraints and approved custodial restraint techniques on subjects who have been combative to reduce the likelihood of self-inflicted injury or to control further resistance while handcuffed. Employees are **not** permitted to use hobble restraints, leg shackles, plastic ties, or any other device to place any subject in a manner which is likely to produce positional asphyxia.

D. Any use of force on subjects who are handcuffed or otherwise in custody is prohibited unless physical resistance must be overcome. Such uses of force must be specifically articulated-with an emphasis on why a particular level of force used was necessary to obtain compliance.

E. Authorized employees are permitted to use only that force which is reasonable and necessary under the particular circumstances to protect themselves or others from bodily injury, and only after other reasonable alternatives have been exhausted or it is determined that such alternative action(s) would be ineffective under the circumstances.

F. Flight alone shall not justify the use of any level of force beyond official presence or verbal direction on a suspect. An officer must have reasonable suspicion or probable cause to believe that the suspect has committed or is about to commit a criminal offense before utilizing force greater than verbal direction.

## 11.10.040  Use of Chemical Spray

A. When discharging chemical spray on an individual or animal that is within the parameters for the use of non-deadly force, the authorized employee shall:

    a. The employee's chain of command;

    b. The Director of the Training Academy; and

    c. The Chief of Police

## 11.10.110 Use of Less Lethal Devices

The department may issue or make available less lethal devices (i.e., bean bag, etc.) to **authorized** employees who have successfully completed specialized training and/or qualification in the operation and use of these devices.

## 11.10.120 Use of Deadly Force in Self Defense

Authorized employees may use deadly force when they have a reasonable belief that the action is immediately necessary to prevent imminent death or serious bodily injury of a human being, including the employee.

## 11.10.130 Use of Deadly Force to Effect an Arrest

Authorized employees may use deadly force to effect the arrest of a fleeing felon only when:

A. The employee has probable cause to believe the individual to be arrested has committed a felony involving the infliction or threatened infliction of serious bodily injury; **AND**

B. The employee has probable cause to believe that the individual to be arrested poses a threat of death or serious bodily injury, either to the employee or to others unless immediately apprehended; **AND**

C. Where feasible, the employee has identified himself/herself as a police employee and given warning such as, **"STOP--POLICE--I'LL SHOOT,"** that deadly force is about to be used unless flight ceases; **AND**

D. If all other means of apprehension available to the employee under the attendant circumstances have been exhausted.

## 11.10.140 Administration of First-Aid

A. Whenever an employee is involved in a use of force incident in which a person sustains injuries or requests evaluation and/or treatment, the appropriate first-aid shall be administered either by the employee or others at the scene, by transporting the injured person to the hospital, and/or by summoning emergency medical personnel.

B. After <u>any</u> use of force, employees should inquire of the subject as to injuries or pre-existing medical conditions, regardless of whether they are obvious.  Where employees are informed or have reason to believe that a person, to whom any use of force has been applied, has an injury or pre-existing medical condition which places the subject at an increased risk of developing a medical crisis, employees shall provide immediate aid by transporting the injured person to the hospital, and/or by summoning emergency medical personnel.

C. After <u>any</u> use of force on an individual who has exhibited signs or symptoms of excited delirium, extreme drug/alcohol intoxication, extreme hyperactivity, or similar uncontrolled behaviors, employees shall provide immediate aid by summoning emergency medical personnel and/or by transporting the person to the hospital.

D. After <u>any</u> use of force on an individual who is suspected to have ingested contraband, evidence, or unknown suspicious substances; employees shall provide immediate aid by summoning emergency medical personnel and/or by transporting the person to the hospital.

E. After <u>any</u> use of force, at a minimum, employees shall notify receiving DCSO personnel of any known or observed injuries or pre-existing medical conditions so that the DCSO Nurse can conduct an informed intake interview and assessment.

F.  In a case when chemical spray is used the employee will:

   1. Monitor and verbally reassure the subject that the effects of the spray will normally subside in thirty to forty-five minutes;

   2. After the subject is secured, allow the subject proper ventilation to expedite the recovery period;

   3. If the individual experiences or complains of symptoms other than those normally associated with the use a chemical spray or does not show signs of recovery within the normally expected time period, they should be afforded immediate medical attention. Unusual symptoms include profuse sweating, respiratory problems, or chest and/or neck pain.  If these symptoms do occur the employee should administer first aid and call for an ambulance. Employees will also advise medical personnel that the individual has been exposed to chemical spray;

4. The Chemical Spray Aftercare Notice, MNPD Form 109, shall be provided to all individuals who have been exposed to the chemical spray; and

5. When transferring custody of a subject who has been exposed to chemical spray to medical personnel, Davidson County Sheriff's Office Personnel, or others, the employee shall advise the receiving personnel of the transferred subject's exposure to the chemical spray and the time of the exposure.

G. When the Taser® is used, either by probes or drive stun, the employee will:

1. Monitor and verbally reassure the subject that the effects of the Taser® will normally subside in a matter of minutes, if not immediately.

2. If the individual experiences or complains of symptoms other than those normally associated with the use of the Taser® or does not show signs of recovery within the normally expected time period, they should be afforded immediate medical attention. Employees will advise medical personnel that the individual has been exposed to the Taser®, and when custody is transferred, the transferring personnel shall also notify the receiving personnel that the subject has been exposed to the Taser®.

3. After Taser® use, the following persons shall be medically evaluated by emergency medical personnel or by an appropriate medical facility:

   a. Persons who are visibly pregnant or are at the extremes of age or physically disabled,

   b. Persons who had more than three (3) bursts applied via probes,

   c. Persons who had more than one CED effectively used in the same incident,

   d. Persons who have been subjected to a continuous burst of fifteen (15) seconds or more, or

   e. Persons described as requiring evaluation and/or treatment as described in Sections A or B above or the Guidelines for Probe Removal of the MNPD Taser® Student Manual.

 **Help prevent the spread of COVID-19 this holiday season**
For the safest Thanksgiving- EVERYONE should avoid travel and only gather with household members to prevent the further spread of COVID-19 in our region. **Discover tips for safer gatherings and ideas for alternative ways to celebrate**.

## Seattle Police Department Manual
Adrian Diaz, Chief of Police

# 8.200 - Using Force

Effective Date: 06/19/2020

## 1. Use of Force: When Authorized

An officer shall use only the force objectively reasonable, necessary, and proportional to effectively bring an incident or person under control, while protecting the life and safety of all persons.

In other words, officers shall only use objectively reasonable force, proportional to the threat or urgency of the situation, when necessary, to achieve a law-enforcement objective. The force used must comply with federal and state law and Seattle Police Department policies, and rules for specific weapons and tools. See **8.300 - Use of Force Tools**. Once it is safe to do so and the threat has ended, the force must stop.

**Use of Force Core Principles**

**Objectively Reasonable** defined

**Necessary** defined

**Proportional** defined

## 2. Use of Force: When Prohibited

- Officers are prohibited from using neck and carotid restraints in all circumstances

- An officer will not use force to punish or retaliate

- An officer will not use force against individuals who only verbally confront them unless the vocalization impedes a legitimate law enforcement function (See **5.160 – Observation of Officers**).

- An officer will not use force to stop a subject from swallowing a substance that is already in their mouth; however:

- Officers may use reasonable force, not including hands to the neck or insertion of any objects or hands into a subject's mouth, to **prevent** a suspect from putting a substance in their mouth

- In the event that an officer reasonably believes that a suspect has ingested a harmful substance, officers shall summon medical assistance as soon as feasible.

- An officer may not use force to extract a substance or item from inside the body of a suspect.

**Exception:** This prohibition does not apply when force is necessary to facilitate a forensic blood draw. In that situation, officers will document any use of reportable force.

## 3. Officers Should Assess and Modulate the Use-Of-Force as Resistance Changes

For example, as resistance decreases, the use of force may decrease.

## 4. Use of Deadly Force

Deadly force may only be used in circumstances where a threat of death or serious physical injury to the officer or others is imminent. A danger is imminent when an objectively reasonable officer would believe that:

- A suspect is acting or threatening to cause death or serious physical injury to the officer or others; and

- The suspect has the means or instrumentalities to do so; and

- The suspect has the opportunity and ability to use the means or instrumentalities to cause death or serious physical injury.

See also **8.050 – Deadly Force**

## 5. Deadly Force May Be Used to Prevent the Escape of a Fleeing Suspect Only When an Objectively Reasonable Officer Would Believe That it Is Necessary and That There is Probable Cause That:

- The suspect has committed or is in the process of committing a felony involving the infliction or threatened infliction of serious physical injury or death; and

- The escape of the suspect would pose an imminent danger of death or serious physical injury to the officer or to another person unless the suspect is apprehended without delay; and

- The officer has given a verbal warning to the suspect, if time, safety, and circumstances permit.

## 6. Officers May Only Use Force on Restrained Subjects When Objectively Reasonable, Necessary, and Proportional

Officers may only use objectively reasonable, necessary and proportional force on restrained subjects

(e.g. including handcuffed or contained in a law enforcement vehicle).

Officers may use objectively reasonable, necessary and proportional force to get subjects into or out of a law enforcement vehicle only after reasonable attempts to gain voluntary compliance have failed. When feasible, officers shall obtain supervisor approval prior to using force to remove a subject from a Department vehicle.

Officers may only use force on restrained subjects that would foreseeably result in a Type II or Type III investigation under exceptional circumstances when the subject's actions must be immediately stopped to prevent injury, escape, or destruction of property. All such force shall be closely and critically reviewed.

The investigating supervisor will consult with FIT regarding the classification of force used on restrained subjects when such force is not easily identifiable as de minimis or Type I.

## 7. Recognizing the Urgency of Providing Medical Aid and the Importance of Preserving Human Life, Following a Use-of-Force, Officers Will Evaluate the Subject for Injuries, Request Medical Aid if Needed or if Requested By Anyone, and Render Appropriate Medical Aid Within Their Training as Soon as Reasonably Possible

When safe and feasible, officers will request a medical aid response for any apparent injury, complaint of injury, or sign of medical distress for subjects and others even if the aid is declined. Officers will closely monitor subjects taken into custody.

After requesting a medical aid response, officers will render aid within the scope of their training unless aid is declined. Certified EMT officers should be given priority to render care, when feasible. Consent should be assumed for unconscious subjects or subjects incapable of providing consent.

**Exception**: A call for medical aid is not required for apparent injuries that can be treated by basic first aid (e.g. minor cuts and abrasions).

Absent exigent circumstances, prone subjects will be placed on their side in the recovery position or assisted to an upright position as soon as safe and feasible. Officers shall not restrain subjects who are in custody and under control in a manner that restricts the subject's ability to breathe.

## 8. Officers Shall Automatically Request Medical Aid in Certain Situations

Every Type III use-of-force.

The following less-lethal incidents:

- TASER applications

- 40 mm LL Launcher applications

After any use-of-force greater than Type I force on subjects who are reasonably believed or known to be:

- Pregnant

- Pre-adolescent children

- Elderly

- Physically frail or disabled

---

# Police

**Address:** <u>610 5th Avenue, Seattle, WA, 98104-1900</u>
**Mailing Address:** PO Box 34986, Seattle, WA, 98124-4986
**Phone:** (206) 625-5011



## City-Wide Information

Departments & Agencies List

Elected Officials

Open Data Portal

Public Information Requests

Services & Information

## SPD Information

1. Find a Police Job

2. Contact SPD

3. Police Locations

4. Crime Information

5. SPD Manual

The Seattle Police Department (SPD) prevents crime, enforces laws, and supports quality public safety by delivering respectful, professional, and dependable police services. SPD operates within a framework that divides the city into five geographical areas called "precincts". These precincts define east, west, north, south, and southwest patrol areas, with a police station in each.

Site Disclaimer: The Seattle Police Department's website was developed to provide general information. Data contained at this location is generally not reviewed for legal sufficiency. SPD documents displayed are for reference purposes only. Their completeness or currency are not guaranteed. Links or references to other information or organizations are for reference only and do not constitute an endorsement.

*© Copyright 1995-2020 City of Seattle*

About Our Digital Properties     Privacy Policy     Notice of Nondiscrimination     ADA Notice